## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD. AND H. LUNDBECK A/S, | |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | **C.A. No. 24-1004-JLH** |
| APOTEX INC., APOTEX CORP., APOTEX PHARMACHEM INC. AND APOSHERM DELAWARE HOLDINGS CORPORATION, | |
| Defendants. | |

### DEFENDANTS' AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT

Apotex Inc., Apotex Corp., Apotex Pharmachem Inc. and Aposherm Delaware Holdings Corporation (collectively, "Defendants") hereby submit the following Amended Answer, Defenses and Counterclaims in response to the Complaint for Patent Infringement ("Complaint") filed by Plaintiffs Otsuka Pharmaceutical Co., Ltd. ("Otsuka") and H. Lundbeck A/S ("Lundbeck") (collectively, "Plaintiffs"). According to Rule 8(b)(3), Defendants deny all allegations except those specifically admitted below.

### RESPONSE TO "NATURE OF THE ACTION"

1.     This is a civil action for patent infringement of U.S. Patent Nos. 10,525,057 ("the '057 patent"), 10,980,803 ("the '803 patent"), 11,154,553 ("the '553 patent"), 11,344,547 ("the '547 patent"), 11,400,087 ("the '087 patent") and 11,648,347 ("the '347 patent") (collectively, "patents in suit"), arising under the United States patent laws, Title 35, United States Code, § 100 *et. seq.*, including 35 U.S.C. §§ 271 and 281. This action relates to Defendants' filing of Abbreviated New Drug Application ("ANDA") No. 219381 under Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), seeking U.S. Food and Drug Administration ("FDA") approval to manufacture, use, import, offer to sell and/or sell aripiprazole for extended-release injectable suspension, 300 mg/vial and 400 mg/vial ("Defendants' generic products"), which are generic versions of Otsuka's ABILIFY MAINTENA® (aripiprazole), before the expiration of the patents in suit.

**ANSWER:** Paragraph 1 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the listed patents. Defendants deny any and all remaining allegations of Paragraph 1.

## RESPONSE TO "THE PARTIES"

2.      Otsuka is a corporation organized and existing under the laws of Japan with its corporate headquarters at 2-9 Kanda-Tsukasamachi, Chiyoda-ku, Tokyo, 101-8535, Japan.

**ANSWER**: Paragraph 2 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2, and therefore deny the allegations of Paragraph 2.

3.      Lundbeck is a corporation organized and existing under the laws of Denmark, with a place of business at Ottiliavej 9, DK-2500 Valby, Denmark. Otsuka has granted Lundbeck an exclusive license to the '057, the '803, the '553, the '547, the '087 and the '347 patents.

**ANSWER**: Paragraph 3 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and therefore deny the allegations of Paragraph 3.

4.      Otsuka and Lundbeck are engaged in the business of researching, developing and bringing to market innovative pharmaceutical products.

**ANSWER**: Paragraph 4 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4, and therefore deny the allegations of Paragraph 4.

5.      Upon information and belief, Apotex Inc. is a corporation organized and existing under the laws of Canada, with a principal place of business at 150 Signet Drive, Toronto, Ontario M9L 1T9, Canada.

**ANSWER**:  Paragraph 5 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Inc. is an entity organized and

existing under the laws of Canada and having a place of business at 150 Signet Drive, Toronto,

Ontario, M9L 1T9, Canada.  Defendants deny any and all remaining allegations of Paragraph 5.

6.      Upon information and belief, Apotex Corp. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2400 N. Commerce Parkway, Suite 400, Weston, FL 33326.

**ANSWER**:  Paragraph 6 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Corp. is an entity organized and

existing under the laws of Delaware and having a place of business at 2400 N. Commerce Parkway,

Suite 400, Weston, FL 33326.  Defendants deny any and all remaining allegations of Paragraph 6.

7.      Upon information and belief, Apotex Corp. is a wholly-owned subsidiary and United States agent of Apotex Inc.

**ANSWER:**  Paragraph 7 contains legal conclusions for which no answer is required.  To

the extent an answer is required, denied.

8.      Upon information and belief, Pharmachem is a corporation organized and existing under the laws of Canada, with a principal place of business at 34 Spalding Drive, Brantford, Ontario, Canada N3T DB8.

**ANSWER:**  Paragraph 8 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. is a corporation

organized under the laws of Canada with a place of business at 34 Spalding Dr. Brantford, ON

N3T 6B8.  Defendants deny any and all remaining allegations of Paragraph 8.  In addition,

Defendants state that Apotex Pharmachem Inc. is not a proper party.

9.      Upon information and belief, Pharmachem is a wholly-owned subsidiary of Apotex Inc.

**ANSWER:**  Paragraph 9 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. is wholly owned by Apotex Inc.  Defendants deny any and all remaining allegations of Paragraph 9.  In addition, Defendants state that Apotex Pharmachem Inc. is not a proper party.

10.      Upon information and belief, Aposherm is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2400 N. Commerce Parkway, Suite 400, Weston, FL 33326.

**ANSWER:**  Paragraph 10 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Aposherm Delaware Holdings Corporation is a Delaware corporation with a place of business at 2400 North Commerce Parkway 400, Weston, FL 33326-3253.  Defendants deny any and all remaining allegations of Paragraph 10.  In addition, Defendants state that Aposherm Delaware Holdings Corporation is not a proper party.

11.      Upon information and belief, Aposherm is the ultimate corporate parent of at least Apotex Corp.

**ANSWER**:  Paragraph 11 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Corp. is wholly owned by Aposherm Delaware Holdings Corporation.  Defendants deny any and all remaining allegations of Paragraph 11.  In addition, Defendants state that Aposherm Delaware Holdings Corporation is not a proper party.

<u>**RESPONSE TO "JURISDICTION AND VENUE"**</u>

12.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER**:  Paragraph 12 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the Complaint purports to state a claim under 28 U.S.C. §§ 1331 and 1338(a).  Further answering, subject matter jurisdiction is proper,

if at all, solely for Plaintiffs' alleged infringement claims against Apotex Inc. under 35 U.S.C.

§ 271(e)(2)(A).  Defendants deny any and all remaining allegations of Paragraph 12.

13.     This Court has personal jurisdiction over Apotex Inc. Upon information and belief, Apotex Inc. is in the business of manufacturing, marketing, importing and selling pharmaceutical drug products, including generic drug products. Upon information and belief, Apotex Inc. directly, or indirectly, develops, manufactures, markets and sells generic drugs throughout the United States and in this judicial district. Upon information and belief, Apotex Inc. purposefully has conducted and continues to conduct business in this judicial district, and this judicial district is a likely destination of Defendants' generic products.

**ANSWER**:  Paragraph 13 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Inc. does not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny

any and all remaining allegations of Paragraph 13.

14.     This Court also has personal jurisdiction over Apotex Inc. because it has previously been sued in this judicial district and has not challenged personal jurisdiction and/or it has affirmatively availed itself of the jurisdiction of this Court by filing claims and counterclaims in this judicial district. *See, e.g., Gilead Scis., Inc. v. Apotex Inc.*, C.A. No. 22-1399-MN (D. Del.); *Horizon Meds. LLC v. Apotex Inc.*, C.A. No. 22-640-CJB (D. Del.); *Galderma Lab'ys L.P. v. Apotex Inc.*, C.A. No. 22-724-SB (D. Del.); *Bayer Healthcare LLC v. Apotex Inc.*, C.A. No. 21-1429-WCB (D. Del.); *Zogenix, Inc. v. Apotex Inc.*, C.A. No. 21-1533-RGA (D. Del.); *Bial-Portela & CA S.A. v. Apotex Inc.*, C.A. No. 21-187-CFC (D. Del.); *Intercept Pharms., Inc. v. Apotex Inc.*, C.A. No. 20-1105-MN (D. Del.); *UCB, Inc. v. Annora Pharma Pvt. Ltd.*, C.A. No. 20-987-CFC (D. Del.); *Sanofi-Aventis U.S., LLC v. Actavis LLC*, C.A. No. 20-804-RGA (D. Del.); *Merck Sharp & Dohme Corp. v. Apotex Inc.*, C.A. No. 20-749-RGA (D. Del.); *Apotex Inc. v. Lupin Ltd.*, C.A. No. 15-357-LPS (D. Del.).

**ANSWER**:  Paragraph 14 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Inc. does not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny

any and all remaining allegations of Paragraph 14.

15.     Upon information and belief, Apotex Inc., either directly or indirectly, currently sells significant quantities of generic drug products in the United States and in this judicial district. Apotex Inc.'s website states: "Our Canadian roots and broad portfolio of generic, biosimilar, and innovative branded products make us the largest Canadian-based pharmaceutical company and a health partner of choice for the Americas for pharmaceutical licensing and product acquisitions." https://www.apotex.com/global/about-us/our-purpose (accessed Aug. 29, 2024). Similarly, upon

information and belief, Apotex Inc. states that "The Apotex Group of Companies is the largest Canadian-owned pharmaceutical company, providing more than 300 generic pharmaceutical products to the global healthcare market." https://www.apotex.com/ca/en/about-us/our-canadianfootprint (accessed Aug. 29, 2024).

**ANSWER**: Paragraph 15 contains legal conclusions for which no answer is required. To

the extent an answer is required, denied.

16.     Apotex Inc. states that by 2020, it was a "[t]op 10 player in the US generics market." https://www.apotex.com/global/about-us/our-story (accessed Aug. 29, 2024). Apotex Inc. also states that "In the USA, for the products which Apotex competes in, we have +30% market share." https://www.apotex.com/ca/en/business-development/north-american-business-opportunities (accessed Aug. 29, 2024).

**ANSWER**: Paragraph 16 contains legal conclusions for which no answer is required. To

the extent an answer is required, denied.

17.     Upon information and belief, Apotex Inc. regularly imports drug products into the United States. https://datadashboard.fda.gov/ora/cd/impentry-table.htm (searching manufacturer legal name: "Apotex Inc." yields 17,636 search results between Oct. 1, 2018 and Aug. 16, 2024) (last searched Aug. 29, 2024).

**ANSWER**: Paragraph 17 contains legal conclusions for which no answer is required. To

the extent an answer is required, Defendants admit that there are two U.S. sites including

warehousing and distribution (Plainfield, Indiana) and headquarters for Apotex Corp., a U.S.

affiliate (Weston, Florida). Defendants deny any and all remaining allegations of Paragraph 17.

18.     This Court has personal jurisdiction over Apotex Corp. Apotex Corp. is incorporated in the State of Delaware. Additionally, upon information and belief, Apotex Corp. is in the business of manufacturing, marketing, importing and selling pharmaceutical drug products, including generic drug products. Upon information and belief, Apotex Corp. directly, or indirectly, develops, manufactures, markets and sells generic drugs throughout the United States and in this judicial district. Upon information and belief, Apotex Corp. purposefully has conducted and continues to conduct business in this judicial district, and this judicial district is a likely destination of Defendants' generic products.

**ANSWER**: Paragraph 18 contains legal conclusions for which no answer is required. To

the extent an answer is required, Defendants admit that Apotex Corp. does not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny any and all remaining allegations of Paragraph 18.

19.     Upon information and belief, Apotex Corp. has an active pharmacy wholesale license in the State of Delaware with the license number A4-0001921 and an active controlled substances distributor/manufacturer license in the State of Delaware with the license number DM-0008873.

**ANSWER**:  Paragraph 19 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that current licensing of corporate entities may be verified at, *e.g.*, https://delpros.delaware.gov/OH_VerifyLicense.  Defendants deny any and all remaining allegations of Paragraph 19.

20.     Upon information and belief, Apotex Corp. regularly imports drug products into the United States.  https://datadashboard.fda.gov/ora/cd/impentry-table.htm  (searching manufacturer legal name: "Apotex Corp." yields 125 search results between Oct. 25, 2018 and Dec. 13, 2023) (last searched Aug. 29, 2024).

**ANSWER:**  Paragraph 20 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that there are two U.S. sites including warehousing and distribution (Plainfield, Indiana) and headquarters for Apotex Corp., a U.S. affiliate (Weston, Florida).  Defendants deny any and all remaining allegations of Paragraph 20.

21.     Upon information and belief, Apotex Corp. is a generic pharmaceutical company that, in coordination with or at the direction of Apotex Inc. and Aposherm, develops, manufactures, markets, imports and distributes generic pharmaceutical products for sale in the State of Delaware and throughout the United States.

**ANSWER:**  Paragraph 21 contains legal conclusions for which no answer is required.  Defendants admit that there are two U.S. sites including warehousing and distribution (Plainfield, Indiana) and headquarters for Apotex Corp., a U.S. affiliate (Weston, Florida).  Defendants deny any and all remaining allegations of Paragraph 21.

22.     Upon information and belief, Apotex Corp. is responsible for distributing and selling generic products in the United States on behalf of Apotex Inc. *See, e.g.*, Press Release, Apotex Corp., "Apotex Corp. Launches Brimonidine Tartrate Ophthalmic Solution, 0.1% in the United States" (Sept. 5, 2023), https://www.apotex.com/us/about-us/presscenter/2023/

09/05/apotex-corp.-launches-brimonidine-tartrate-ophthalmic-solution-0.1-in-theunited-states (accessed on Aug. 29, 2024) ("Apotex Corp. is a US based company, headquartered in Weston, Florida. It and its global affiliates are leaders in generic pharmaceuticals and biosimilars and are committed to supplying patients with a broad portfolio of high-quality, affordable medicines covering all major therapeutic areas.").

**ANSWER:**  Paragraph 22 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that there are two U.S. sites including warehousing and distribution (Plainfield, Indiana) and headquarters for Apotex Corp., a U.S. affiliate (Weston, Florida).  Defendants deny any and all remaining allegations of Paragraph 22.

23.    Upon information and belief, and consistent with its role with respect to other of Apotex Inc.'s generic products, Apotex Corp. is the United States agent for Defendants' generic products that are the subject of ANDA No. 219381. *See, e.g., Otsuka Pharm. Co., Ltd. v. Apotex Inc.*, C.A. No. 19-2006-LPS (D. Del.); *Pfizer Inc. v. Apotex Inc.*, C.A. No. 24-00621-CFC (D. Del.); *H. Lundbeck A/S v. Apotex Inc.*, C.A. No. 18-00088-LPS (D. Del.); *cf. Eagle Pharms., Inc. v. Apotex Inc.*, C.A. No. 24-00064-JLH (D. Del.).

**ANSWER**:  Paragraph 23 contains legal conclusions for which no answer is required.  To the extent that an answer is required, Defendants admit that Apotex Corp. is identified as the authorized U.S. agent for ANDA No. 219381.  Defendants deny any and all remaining allegations of Paragraph 23.

24.    Upon information and belief, Kiran Krishnan is presently Apotex Inc. and/or Apotex Corp.'s Senior Vice President of Global Regulatory Affairs, and "leads the company's efforts to develop top-level regulatory strategies, supporting the launch and commercialization of key products across the specialty, biosimilar, and generic portfolios." https://www.apotex.com/ca/en/about-us/our-leadership (accessed Aug. 29, 2024). Upon information and belief, Dr. Krishnan's LinkedIn page states that he is the "Senior Vice President [of] Global Regulatory & Medical Affairs" at Apotex Corp. in Weston, Florida. https://www.linkedin.com/in/kirankrishnanki20 (accessed Aug. 29, 2024). Upon information and belief, Dr. Krishnan handles communications with the FDA on behalf of Apotex Corp. and Apotex Inc. with respect to Defendants' regulatory filings including ANDAs. *See, e.g.*, Jan. 9, 2024 Letter to Kiran Krishnan, PhD, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/211195 Orig1s000ltr.pdf (accessed Aug. 29, 2024); Jan. 5, 2024 Letter to Kiran Krishnan, PhD, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/203640Orig1s000ltr.pdf (accessed Aug. 29, 2024).

**ANSWER**:  Paragraph 24 contains legal conclusions for which no answer is required.  To the extent that an answer is required, Defendants admit that Kiran Krishnan, Senior Vice President,

GRA, is identified in Form FDA 356h as the applicant's responsible official for ANDA No. 219381. Defendants deny any and all remaining allegations of Paragraph 24.

25.    This Court has personal jurisdiction over Pharmachem. Upon information and belief, Pharmachem is in the business of manufacturing, marketing, importing and selling pharmaceutical drug products, including generic drug products. Upon information and belief, Pharmachem directly, or indirectly, develops, manufactures, markets and sells generic drugs throughout the United States and in this judicial district. Upon information and belief, Pharmachem purposefully has conducted and continues to conduct business in this judicial district, and this judicial district is a likely destination of Defendants' generic products.

**ANSWER**:  Paragraph 25 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. does not contest personal jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny any and all remaining allegations of Paragraph 25.

26.    This Court also has personal jurisdiction over Pharmachem because it has previously been sued in this judicial district and has not challenged personal jurisdiction. *See, e.g.*, D.I. 11 at ¶ 15, *Otsuka Pharm. Co., Ltd. v. Apotex Inc.*, C.A. No. 1:19-cv-2006-LPS (D. Del. Mar. 13, 2020).

**ANSWER**:  Paragraph 26 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. does not contest personal jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny any and all remaining allegations of Paragraph 26.

27.    Upon information and belief, Pharmachem is the holder of FDA Drug Master File ("DMF") No. 19957 for aripiprazole USP.

**ANSWER**:  Paragraph 27 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. is the holder of DMF No. 19957 for "ARIPIPRAZOLE USP."  Defendants deny any and all remaining allegations of Paragraph 27.

28.    Upon information and belief, Pharmachem is treated as a "division of Apotex" and is "Canada's largest producer of active pharmaceutical ingredients." https://www.apotex.com/ca/en/about-us/press-center/2020/05/26/canada-s-

largestpharmaceutical-manufacturer-donates-thousands-of-bottles-of-hand-sanitizer-to-hospitals-acrossquebec (accessed Aug. 29, 2024). Upon information and belief, Apotex Inc.'s website formerly included a page titled "Apotex Pharmachem Inc (API), Brantford, ON, Canada," which was removed from Apotex's website in early August 2024. https://www.apotex.com/ global/apisales/manufacturing-facilities/api-brantford-canada (last accessed July 29, 2024) (webpage now displaying "file or directory not found"); *see also* https://web.archive.org/web/20240419162722/https://www.apotex.com/global/apisales/manufact uring-facilities/api-brantford-canada (archived Apr. 19, 2024; accessed Aug. 29, 2024). Upon information and belief, Apotex Inc. described Pharmachem as "the centre of excellence for API R&D with cGMP API manufacturing capabilities for the Apotex group of companies." https://web.archive.org/web/20240419162722/https://www.apotex.com/global/apisales/manufact uring-facilities/api-brantford-canada (archived Apr. 19, 2024; accessed Aug. 29, 2024). Upon information and belief, Apotex Inc. further described Pharmachem as a "key strategic component to Apotex's supply chain." *Id.*

**ANSWER**: Paragraph 28 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. and Apotex Inc.

are corporate affiliates.  Defendants deny any and all remaining allegations of Paragraph 28.

29.    This Court has personal jurisdiction over Aposherm. Aposherm is incorporated in the State of Delaware. Additionally, upon information and belief, Aposherm is in the business of manufacturing, marketing, importing and selling pharmaceutical drug products, including generic drug products. Upon information and belief, Aposherm directly, or indirectly, develops, manufactures, markets and sells generic drugs throughout the United States and in this judicial district. Upon information and belief, Aposherm purposefully has conducted and continues to conduct business in this judicial district, and this judicial district is a likely destination of Defendants' generic products.

**ANSWER**: Paragraph 29 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Aposherm Delaware Holdings Corporation

does not contest personal jurisdiction in this judicial district for the limited purpose of this action

only.  Defendants deny any and all remaining allegations of Paragraph 29.

30.    Upon information and belief, since September 2021, Aposherm has been identified by Apotex Inc. and/or Apotex Corp. as a real party-in-interest in proceedings before the Patent Trial and Appeal Board ("PTAB") involving Apotex Inc. and/or Apotex Corp. as petitioner(s). *See, e.g., Apotex Inc. v. Novo Nordisk A/S*, IPR2024-00631, Paper No. 1 (PTAB Mar. 1, 2024); *Apotex Inc. v. Celgene Corp.*, IPR2023-00512, Paper No. 1 (PTAB Feb. 10, 2023); *Apotex Inc. v. Regeneron Pharms., Inc.*, IPR2022-01524, Paper No. 1 (PTAB Sept. 9, 2022), IPR2022-00298, Paper No. 1 (PTAB Dec. 9, 2021), IPR2022-00301, Paper No. 1 (PTAB Dec. 9, 2021); *Apotex Inc. & Apotex Corp. v. Auspex Pharms., Inc.*, IPR2021-01507, Paper No. 2 (PTAB Sept. 8, 2021).

**ANSWER**: Paragraph 30 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Aposherm Delaware Holdings Corporation does not contest personal jurisdiction in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 30.

31.    Upon information and belief, Aposherm has been identified as a parent company, and as having "direct or indirect interests in companies that develop, manufacture, and/or sell generic drugs and therefore [as being] interested in the issues identified," in federal lobbying reports filed by Apotex Corp. *See, e.g.*, Apotex Corp. Lobbying Report regarding "HR 938, the Bringing Low-cost Options and Competition while Keeping Incentives for new Generics (BLOCKING) Act of 2019, provisions relating to the Hatch-Waxman Acts 180-day exclusivity framework," https://lda.senate.gov/filings/public/filing/047446ee-2adc-4235-919fda43fcca0e3a/print/ (accessed Aug. 29, 2024).

**ANSWER**: Paragraph 31 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Aposherm Delaware Holdings Corporation does not contest personal jurisdiction in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 31.

32.    Upon information and belief, Apotex Holdco Inc., an active corporation registered under the laws of Ontario, Canada as of March 20, 2024, has been identified as a corporate parent of at least Apotex Inc. in Rule 7.1 statements filed by Apotex Inc. and Apotex Corp. in litigation in this District. *See, e.g.*, D.I. 14, *Pfizer Inc. v. Apotex Inc.*, C.A. No. 24-00621-CFC (D. Del.); D.I. 7, *Apotex Inc. v. Boehringer Ingelheim Pharms. Inc.*, C.A. No. 24-00577 (D. Del.); D.I. 13, *Mitsubishi Tanabe Pharma Corp. v. Apotex Inc.*, C.A. No. 24-549-JLH (D. Del.). At various points in time, other entities including Apotex Pharmaceutical Holdings Inc. (formerly incorporated in Ontario, Canada and inactive as of April 1, 2024) and Apotex Holdings Inc. (formerly incorporated in Ontario, Canada and inactive as of April 1, 2022) have also been identified as a corporate parent of at least Apotex Inc.; and in 2023, SK Capital Partners, LP acquired at least the former Apotex Pharmaceutical Holdings Inc. *See, e.g.*, D.I. 15, *Vanda Pharms. Inc. v. Apotex Inc.*, C.A. No. 21-282-CFC (D. Del.); D.I. 9, *Eagle Pharms., Inc. v. Apotex Inc.*, C.A. No. 24-00064-JLH (D. Del.); Press Release, SK Capital completes acquisition of Apotex, a global leader in affordable pharmaceuticals, Apr. 3, 2023, https://www.apotex.com/ca/en/about-us/press-center/2023/04/03/sk-capital-completesacquisition-of-apotex-a-global-leader-in-affordable-pharmaceuticals (accessed Aug. 29, 2024). The extent and details of Apotex Holdco Inc.'s corporate relationship with the aforementioned entities and with Defendants Apotex Inc., Apotex Corp., Pharmachem and Aposherm is not clear at this time based on publicly available information.

**ANSWER**: Paragraph 32 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Defendants do not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny

any and all remaining allegations of Paragraph 32.

33.      Upon information and belief, Defendants hold themselves out as a unitary entity and operate as a single integrated business with respect to the regulatory approval, manufacturing, marketing, sale and distribution of generic pharmaceutical products throughout the United States, including in this judicial district and including for Defendants' generic products that are the subject of ANDA No. 219381.

**ANSWER**:  Paragraph 33 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Defendants do not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny

any and all remaining allegations of Paragraph 33.

34.      Upon information and belief, Apotex Inc. represents that it is "a vertically integrated company, with experience in active pharmaceutical ingredients (API) and finished product."      https://www.apotex.com/mx/en/business-development/benefits-of-associating-with apotex (accessed Aug. 29, 2024).

**ANSWER**:  Paragraph 34 contains legal conclusions for which no answer is required.  To

the extent an answer is required, denied.

35.      Defendants' ANDA filing regarding the patents in suit relates to this litigation and is substantially connected with this judicial district because it reliably and non-speculatively predicts Defendants' intent to market and sell Defendants' generic products in this judicial district.

**ANSWER**:  Paragraph 35 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Defendants do not contest personal

jurisdiction in this judicial district for the limited purpose of this action only.  Defendants deny

any and all remaining allegations of Paragraph 35.

36.      Defendants have taken the significant step of applying to the FDA for approval to engage in future activities—including the marketing of its generic drugs—which, upon information and belief, will be purposefully directed at the District of Delaware and elsewhere throughout the United States. Upon information and belief, Defendants intend to direct sales of their generic drugs in this judicial district, among other places, once Defendants receive the requested FDA approval to market their generic products. Upon information and belief, Defendants will engage in marketing of their proposed generic products in Delaware upon approval of their ANDA.

**ANSWER:** Paragraph 36 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Defendants do not contest personal jurisdiction in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 36.

37.     Upon information and belief, Defendants have thus been, and continue to be, joint and prime actors in the drafting, submission, approval and maintenance of ANDA No. 219381 and intend to benefit from the ANDA.

**ANSWER**: Paragraph 37 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Defendants do not contest personal jurisdiction in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 37.

38.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because Apotex Inc. is incorporated in Canada and may be sued in any judicial district in the United States in which it is subject to the Court's personal jurisdiction.

**ANSWER**: Paragraph 38 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Inc. does not contest venue in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 38.

39.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because Apotex Corp. is incorporated in Delaware.

**ANSWER**: Paragraph 39 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Corp. does not contest venue in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 39.

40.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because Pharmachem is incorporated in Canada and may be sued in any judicial district in the United States in which it is subject to the Court's personal jurisdiction.

**ANSWER**: Paragraph 40 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Pharmachem Inc. does not contest venue in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 40.

41.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), because Aposherm is incorporated in Delaware.

**ANSWER**: Paragraph 41 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Aposherm Delaware Holdings Corporation does not contest venue in this judicial district for the limited purpose of this action only. Defendants deny any and all remaining allegations of Paragraph 41.

## RESPONSE TO "FACTUAL BACKGROUND"

## RESPONSE TO "The NDA"

42.    Otsuka is the holder of New Drug Application ("NDA") No. 202971 for ABILIFY MAINTENA® (aripiprazole for extended-release injectable suspension) in strengths of 300 mg and 400 mg vials and pre-filled syringes.

**ANSWER**: Paragraph 42 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971 and lists "OTSUKA PHARMACEUTICAL CO LTD" as "Applicant Holder." Defendants deny any and all remaining allegations of Paragraph 42.

43.    The FDA approved NDA No. 202971 on February 28, 2013.

**ANSWER**: Paragraph 43 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies the approval date for NDA No. 202971 as February 28, 2013. Defendants deny any and all remaining allegations of Paragraph 43.

44.     ABILIFY MAINTENA® is a prescription drug approved for the treatment of schizophrenia and maintenance monotherapy treatment of bipolar I disorder.  Aripiprazole is the active ingredient in ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 44 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that prescribing information states:

---

**1     INDICATIONS AND USAGE**

ABILIFY MAINTENA (aripiprazole) is indicated for:
- Treatment of schizophrenia in adults *[see Clinical Studies (14.1)]*
- Maintenance monotherapy treatment of bipolar I disorder in adults *[see Clinical Studies (14.2)]*

---

Defendants deny any and all remaining allegations of Paragraph 44.

## RESPONSE TO "The Patents in Suit"

45.     The United States Patent and Trademark Office ("PTO") issued the '057 patent on January 7, 2020, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '057 patent is attached as Exhibit A.

**ANSWER**:  Paragraph 45 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that, according to online records of the United

States Patent and Trademark Office ("PTO"), the 057 patent, which is titled "METHOD OF

PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4

ENZYME FUNCTION," issued on or about January 7, 2020.  Defendants further admit that a

document purporting to be a copy of the 057 patent is attached to the Complaint as Exhibit A.

Defendants deny any and all remaining allegations of Paragraph 45.

46.     Otsuka owns the '057 patent through assignment as recorded by the PTO at Reel 033071, Frame 0910.

**ANSWER**:  Paragraph 46 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that the PTO's electronic records show that

"Otsuka Pharmaceutical Co., Ltd." is the assignee of "the non-provisional application bearing

Application No. 14/034,727 and filed on September 25, 2013," and that such records are available at Reel 033071, Frame 0910.  Defendants deny any and all remaining allegations of Paragraph 46.

47.    The '057 patent expires on March 8, 2034, by virtue of 165 days of patent term adjustment granted to the '057 patent under 35 U.S.C. § 154(b). A true and correct copy of the patent term adjustment is attached as Exhibit B.

**ANSWER**:  Paragraph 47 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists the expiration date of the 057 patent as March 8, 2034.  Defendants further admit that a document purporting to be a copy of the PTO's Issue Notification for the 057 patent is attached to the Complaint as Exhibit B.  Defendants deny any and all remaining allegations of Paragraph 47.

48.    The '057 patent is listed in Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book") in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 48 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971, and lists the 057 patent in connection with ABILIFY MAINTENA KIT.  Defendants deny any and all remaining allegations of Paragraph 48.

49.    The PTO issued the '803 patent on April 20, 2021, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '803 patent is attached as Exhibit C.

**ANSWER**:  Paragraph 49 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that, according to the online records of the PTO, the 803 patent, which is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION," issued on or about April 20, 2021.  Defendants further admit that a document purporting to be a copy of the

803 patent is attached to the Complaint as Exhibit C.  Defendants deny any and all remaining allegations of Paragraph 49.

50.    Otsuka owns the '803 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER:**  Paragraph 50 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the PTO's electronic records show that "Otsuka Pharmaceutical Co., Ltd." is the assignee of "the non-provisional application bearing Application No. 14/034,727 and filed on September 25, 2013," and that such records are available at Reel 033071, Frame 0910.  Defendants deny any and all remaining allegations of Paragraph 50.

51.    The '803 patent expires on September 24, 2033.

**ANSWER:**  Paragraph 51 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists the expiration date of the 803 patent as September 24, 2033.  Defendants deny any and all remaining allegations of Paragraph 51.

52.    The '803 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 52 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971, and lists the 803 patent in connection with ABILIFY MAINTENA KIT.  Defendants deny any and all remaining allegations of Paragraph 52.

53.    The PTO issued the '553 patent on October 26, 2021, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '553 patent is attached as Exhibit D.

**ANSWER**:  Paragraph 53 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that, according to the online records of the

PTO, the 553 patent, which is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO

PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION," issued on or

about October 26, 2021. Defendants further admit that a document purporting to be a copy of the

553 patent is attached to the Complaint as Exhibit D. Defendants deny any and all remaining

allegations of Paragraph 53.

54.    Otsuka owns the '553 patent through assignment as recorded by the PTO for the

'057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Paragraph 54 contains legal conclusions for which no answer is required. To

the extent an answer is required, Defendants admit that the PTO's electronic records show that

"Otsuka Pharmaceutical Co., Ltd." is the assignee of "the non-provisional application bearing

Application No. 14/034,727 and filed on September 25, 2013," and that such records are available

at Reel 033071, Frame 0910. Defendants deny any and all remaining allegations of Paragraph 54.

55.    The '553 patent expires on September 24, 2033.

**ANSWER**:  Paragraph 55 contains legal conclusions for which no answer is required. To

the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists

the expiration date of the 553 patent as September 24, 2033. Defendants deny any and all

remaining allegations of Paragraph 55.

56.    The '553 patent is listed in the Orange Book in connection with NDA No. 202971

for ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 56 contains legal conclusions for which no answer is required. To

the extent an answer is required, Defendants admit that the electronic version of FDA's Orange

Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971, and lists the 553 patent in

connection with ABILIFY MAINTENA KIT. Defendants deny any and all remaining allegations

of Paragraph 56.

57.    The PTO issued the '547 patent on May 31, 2022, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '547 patent is attached as Exhibit E.

**ANSWER**:  Paragraph 57 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that, according to the online records of the PTO, the 547 patent, which is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION," issued on or about May 31, 2022.  Defendants further admit that a document purporting to be a copy of the 547 patent is attached to the Complaint as Exhibit E.  Defendants deny any and all remaining allegations of Paragraph 57.

58.    Otsuka owns the '547 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Paragraph 58 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the PTO's electronic records show that "Otsuka Pharmaceutical Co., Ltd." is the assignee of "the non-provisional application bearing Application No. 14/034,727 and filed on September 25, 2013," and that such records are available at Reel 033071, Frame 0910.  Defendants deny any and all remaining allegations of Paragraph 58.

59.    The '547 patent expires on September 24, 2033.

**ANSWER**:  Paragraph 59 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists the expiration date of the 547 patent as September 24, 2033.  Defendants deny any and all remaining allegations of Paragraph 59.

60.    The '547 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 60 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange

Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971, and lists the 547 patent in connection with ABILIFY MAINTENA KIT.  Defendants deny any and all remaining allegations of Paragraph 60.

61.    The PTO issued the '087 patent on August 2, 2022, titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function." A true and correct copy of the '087 patent is attached as Exhibit F.

**ANSWER**:  Paragraph 61 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that, according to the online records of the PTO, the 087 patent, which is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION," issued on or about August 2, 2022.  Defendants further admit that a document purporting to be a copy of the 087 patent is attached to the Complaint as Exhibit F.  Defendants deny any and all remaining allegations of Paragraph 61.

62.    Otsuka owns the '087 patent through assignment as recorded by the PTO for the '057 patent at Reel 033071, Frame 0910.

**ANSWER**:  Paragraph 62 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the PTO's electronic records show that "Otsuka Pharmaceutical Co., Ltd." is the assignee of "the non-provisional application bearing Application No. 14/034,727 and filed on September 25, 2013," and that such records are available at Reel 033071, Frame 0910.  Defendants deny any and all remaining allegations of Paragraph 62.

63.    The '087 patent expires on September 24, 2033.

**ANSWER**:  Paragraph 63 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists the expiration date of the 087 patent as September 24, 2033.  Defendants deny any and all remaining allegations of Paragraph 63.

64.    The '087 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER:**  Paragraph 64 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971 and lists the 087 patent in connection with ABILIFY MAINTENA KIT.  Defendants deny any and all remaining allegations of Paragraph 64.

65.    The PTO issued the '347 patent on May 16, 2023, titled "Medical Device Containing a Cake Composition Comprising Aripiprazole as an Active Ingredient, and a Cake Composition Comprising Aripiprazole as an Active Ingredient." A true and correct copy of the '347 patent is attached as Exhibit G.

**ANSWER**:  Paragraph 65 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that, according to the online records of the PTO, the 347 patent, which is titled "MEDICAL DEVICE CONTAINING A CAKE COMPOSITION COMPRISING ARIPIPRAZOLE AS AN ACTIVE INGREDIENT, AND A CAKE COMPOSITION COMPRISING ARIPIPRAZOLE AS AN ACTIVE INGREDIENT," issued on or about May 16, 2023.  Defendants further admit that a document purporting to be a copy of the 347 patent is attached to the Complaint as Exhibit G.  Defendants deny any and all remaining allegations of Paragraph 65.

66.    Otsuka owns the '347 patent through assignment as recorded by the PTO at Reel 030905, Frame 0822.

**ANSWER**:  Paragraph 66 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the PTO's electronic records show that "Otsuka Pharmaceutical Co., Ltd." is the assignee of United States Patent Application No. 13/981,229, and that such records are available at Reel 030905, Frame 0822.  Defendants deny any and all remaining allegations of Paragraph 66.

67.     The '347 patent expires on April 6, 2034, by virtue of 257 days of patent term adjustment granted to the '347 patent under 35 U.S.C. § 154(b). A true and correct copy of the patent term adjustment is attached as Exhibit H.

**ANSWER**:  Paragraph 67 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the FDA's electronic Orange Book lists the expiration date of the 347 patent as April 6, 2034.  Defendants further admit that a document purporting to be a copy of the PTO's Issue Notification for the 347 patent is attached to the Complaint as Exhibit H.  Defendants deny any and all remaining allegations of Paragraph 67.

68.     The '347 patent is listed in the Orange Book in connection with NDA No. 202971 for ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 68 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the electronic version of FDA's Orange Book identifies "ABILIFY MAINTENA KIT" for NDA No. 202971 and lists the 347 patent in connection with ABILIFY MAINTENA KIT.  Defendants deny any and all remaining allegations of Paragraph 68.

**RESPONSE TO "The ANDA"**

69.     Upon information and belief, Defendants submitted ANDA No. 219381 with the FDA under 21 U.S.C. § 355(j) seeking FDA approval to engage in the manufacture, use, and/or sale in the United States of aripiprazole for extended-release injectable suspension, 300 mg/vial and 400 mg/vial (defined above as "Defendants' generic products"), which is a generic version of Otsuka's ABILIFY MAINTENA® (aripiprazole).

**ANSWER**:  Paragraph 69 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial ("ANDA Products").  Defendants deny any and all remaining allegations of Paragraph 69.

70.     Upon information and belief, ANDA No. 219381 contains certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("paragraph IV certifications"), alleging that the claims of the

patents in suit are invalid, unenforceable and/or would not be infringed by Defendants' generic products.

**ANSWER**:  Paragraph 70 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 contains, *inter alia*, patent certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), which state that the Patents-in-Suit are invalid, unenforceable and/or will not be infringed by the manufacture, use, or sale of the ANDA Products.  Defendants deny any and all remaining allegations of Paragraph 70.

71.    Otsuka received a letter sent by Defendants, dated July 17, 2024, purporting to be a "Notification of Certification of Invalidity, Unenforceability, and/or Non-Infringement" for an ANDA, ("Defendants' Notice Letter") pursuant to § 505(j)(2)(B) of the Federal Food, Drug and Cosmetic Act and 21 C.F.R. § 314.95. Defendants' Notice Letter identified Defendants' ANDA as "ANDA No. 219381." Defendants' Notice Letter included an enclosure purporting to be a detailed factual and legal basis for Apotex's paragraph IV certification that the patents in suit are invalid, unenforceable, and/or will not be infringed.

**ANSWER**:  Paragraph 71 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. sent a Notice Letter dated July 17, 2024 to Plaintiffs.  Further answering, Defendants admit that Apotex Inc.'s Notice Letter notified Plaintiffs that Apotex Inc. submitted ANDA No. 219381 to FDA under 21 U.S.C. § 355(j), which contains, *inter alia*, patent certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), which state that the Patents-in-Suit are invalid, unenforceable and/or will not be infringed by the manufacture, use, or sale of the ANDA Products.  Defendants deny any and all remaining allegations of Paragraph 71.

72.    Defendants' Notice Letter states that Defendants had filed ANDA No. 219381 seeking "to obtain approval to engage in the commercial manufacture, use or sale" of Defendants' generic products before the expiration of the patents in suit.

**ANSWER**:  Paragraph 72 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc.'s Notice Letter states that Apotex Inc. submitted ANDA No. 219381 "to obtain approval to engage in the commercial

manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before the expiration of the 057, 803, 553, 547, 087, and 347 patents." Defendants deny any and all remaining allegations of Paragraph 72.

73.    Plaintiffs commenced this action within 45 days of receiving Defendants' Notice Letter.

**ANSWER**:  Paragraph 73 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that the Complaint was filed on August 30, 2024.  Defendants deny any and all remaining allegations of Paragraph 73.

## **RESPONSE TO "COUNT I"**

## **RESPONSE TO "(INFRINGEMENT OF THE '057 PATENT)"**

74.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER**:  Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

75.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '057 patent.

**ANSWER**:  Paragraph 75 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 75.

76.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '057 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 76 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. included Paragraph IV

certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 76.

77.    Upon information and belief, Defendants concede infringement of at least one claim of the '057 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement.

**ANSWER**:  Denied.

78.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 78 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA requirements regarding bioequivalence.  Defendants deny any and all remaining allegations of Paragraph 78.

79.    Defendants have actual knowledge of the '057 patent, as evidenced by Defendants' Notice Letter.

**ANSWER**:  Paragraph 79 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-in-Suit is evidenced by its Notice Letter.  Defendants deny any and all remaining allegations of Paragraph 79.

80.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '057 patent by submitting, or causing to be submitted, to the FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '057 patent.

**ANSWER**:  Denied.

81.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will infringe one or more claims of the '057 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic

products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 219381 shall be no earlier than the expiration of the '057 patent and any additional periods of exclusivity.

**ANSWER**:  Denied.

82.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 219381, and therefore will infringe at least one claim of the '057 patent.

**ANSWER**:  Denied.

83.    Upon information and belief, Defendants have knowledge of the '057 patent and, by their proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '057 patent, either literally or under the doctrine of equivalents.

**ANSWER**:  Denied.

84.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '057 patent.

**ANSWER**:  Denied.

85.    Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

**ANSWER**:  Paragraph 85 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 85.

86.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

**ANSWER**:  Denied.

87.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER**:  Denied.

88.    Plaintiffs do not have an adequate remedy at law.

**ANSWER**:  Denied.

**RESPONSE TO "COUNT II"**

**RESPONSE TO "(INFRINGEMENT OF THE '803 PATENT)"**

89.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER**:  Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

90.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '803 patent.

**ANSWER**:  Paragraph 90 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 90.

91.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '803 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 91 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable

Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 91.

92.    Upon information and belief, Defendants concede infringement of at least one claim of the '803 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement.

**ANSWER**:  Denied.

93.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 93 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA requirements regarding bioequivalence.  Defendants deny any and all remaining allegations of Paragraph 93.

94.    Defendants have actual knowledge of the '803 patent, as evidenced by Defendants' Notice Letter.

**ANSWER**:  Paragraph 94 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-in-Suit is evidenced by its Notice Letter.  Defendants deny any and all remaining allegations of Paragraph 94.

95.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '803 patent by submitting, or causing to be submitted, to the FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '803 patent.

**ANSWER**:  Denied.

96.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will infringe one or more claims of the '803 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 219381 shall be no earlier than the expiration of the '803 patent and any additional periods of exclusivity.

**ANSWER**: Denied.

97.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 219381, and therefore will infringe at least one claim of the '803 patent.

**ANSWER**: Denied.

98.    Upon information and belief, Defendants have knowledge of the '803 patent and, by their proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '803 patent, either literally or under the doctrine of equivalents.

**ANSWER**: Denied.

99.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '803 patent.

**ANSWER**: Denied.

100.    Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

**ANSWER**:  Paragraph 100 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 100.

101.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

**ANSWER**:  Denied.

102.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER**:  Denied.

103.    Plaintiffs do not have an adequate remedy at law.

**ANSWER**: Denied.

## RESPONSE TO "COUNT III"

## RESPONSE TO "(INFRINGEMENT OF THE '553 PATENT)"

104.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER**: Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

105.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '553 patent.

**ANSWER**: Paragraph 105 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 105.

106.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '553 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 106 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 106.

107.    Upon information and belief, Defendants concede infringement of at least one claim of the '553 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement.

**ANSWER**: Denied.

108.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**: Paragraph 108 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA requirements regarding bioequivalence. Defendants deny any and all remaining allegations of Paragraph 108.

109.    Defendants have actual knowledge of the '553 patent, as evidenced by Defendants' Notice Letter.

**ANSWER**: Paragraph 109 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-in-Suit is evidenced by its Notice Letter. Defendants deny any and all remaining allegations of Paragraph 109.

110.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '553 patent by submitting, or causing to be submitted, to the FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '553 patent.

**ANSWER**: Denied.

111.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will infringe one or more claims of the '553 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 219381 shall be no earlier than the expiration of the '553 patent and any additional periods of exclusivity.

**ANSWER**: Denied.

112.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 219381, and therefore will infringe at least one claim of the '553 patent.

**ANSWER**: Denied.

113.     Upon information and belief, Defendants have knowledge of the '553 patent and, by their proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '553 patent, either literally or under the doctrine of equivalents.

**ANSWER**:  Denied.

114.     Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '553 patent.

**ANSWER**:  Denied.

115.     Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

**ANSWER**:  Paragraph 115 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 115.

116.     Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

**ANSWER**:  Denied.

117.     Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER**:  Denied.

118.     Plaintiffs do not have an adequate remedy at law.

**ANSWER**:  Denied.

## **RESPONSE TO "COUNT IV"**

## **RESPONSE TO "(INFRINGEMENT OF THE '547 PATENT)"**

119.     Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER**:  Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

120.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '547 patent.

**ANSWER**:  Paragraph 120 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 120.

121.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '547 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 121 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 121.

122.    Upon information and belief, Defendants concede infringement of at least one claim of the '547 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement.

**ANSWER**:  Denied.

123.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 123 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA

requirements regarding bioequivalence.  Defendants deny any and all remaining allegations of

Paragraph 123.

124.    Defendants have actual knowledge of the '547 patent, as evidenced by Defendants'
Notice Letter.

**ANSWER**:  Paragraph 124 contains legal conclusions for which no answer is required.  To

the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-

in-Suit is evidenced by its Notice Letter.  Defendants deny any and all remaining allegations of

Paragraph 124.

125.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have
infringed one or more claims of the '547 patent by submitting, or causing to be submitted, to the
FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell
Defendants' generic products before the expiration date of the '547 patent.

**ANSWER**:  Denied.

126.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will
infringe one or more claims of the '547 patent under § 271(a), either literally or under the doctrine
of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic
products, and/or by actively inducing infringement by others under § 271(b) and/or contributing
to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval
of ANDA No. 219381 shall be no earlier than the expiration of the '547 patent and any additional
periods of exclusivity.

**ANSWER**:  Denied.

127.    Upon information and belief, Defendants know, should know and intend that
physicians will prescribe and patients will take Defendants' generic products for which approval
is sought in ANDA No. 219381, and therefore will infringe at least one claim of the '547 patent.

**ANSWER**:  Denied.

128.    Upon information and belief, Defendants have knowledge of the '547 patent and,
by their proposed package insert for Defendants' generic products, know or should know that it
will induce direct infringement of at least one claim of the '547 patent, either literally or under the
doctrine of equivalents.

**ANSWER**:  Denied.

129.    Upon information and belief, Defendants are aware and/or have knowledge that
their proposed package insert will recommend, suggest, encourage and/or instruct others how to

engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '547 patent.

      **ANSWER**:  Denied.

      130.    Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

      **ANSWER**:  Paragraph 130 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 130.

      131.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

      **ANSWER**:  Denied.

      132.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

      **ANSWER**:  Denied.

      133.    Plaintiffs do not have an adequate remedy at law.

      **ANSWER**:  Denied.

**RESPONSE TO "COUNT V"**

**RESPONSE TO "(INFRINGEMENT OF THE '087 PATENT)"**

      134.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

      **ANSWER**:  Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

      135.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '087 patent.

**ANSWER**:  Paragraph 135 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 135.

136.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '087 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 136 contains legal conclusions for which no answer is required. Defendants admit that Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 136.

137.    Upon information and belief, Defendants concede infringement of at least one claim of the '087 patent because Defendants' Notice Letter did not provide non-infringement allegations addressing induced infringement.

**ANSWER**:  Denied.

138.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**: Paragraph 138 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA requirements regarding bioequivalence.  Defendants deny any and all remaining allegations of Paragraph 138.

139.    Defendants have actual knowledge of the '087 patent, as evidenced by Defendants' Notice Letter.

**ANSWER**: Paragraph 139 contains legal conclusions for which no answer is required. To the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-in-Suit is evidenced by its Notice Letter. Defendants deny any and all remaining allegations of Paragraph 139.

140.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '087 patent by submitting, or causing to be submitted, to the FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '087 patent.

**ANSWER**: Denied.

141.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will infringe one or more claims of the '087 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 219381 shall be no earlier than the expiration of the '087 patent and any additional periods of exclusivity.

**ANSWER**: Denied.

142.    Upon information and belief, Defendants know, should know and intend that physicians will prescribe and patients will take Defendants' generic products for which approval is sought in ANDA No. 219381, and therefore will infringe at least one claim of the '087 patent.

**ANSWER**: Denied.

143.    Upon information and belief, Defendants have knowledge of the '087 patent and, by their proposed package insert for Defendants' generic products, know or should know that it will induce direct infringement of at least one claim of the '087 patent, either literally or under the doctrine of equivalents.

**ANSWER**: Denied.

144.    Upon information and belief, Defendants are aware and/or have knowledge that their proposed package insert will recommend, suggest, encourage and/or instruct others how to engage in an infringing use because healthcare professionals and/or patients will use Defendants' generic products according to the instructions in the proposed package insert in a way that directly infringes at least one claim of the '087 patent.

**ANSWER**: Denied.

145.    Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

**ANSWER**:  Paragraph 145 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 145.

146.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

**ANSWER**:  Denied.

147.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER**:  Denied.

148.    Plaintiffs do not have an adequate remedy at law.

**ANSWER**:  Denied.

## RESPONSE TO "COUNT VI"

## RESPONSE TO "(INFRINGEMENT OF THE '347 PATENT)"

149.    Plaintiffs reallege, and incorporate fully herein, each preceding paragraph.

**ANSWER**:  Defendants reiterate and incorporate their answers to the above allegations as though fully set forth herein.

150.    Upon information and belief, Defendants filed ANDA No. 219381 seeking approval to manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States before the expiration of the '347 patent.

**ANSWER**:  Paragraph 150 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for

Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 150.

151.    Upon information and belief, Defendants filed with the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) and 21 C.F.R. § 314.94(a)(12)(i)(A)(4), a certification alleging that the claims of the '347 patent are invalid, unenforceable and/or not infringed.

**ANSWER**:  Paragraph 151 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial.  Defendants deny any and all remaining allegations of Paragraph 151.

152.    Upon information and belief, in their ANDA No. 219381, Defendants have represented to the FDA that Defendants' generic products are pharmaceutically and therapeutically equivalent to Otsuka's ABILIFY MAINTENA®.

**ANSWER**:  Paragraph 152 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that ANDA No. 219381 complies with FDA requirements regarding bioequivalence.  Defendants deny any and all remaining allegations of Paragraph 152.

153.    Defendants have actual knowledge of the '347 patent, as evidenced by Defendants' Notice Letter.

**ANSWER**:  Paragraph 153 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc.'s knowledge of the Patents-in-Suit is evidenced by its Notice Letter.  Defendants deny any and all remaining allegations of Paragraph 153.

154.    Upon information and belief, under 35 U.S.C. § 271(e)(2)(A), Defendants have infringed one or more claims of the '347 patent by submitting, or causing to be submitted, to the FDA ANDA No. 219381, seeking approval to manufacture, use, import, offer to sell or sell Defendants' generic products before the expiration date of the '347 patent.

**ANSWER**:  Denied.

155.    Upon information and belief, if ANDA No. 219381 is approved, Defendants will infringe one or more claims of the '347 patent under § 271(a), either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing Defendants' generic products, and/or by actively inducing infringement by others under § 271(b) and/or contributing to infringement under § 271(c), unless this Court orders that the effective date of any FDA approval of ANDA No. 219381 shall be no earlier than the expiration of the '347 patent and any additional periods of exclusivity.

**ANSWER**:  Denied.

156.    Upon information and belief, if ANDA No. 219381 is approved, Defendants intend to and will manufacture, use, import, offer to sell and/or sell Defendants' generic products in the United States.

**ANSWER**:  Paragraph 156 contains legal conclusions for which no answer is required.  To the extent an answer is required, Defendants admit that Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial, before expiration of the Patents-in-Suit.  Defendants deny any and all remaining allegations of Paragraph 156.

157.    Upon information and belief, Defendants' actions relating to Defendants' ANDA No. 219381 complained of herein were done by and for the benefit of Defendants.

**ANSWER**:  Denied.

158.    Plaintiffs will be irreparably harmed by Defendants' infringing activities unless this Court enjoins those activities.

**ANSWER**:  Denied.

159.    Plaintiffs do not have an adequate remedy at law.

**ANSWER**:  Denied.

## RESPONSE TO "REQUEST FOR RELIEF"

Defendants deny that Plaintiffs are entitled to any of the relief requested in their Request For Relief.

***

## SEPARATE AND INDEPENDENT DEFENSES

Without prejudice to the denials set forth in this Answer, without admitting any allegations in the Complaint not otherwise admitted, and without undertaking any of the burdens imposed by law on Plaintiffs, Defendants assert the following separate and independent defenses.

### First Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Defense

The claims of the 057, 803, 553, 547, 087, and 347 patents are invalid for failing to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including without limitation §§ 101, 102, 103, and/or 112, and/or any judicially created basis for invalidation or unenforceability.

### Third Defense

The proposed manufacture, use, sale, offer for sale, importation, and/or marketing of the ANDA Products have not infringed, do not infringe, and would not—if made, used, sold, offered for sale, imported, or marketed—infringe, either directly or indirectly, any valid and/or enforceable claim of the 057, 803, 553, 547, 087, and 347 patents, either literally or under the doctrine of equivalents.

### Fourth Defense

Defendants have not induced, do not induce, and will not induce infringement of any valid and/or enforceable claim of the 057, 803, 553, 547, 087, and 347 patents.

### Fifth Defense

Defendants have not contributed, do not contribute, and will not contribute to infringement of any valid and/or enforceable claim of the 057, 803, 553, 547, 087, and 347 patents.

## Sixth Defense

The Court lacks subject matter jurisdiction over any and all claims asserted under 35 U.S.C. § 271(a), (b), and/or (c).

## Seventh Defense

The Complaint fails to state a claim for willful infringement and/or exceptional case.

## Eighth Defense

The claims of the 057, 803, 553, 547, and 087 patents are unenforceable as a result of inequitable conduct committed during prosecution before the U.S. Patent & Trademark Office ("PTO"), including as particularly explained and alleged in the Thirteenth Counterclaim.

## Ninth Defense

The claims of the 057, 803, 553, 547, and 087 patents are unenforceable for incorrect inventorship under at least 35 U.S.C. §§ 101, 115, and/or 116, including as particularly explained and alleged in the Fourteenth Counterclaim.

## Tenth Defense

The claims of the 057, 803, 553, 547, and 087 patents are invalid for incorrect inventorship under at least 35 U.S.C. §§ 101, 115, and/or 116, including as particularly explained and alleged in the Fifteenth Counterclaim.

## Eleventh Defense

The claims of the 057, 803, 553, 547, and 087 patents are invalid for derivation under at least 35 U.S.C. § 101, including as particularly explained and alleged in the Sixteenth Counterclaim.

## Twelfth Defense

Any additional defenses or counterclaims that discovery may reveal, including unenforceability.

### Thirteenth Defense

Apotex Pharmachem Inc. is not a proper party.

### Fourteenth Defense

Aposherm Delaware Holdings Corporation is not a proper party.

### RESERVATION OF DEFENSES

Defendants reserve any and all defenses that are available under the Federal Rules of Civil Procedure and the U.S. Patent Laws, and any other defenses, at law or in equity, that may now exist or become available later as a result of discovery, further factual investigation, or by any other means.

## COUNTERCLAIMS

Apotex Inc. counterclaims as follows.

## THE PARTIES

1.      Apotex Inc. is an entity organized and existing under the laws of Canada and having a place of business at 150 Signet Drive, Toronto, Ontario, M9L 1T9, Canada.

2.      On information and belief, Otsuka is a corporation organized and existing under the laws of Japan with its corporate headquarters at 2-9 Kanda-Tsukasamachi, Chiyoda-ku, Tokyo, 101-8535, Japan.

3.      On information and belief, Lundbeck is a corporation organized and existing under the laws of Denmark, with a place of business at Ottiliavej 9, DK-2500 Valby, Denmark.

## JURISDICTION

4.      These counterclaims arise under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ("MMA") (21 U.S.C. § 355(j) and 35 U.S.C. § 271(e)(5)).

5.      This court has original jurisdiction over the subject matter of these Counterclaims under 28 U.S.C. §§ 1331 and 1338(a); under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and under the MMA (21 U.S.C. § 355(j) and 35 U.S.C. § 271(e)(5)).

6.      This Court has personal jurisdiction over Plaintiffs because Plaintiffs have availed themselves of the rights and privileges—and subjected themselves to the jurisdiction—of this forum by suing Apotex Inc. in this District, and/or because Plaintiffs conduct substantial business in, and have regular and systematic contact with, this District.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

## ABILIFY MAINTENA® (aripiprazole)

8.     Otsuka purports to be the holder of approved New Drug Application ("NDA") No. 202971, under which the United States Food and Drug Administration ("FDA") granted approval for aripiprazole for extended-release injectable suspension in strengths of 300 mg and 400 mg vials and pre-filled syringes under the trade name ABILIFY MAINTENA®.

9.     At the time the Complaint was filed, U.S. Patent Nos. 10,525,057, 10,980,803, 11,154,553, 11,344,547, 11,400,087 and 11,648,347 (collectively "Patents-in-Suit") were listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") under NDA No. 202971.

## Patents-in-Suit

10.     On or about January 7, 2020, the United States Patent and Trademark Office ("PTO") issued the 057 patent (Ex. 1), titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION," to Arash Raoufinia.

11.     Otsuka is listed as the assignee of the 057 patent in the PTO's online records as well as on the face of the 057 patent (Ex. 1 (057 patent) at Assignee).

12.     On information and belief, Plaintiffs have the right to enforce the 057 patent.

13.     By listing the 057 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an Abbreviated New Drug Application ("ANDA") applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 057 patent.

14.    On or about April 20, 2021, the PTO issued the 803 patent (Ex. 3), titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function," to Arash Raoufinia.

15.    Otsuka is listed as the assignee of the 803 patent in the PTO's online records as well as on the face of the 803 patent (Ex. 3 (803 patent) at Assignee).

16.    On information and belief, Plaintiffs have the right to enforce the 803 patent.

17.    By listing the 803 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an ANDA applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 803 patent.

18.    On or about October 26, 2021, the PTO issued the 553 patent (Ex. 5), titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function," to Arash Raoufinia.

19.    Otsuka is listed as the assignee of the 553 patent in the PTO's online records as well as on the face of the 553 patent (Ex. 5 (553 patent) at Assignee).

20.    On information and belief, Plaintiffs have the right to enforce the 553 patent.

21.    By listing the 553 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an ANDA applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 553 patent.

22.    On or about May 31, 2022, the PTO issued the 547 patent (Ex. 7), titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function," to Arash Raoufinia.

23.     Otsuka is listed as the assignee of the 547 patent in the PTO's online records as well as on the face of the 547 patent (Ex. 7 (547 patent) at Assignee).

24.     On information and belief, Plaintiffs have the right to enforce the 547 patent.

25.     By listing the 547 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an ANDA applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 547 patent.

26.     On or about August 2, 2022, the PTO issued the 087 patent (Ex. 9), titled "Method of Providing Aripiprazole to Patients Having Impaired CYP2D6 or CYP3A4 Enzyme Function," to Arash Raoufinia.

27.     Otsuka is listed as the assignee of the 087 patent in the PTO's online records as well as on the face of the 087 patent (Ex. 9 (087 patent) at Assignee).

28.     On information and belief, Plaintiffs have the right to enforce the 087 patent.

29.     By listing the 087 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an ANDA applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 087 patent.

30.     On or about May 16, 2023, the PTO issued the 347 patent, titled "MEDICAL DEVICE CONTAINING A CAKE COMPOSITION COMPRISING ARIPIPRAZOLE AS AN ACTIVE INGREDIENT, AND A CAKE COMPOSITION COMPRISING ARIPIPRAZOLE AS AN ACTIVE INGREDIENT," to Shogo Hiraoka and Kiyoshi Taniguchi.

31.     Otsuka is listed as the assignee of the 347 patent in the PTO's online records as well as on the face of the 347 patent.

32.     On information and belief, Plaintiffs have the right to enforce the 347 patent.

33.     By listing the 347 patent in the Orange Book, Otsuka maintains that an infringement suit could be asserted reasonably against an ANDA applicant—including Apotex Inc.—that attempts to seek approval for, and market, a generic version of ABILIFY MAINTENA® before the expiration of the 347 patent.

### Apotex Inc.'s ANDA Products

34.     Apotex Inc. submitted ANDA No. 219381 seeking approval to engage in the commercial manufacture, use or sale of Aripiprazole for Extended-Release Injectable Suspension, 300 mg/vial and 400 mg/vial ("ANDA Products"), before expiration of the Patents-in-Suit.

35.     Apotex Inc. included Paragraph IV certifications to the Patents-in-Suit in its submission of ANDA No. 219381.

36.     Apotex Inc. produced ANDA No. 219381 to Plaintiffs on August 1, 2025.

### COUNT I

### (Declaratory Judgment of Non-Infringement of the 057 Patent)

37.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

38.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would infringe any valid or enforceable claim of the 057 patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

39.     The manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe any valid or enforceable claim of the 057 patent, either directly or indirectly.

40.     Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 057 patent, either literally or under the doctrine of equivalents.

## COUNT II

### (Declaratory Judgment of Invalidity of the 057 Patent)

41.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

42.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the 057 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

43.     The 057 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

44.     Apotex Inc. is entitled to a judicial declaration that the 057 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT III

### (Declaratory Judgment of Non-Infringement of the 803 Patent)

45.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

46.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would infringe any valid or enforceable claim of the 803

patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

47.     The manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe any valid or enforceable claim of the 803 patent, either directly or indirectly.

48.     Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 803 patent, either literally or under the doctrine of equivalents.

## COUNT IV

### (Declaratory Judgment of Invalidity of the 803 Patent)

49.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

50.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the 803 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

51.     The 803 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

52.     Apotex Inc. is entitled to a judicial declaration that the 803 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT V

### (Declaratory Judgment of Non-Infringement of the 553 Patent)

53.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

54.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of ANDA Products would infringe any valid or enforceable claim of the 553 patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

55.    The manufacture, use, offer for sale, sale, importation, and/or marketing of ANDA Products would not infringe any valid or enforceable claim of the 553 patent, either directly or indirectly.

56.    Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 553 patent, either literally or under the doctrine of equivalents.

## COUNT VI

### (Declaratory Judgment of Invalidity of the 553 Patent)

57.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

58.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the 553 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

59.     The 553 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

60.     Apotex Inc. is entitled to a judicial declaration that the 553 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT VII

### (Declaratory Judgment of Non-Infringement of the 547 Patent)

61.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

62.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would infringe any valid or enforceable claim of the 547 patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

63.     The manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe any valid or enforceable claim of the 547 patent, either directly or indirectly.

64.     Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 547 patent, either literally or under the doctrine of equivalents.

## COUNT VIII

### (Declaratory Judgment of Invalidity of the 547 Patent)

65.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

66.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the '547 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

67.     The 547 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

68.     Apotex Inc. is entitled to a judicial declaration that the 547 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT IX

### (Declaratory Judgment of Non-Infringement of the 087 Patent)

69.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

70.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would infringe any valid or enforceable claim of the 087 patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

71.     The manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe any valid or enforceable claim of the 087 patent, either directly or indirectly.

72.     Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 087 patent, either literally or under the doctrine of equivalents.

## COUNT X

### (Declaratory Judgment of Invalidity of the 087 Patent)

73.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

74.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the 087 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

75.     The 087 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

76.     Apotex Inc. is entitled to a judicial declaration that the 087 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT XI

### (Declaratory Judgment of Non-Infringement of the 347 Patent)

77.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

78.     A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, whether the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would infringe any valid or enforceable claim of the 347

patent, either directly or indirectly, that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

79.    The manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe any valid or enforceable claim of the 347 patent, either directly or indirectly.

80.    Apotex Inc. is entitled to a judicial declaration that the manufacture, use, offer for sale, sale, importation, and/or marketing of the ANDA Products would not infringe, directly or indirectly, any valid or enforceable claim of the 347 patent, either literally or under the doctrine of equivalents.

## COUNT XII

### (Declaratory Judgment of Invalidity of the 347 Patent)

81.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

82.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the 347 patent that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

83.    The 347 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

84.    Apotex Inc. is entitled to a judicial declaration that the 347 patent is invalid for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or for obviousness-type double patenting.

## COUNT XIII

### (Declaratory Judgment of Unenforceability of the 057, 803, 553, 547, and 087 Patents Due to Inequitable Conduct)

85.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

86.    Because fact discovery is ongoing and Apotex Inc. has not finished its investigation into Plaintiffs' documents or deposed Plaintiffs' witnesses, Apotex Inc. provides the following statement of its counterclaims, in part, on information and belief.

87.    Applicants have a duty of candor and good faith to the PTO that prohibits applicants from making a misrepresentation of material fact, failing to disclose information that is material to an application, or willfully misrepresenting information to the PTO.

88.    The 057, 803, 553, 547, and 087 patents (collectively, the "Raoufinia Patents") are unenforceable due to inequitable conduct because, on information and belief, one or more persons involved in the prosecution of the patents, including at least the sole named inventor, Arash Raoufinia (hereinafter, "Applicants"), despite owing a duty of candor and good faith to the PTO, deliberately concealed and/or withheld information that Applicants knew was highly material regarding third parties' (including the FDA) contributions to the claims of the Raoufinia Patents with the intent to deceive the PTO.

89.    The Raoufinia Patents are unenforceable due to inequitable conduct because, on information and belief, Applicants, despite owing a duty of candor and good faith to the PTO, deliberately made materially false or misleading representations to the PTO regarding third parties' (including the FDA) contributions to the claims of the Raoufinia Patents and regarding the nature of certain prior art references with the intent to deceive the PTO.

90.    The Raoufinia Patents are generally directed to dose adjustments of aripiprazole depending on patients' CYP2D6 or CYP3A4 enzyme function and/or whether or not the patients are on CYP2D6 and/or CYP3A4 inhibitors or inducers.

91.    In or around June 2012, the FDA's Office of Clinical Pharmacology ("OCP") Review team noted various deficiencies during their review of Otsuka's proposed labeling for its NDA No. 202971 seeking approval of Abilify Maintena®.  Specifically, Otsuka had not accounted for certain dose adjustments for patients receiving CYP2D6 and/or CYP3A4 inhibitors, for patients who were CYP2D6 poor metabolizers, and for patients on CYP3A4 inducers.  The FDA further observed that Otsuka had failed to even collect data regarding some of these patient populations. To account for these deficiencies, the FDA's OCP review team—i.e., Huixia Zhang, Satjit Brar, Mike Pacanowski, Atul Bhattaram and Hao Zhu (collectively, "OCP Review Team")—added specific dose adjustments to the Abilify Maintena labeling.

92.    On February 28, 2013, Otsuka received FDA approval of its NDA for Abilify Maintena.  The approved labeling contained the exact dose adjustments that had been added by the FDA's OCP Review Team.

93.    On September 24, 2013, Applicants filed the first of several patent applications that purportedly cover Abilify Maintena.  The dose adjustments conceived by the FDA's OCP Review Team were incorporated, unchanged, into the claims of the applications.  Applicants were successful, as the PTO ultimately allowed the five Raoufinia Patents that are asserted against Apotex in this action.

94.    During prosecution of the Raoufinia Patents, the PTO Examiners issued numerous rejections of the pending claims, including as anticipated and obvious over various prior art, including the label of Abilify Maintena itself.  In order to overcome these rejections, Applicants

engaged in a campaign of deceit, misrepresenting and/or hiding key information to convince the Examiners that the material prior art could not be properly considered prior art under the statutory safe harbor because the information purportedly originated with Raoufinia, the person named as the inventor on each of the patent applications.  In fact, however, many of the key dosing adjustment limitations originated with the FDA's employees and not with Raoufinia.

95.    The Examiners relied on Applicants' sworn statements that the dosing adjustment limitations originated with Raoufinia and were never informed that many, in fact, originated with the FDA's employees.  Had the Examiners known that these limitations originated with FDA personnel rather than with Raoufinia, the Examiners would have understood that Raoufinia's sworn statements were false, and maintained that all five of the Raoufinia Patents were non-patentable over the prior art.

96.    The single most reasonable inference able to be drawn from the evidence collected to date is that the Applicants, including Raoufinia, on information and belief, deliberately withheld the proper inventorship and misrepresented the scope of inventorship in order to defeat various material invalidity arguments.  These deliberate decisions were so material that, had the truth had been provided to the PTO, none of the Raoufinia Patents would have issued.

97.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the unenforceability of the Raoufinia Patents that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

98.    The Raoufinia Patents are unenforceable due to inequitable conduct.

99.    Apotex Inc. is entitled to a judicial declaration that the Raoufinia Patents are unenforceable due to inequitable conduct.

## I.    ABILIFY MAINTENA

### A.    FDA Review Process for Abilify Maintena

100.    On September 26, 2011, Otsuka filed NDA No. 202971 with FDA, seeking approval for Abilify Maintena.  (Ex. 11 (Abilify Maintena Approval Letter) at 1).

101.    On February 28, 2013, the FDA approved Otsuka's NDA No. 202971.  (Ex. 11 (Abilify Maintena Approval Letter) at 1, 5).

102.    On April 11, 2013, FDA published the "Drug Approval Package" for Abilify Maintena online, which includes documents detailing the process for FDA approval of Abilify Maintena.  The Drug Approval Package for Abilify Maintena is available online at:

https://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/202971s000TOC.cfm

The Drug Approval Package for Abilify Maintena is also accessible online from Drugs@FDA, by clicking the "Review" link for Abilify Maintena.

103.    The Drug Approval Package for Abilify Maintena includes the Clinical Pharmacology Review (Ex. 12 (Clinical Pharmacology Review)).

104.    During the Mylan Litigation, Plaintiffs' Rule 30(b)(6) witness, Mary Hobart, testified that the documents in the Drug Approval Package are typically available on FDA's website one to three months after approval.  (Ex. 13 (Mylan Litigation, D.I. 246-10, Ex. G-1) at 133:14-19).  Ms. Hobart also testified that these review documents, including the Clinical Pharmacology Review, were drafted by FDA (and not Otsuka), that drug sponsors propose information and FDA responds, but drug sponsors do not draft these documents, that the OCP Review Team prepared the Clinical Pharmacology Review, and that the italicized information in the Clinical Pharmacology Review were FDA recommendations.  (*Id.* at 133:2-13, 135:7-136:1, 136:11-19, 137:15-139:6).

105.    As part of FDA's review of Abilify Maintena, the proposed label for Abilify Maintena was reviewed by the FDA's OCP Review Team.  (Ex. 12 (Clinical Pharmacology Review) at 1, 21-22).  The OCP Review Team signed the Clinical Pharmacology Review on or before June 4, 2012.  (*Id.* at 76).

106.    As reflected in the Clinical Pharmacology Review, the OCP Review Team proposed multiple changes to the proposed labeling for Abilify Maintena.  FDA recommendations were based on data from Abilify and from running simulations.  (Ex. 12 (Clinical Pharmacology Review) at 5-6, 15, 59-61).

107.    In the Clinical Pharmacology Review, the OCP Review Team noted that although certain parts of the Abilify Maintena label were approvable, "[f]urther dose adjustments in CYP2D6 poor metabolizers and in patients receiving CYP2D6 and/or CYP3A4 inhibitors are recommended (Table 1)."  (Ex. 12 (Clinical Pharmacology Review) at 3).  The OCP Review Team further noted that "[i]n addition, aripiprazole IM injection is not recommended to be used with long-term coadministration of CYP3A4 inducers."  (*Id.*).

108.    The OCP Review Team's "Overall" decision was that Abilify Maintena was acceptable "Pending labeling."  (Ex. 12 (Clinical Pharmacology Review) at 3).  Specifically, the "Proposed dose for adult patients" was not acceptable and the OCP Review Team referred Otsuka to Table 1.  (*Id.*).  The "Labeling" was also not acceptable, "Pending satisfactory agreement with the sponsor."  (*Id.*).

109.    Table 1 of the Clinical Pharmacology Review stated as follows:

**Table 1: Dose Adjustments in Patients Taking Concomitant CYP2D6 inhibitors, 3A4 inhibitors, and/or CYP3A4 inducers for greater than 14 days** (b) (4)

| | Adjusted Dose |
|---|---|
| **Patients Taking 400 mg of ABILIFY** (b) (4) | |
| Strong CYP2D6 inhibitors **or** strong CYP3A4 inhibitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Taking 300 mg of ABILIFY** (b) (4) | |
| strong CYP2D6 OR strong CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Who are Poor Metabolizers of CYP2D6** | |
| Poor Metabolizers of CYP2D6 | 300 mg |
| Poor Metabolizers of CYP2D6 taking concomitant strong CYP3A4 inhibitors | 160 mg |

When the inhibitor or inducer is withdrawn, change the ABILIFY MAINTENA dose *[see Dosage and Administration (2.1)]*.

(Ex. 12 (Clinical Pharmacology Review) at 4).

110.    Further, in "Table 1: Sponsor-Proposed and FDA-Recommended Dosing of Aripiprazole IM Depot," with respect to "Dosing Recommendations for Drug Interactions," the OCP Review Team wrote:

| (b) (4) | We recommend the following dosing regimen based on pharmacokientic simulations. *For patients taking 300 mg dose:* *Patients taking aripiprazole concomitantly with long term (≥14 days) CYP 2D6 and/or CYP3A4 inhibitors require a dose adjustment.* <ul><li>*200 mg IM every 4 weeks with concomitant strong CYP3A4 inhibitor*</li><li>*200 mg IM every 4 weeks with concomitant strong CYP2D6 inhibitor*</li><li>*160 mg IM every 4 weeks with both concomitant CYP2D6 and CYP3A4 inhibitor.*</li></ul> |
| (b) (4) | We recommend the following: *Long term coadministration of CYP3A4 inducer with Aripiprazole IM depot injection is not recommended.* |

(Ex. 12 (Clinical Pharmacology Review) at 5-6). The italicized text reflects the FDA OCP Review Team's recommended revisions to the Abilify Maintena label that Otsuka had not proposed in its original labeling.

111.    Further, in "Table 1: Sponsor-Proposed and FDA-Recommended Dosing of Aripiprazole IM Depot," with respect to "Dosing Recommendations for CYP2D6 Poor Metabolizer Status Patients," the OCP Review Team wrote:

> (b) (4)  We recommend the following dosing regimen based on pharmacokinetic simulations:
>
> *For patients who are known to be CYP2D6 poor metabolizers, the recommended dose is 300 mg.*

(Ex. 12 (Clinical Pharmacology Review) at 6). The italicized text reflects the FDA OCP Review Team's recommended revisions to the Abilify Maintena label that Otsuka had not proposed in its original labeling.

112. Further—with respect to the question "What is the recommended dose for patients who are CYP2D6 poor metabolizers?"—the OCP Review Team wrote:

> **A 300 mg IM Depot dose is recommended for patients who are CYP2D6 poor metabolizers (PM)**. As presented in Table 3 and Figure 4, steady state aripiprazole exposures are higher in PMs compared to extensive metabolizers (EM), in which approximately a two-fold difference in exposures is observed. According to steady state aripiprazole exposures and mean $AUC^{ss}_{(0-28\ days)}$, a 300 mg IM Depot dose is recommended for patients who are CYP2D6 PMs and the exposures are consistent for the dosing recommendation for patients taking concomitant CYP2D6 inhibitors for more than 14 days (the upper 75% percentiles are similar between the two scenarios). Based on clinical need, the dosing may be increased to 400 mg.

(Ex. 12 (Clinical Pharmacology Review) at 10 (emphasis added); *see also id.* at 38).

113. Further—with respect to the question "What is the recommended dose for patients taking aripiprazole IM depot formulation concomitantly with long-term CYP3A4 and/or CYP2D6 inhibitors?"—the OCP Review Team wrote:

> Under the regular maintenance dose of 400 mg, the dose should be reduced to 300 mg IM if given concomitantly with either a strong CYP3A4 or CYP2D6 inhibitor. Moreover, a 200 mg IM Depot dose should be given with concomitant CYP3A4 and CYP2D6 inhibitor. The sponsor's recommendation is appropriate. Similarly, **for patients receiving 300 mg maintenance dose, we recommend the dose should be reduced to 200 mg IM if given concomitantly with either a strong CYP3A4 or CYP2D6 inhibitor. In addition,**

> **the dose should be further reduced to 160 mg if given concomitantly with both CYP3A4 and CYP2D6 inhibitors**.
>
> Assessment of simulated steady state aripiprazole concentrations after IM Depot administration in conjunction with chronic use (>14 days) CYP3A4 inhibitor, a CYP2D6 inhibitor and both CYP3A4 and/or CYP2D6 inhibitor, show that aripiprazole concentrations are increased (Figure 6).  Steady-state exposures (AUCss (0-28 days)) for the recommended dosing regimen adjustment are provided in Table 4 below.  The 75th percentile exposures for all dosing recommendations are below the upper margin of the therapeutic window while the 25th percentile is above the lower margin of the therapeutic window.  Therefore, for patients stabilized on 400 mg, the current recommendation of decreasing the dose to 300 mg IM if given concomitantly with either a CYP3A4 or CYP2D6 inhibitor (Figure 7) is appropriate.  Moreover, a 200 mg IM Depot dose should be given with concomitant CYP3A4 and CYP2D6 inhibitor.  The sponsor's recommendation is appropriate.  Following the same rationale, **for patients stabilized on 300 mg IM depot, further dose adjustment is recommended to ensure the exposure falls within the established therapeutic window**.

(Ex. 12 (Clinical Pharmacology Review) at 12-13 (emphasis added); *see also id.* at 34).

114.    Further—with respect to the question "What is the recommended dose for patients taking aripiprazole IM depot formulation concomitantly with long-term CYP3A4 inducers?"—the OCP Review Team wrote:

> As 400 mg is the largest dosage form for the IM Depot formulation, dosing adjustment for this interaction may not be feasible and **it is suggested that patients be warned not to use a combination of CYP3A4 inducers with this formulation**.
>
> Based on the original label for oral aripiprazole (Abilify®), concomitant administration of a CYP3A4 inducer greatly decreases the exposure of plasma aripirazole.  For example, the coadministration of carbamazepine (200 mg BID), a potent CYP3A4 inducer, with aripiprazole (30 mg/day) resulted in an approximate 70% decrease in Cmax and AUC values of both aripiprazole.  In this case, doubling the dose is recommended.  Based on simulations, an approximate four-fold decrease in steady state aripiprazole plasma concentrations is evident upon long-term concomitant administration of a CYP3A4 inducer with 400 mg IM Depot (Figure 8).  Individuals in the pivotal clinical trial were not permitted to take concomitant CYP3A4 inducers, so it is unsure of

what the clinical implications are of this interaction. **The current proposal for the label does not suggest any dosing recommendations for this interaction**.

(Ex. 12 (Clinical Pharmacology Review) at 15 (emphasis added); *see also id.* at 40).

115.    Further—with respect to a study titled "Assessment of the In Vivo Release Characteristics and Safety of an Intramuscular Depot Formulation of Aripiprazole in Subjects with Schizophrenia or Schizoaffective Disorder"—the OCP Review Team wrote:

> *Aripiprazole is mainly metabolized by two enzymes CYP3A4 and CYP2D6, and poor metabolizers of CYP2D6 are expected to have higher level of exposure of aripiprazole. No genotype information of the enrolled subjects were collected for this study, therefore, the effect of CYP2D6 genotype on the exposure of aripiprozole after IM depot injection could not be evaluated.*

(Ex. 12 (Clinical Pharmacology Review) at 26).

116.    Further—with respect to a study titled "An Open-label Parallel Arm Multiple Dose Tolerability, Pharmacokinetics and Safety Study in Adult Patients with Schizophrenia Following Administration of Aripiprazole IM Depot Formulation Once Every Four Weeks"—the OCP Review Team wrote:

> *CYP2D6 genotype information of the enrolled subjects were collected on an optional basis in this study, therefore, no evaluation was performed to assess the effect of CYP2D6 poor metabolizers on the exposure of aripiprazole and dehydro-aripiprazole after multiple aripiprazole IM depot administration.*

(Ex. 12 (Clinical Pharmacology Review) at 30).

117.    Further, the OCP Review Team provided their label edits in a side-by-side document, but those edits have been redacted in the publicly available version published by FDA:

**1.3    Label Statements**

Labeling statements to be removed are shown in ~~red strikethrough font~~ and suggested labeling to be included is shown in <u>underline blue font</u>.

(b) (4)

(Ex. 12 (Clinical Pharmacology Review) at 41).

118.    The OCP Review Team further wrote:

*There is inconsistency in the dosing recommendation for those patients taking concomitant strong CYP2D6 inhibitors on a long term basis compared to individuals who are CYP2D6 poor metabolizing status.  If given a CYP2D6 inhibitor long term (>14 days) the dosing recommendation is to decrease the dose to 300 mg (and further reduced to 200 mg if taken along with a CYP3A4 inhibitor).  .   .   .   Understanding the influence of CYP2D6 polymorphism on aripiprazole exposure, in conjunction with the small number of CYP2D6 PM subjects within the pivotal trial, warrants a dosing adjustment in this population that is consistent with the dosing recommendation for concomitant administration of a CYP2D6 inhibitor long term (>14 days) to an initial and maintenance dose of 300 mg.  Dose adjustment to a higher 400 mg dose would be based on clinical judgment and need.*

(Ex. 12 (Clinical Pharmacology Review) at 59-60).

119.    The OCP Review Team further wrote:

> *The influence concomitant administration of a CYP3A4 inducer on aripiprazole exposures has not been assessed nor has an adequate recommendation been given on the dosing adjustment required for the concomitant administration.*

(Ex. 12 (Clinical Pharmacology Review) at 60).

120.    The OCP Review Team further wrote that "[a]n independent simulation analysis was conducted to resolve the aforementioned outstanding issues." (Ex. 12 (Clinical Pharmacology Review) at 60). The "objectives" of the analysis were:

> 1.    To evaluate the dosing recommendations for initiation, maintenance, missed and delayed doses and assess the influence of dose dumping.
>
> 2.    To determine if additional dosing recommendations are warranted for patients that are initially stabilized on different doses of oral aripiprazole.
>
> 3.    To ascertain the degree of exposure differences between CYP2D6 poor metabolizer and extensive metabolizer status patients requires the need for a dose adjustment that is similar to the recommendation of the concomitant administration of long term CYP2D6 inhibitors.
>
> 4.    To evaluate of the potential exposures of aripiprazole after concomitant administration of a CYP3A4 inducer.

(*Id.*).

121.    The OCP Review Team further wrote that "[s]imulations, using the sponsor's population PK model, were performed to assess different dosing regimens, and compared with the therapeutic window." (Ex. 12 (Clinical Pharmacology Review) at 60). These simulations were performed for the following scenarios:

> 1)    Transitioning from a prior steady state oral dose of 10, 15, 20 and 30 mg to a IM Depot maintenance dose of either 300 mg or

400 mg.  This analysis evaluates the exposures of prior steady state oral administration to that of either 300 or 400 mg IM exposures.

2)      Dosing of 300 mg or 400 mg IM to CYP 2D6 poor metabolizing status subjects.

3)      Dosing of the proposed regimen of 400 mg IM concomitantly with a CYP3A4 inducer.

(*Id.* at 60-61).

122.    The OCP Review Team further wrote:

Overall, limited efficacy and safety data are available in the subgroup of patients who are genetic CYP2D6 PMs.  **The labeling should therefore specify dose reduction for patients who are known to be genetic CYP2D6 PMs** to be consistent with IMD dose reductions recommended for patients receiving CYP2D6 inhibitors, considering 1) the high concentrations observed in this subgroup, 2) the potential risk for concentration-related adverse events, 3) the presence of genotype-specific dosing recommendations for the oral formulation, and 4) the persistence of the drug in the circulation following IMD administration.

(Ex. 12 (Clinical Pharmacology Review) at 62 (emphasis added)).

123.    The OCP Review Team further wrote:

**The sponsor** has proposed dose reduction for patients receiving CYP2D6 inhibitors, but **has not proposed dose adjustment for CYP2D6 PMs**, on the basis that differential safety by genotype was not observed. The purpose of this review is to evaluate the appropriateness of dosing recommendations of this new aripiprazole formulation for CYP2D6 PMs.

(Ex. 12 (Clinical Pharmacology Review) at 62 (emphasis added)).

124.    Further—with respect to the question "Does aripiprazole IMD require dose adjustment based on CYP2D6 genotype?"—the OCP Review Team wrote:

*Yes.  Limited efficacy and safety data are available in the subgroup of patients who are genetic CYP2D6 PMs.  **The labeling should specify dose reduction for patients who are known to be genetic CYP2D6 PMs** to be consistent with dose adjustments for CYP2D6 inhibitor use considering 1) the high concentrations observed in this subgroup, 2) the potential risk for concentration-related adverse*

> *events, 3) presence of genotype-specific dosing recommendations for the oral formulation administration, and 4) the persistence of the drug in the circulation following IMD.*

(Ex. 12 (Clinical Pharmacology Review) at 65 (emphasis added)).

125.    The OCP Review Team further wrote:

> Stabilizing patients on oral aripiprazole helps to accommodate exposure variability. However, individuals are administered the same dose of aripiprazole IMD regardless of the stable oral dose. Given that aripiprazole IMD persists in the systemic circulation for a long period of time, and that the IMD formulation will result in a sustained increase in aripiprazole concentrations in subjects maintained on lower oral aripiprazole doses, **subjects who are known to be CYP2D6 PMs should be started on a lower IMD dose (i.e., 300 mg). Dose reductions to 300 mg aripiprazole IMD are recommended for chronic use of CYP2D6 inhibitors** (it should also be noted that use of CYP2D6 inhibitors was prohibited in the Phase 3 trial), which should also apply to genetic CYP2D6 PMs.

(Ex. 12 (Clinical Pharmacology Review) at 70 (emphasis added)).

126.    The OCP Review Team further wrote:

> Limited efficacy and safety data are available in the subgroup of patients who are genetic CYP2D6 PMs. **The labeling should specify dose reduction for patients who are known to be genetic CYP2D6 PMs** to be consistent with dose adjustments for CYP2D6 inhibitor use considering 1) the high concentrations observed in this subgroup, 2) the potential risk for concentration-related adverse events, 3) presence of genotype-specific dosing recommendations for the oral formulation administration, and 4) the persistence of the drug in the circulation following IMD.

(Ex. 12 (Clinical Pharmacology Review) at 70 (emphasis added)).

127.    The Drug Approval Package for Abilify Maintena includes additional documents beyond the Clinical Pharmacology Review.  These include: Approval Letter(s), Other Action Letters, Printed Labeling, Summary Review, Officer/Employee List, Cross Discipline Team Leader Review, Medical Review(s), Chemistry Review(s), Pharmacology Review(s), Statistical

Review(s), Microbiology Review(s), Proprietary Name Review(s), Other Review(s), and
Administrative Document(s) & Correspondence.

128.    In the Summary Review, which is dated February 28, 2013 and signed by Mitchell
V. Mathis, FDA wrote under the headline "Revised Labeling" that the "Labeling has been
negotiated and agreement reached."  (Ex. 14 (Summary Review) at 2-3).

129.    The Officer/Employee List states as follows:

---

### Officer/Employee List
### Application: NDA 202971

The following officers or employees of FDA participated in the decision to
approve this application and consented to be identified on this list:

Atrakchi, Aisar
Brar, Satjit
Ceresa, Carrie
Cole, Jessica
Duer, Robin
Duran, Joseph
Hutchins, Shawna
Laughren, Tom
Mathis, Mitch
Saini, Sonny
Tabacova, Sonia
Yang, Peiling
Zedong, Dong
Zhang, Jing
Zhu, Hao

---

(Ex. 15 (Officer/Employee List) at 2).

130.    In the Cross Discipline Team Leader Review, which is dated July 5, 2012 and
signed by Jing Zhang, FDA wrote that "Huixia Zhang, PhD. and Satjit Brar PhD. are clinical
pharmacology reviewers for this NDA."  (Ex. 16 (Cross Discipline Team Leader Review) at 3,
13).  FDA further wrote:

Aripiprazole is extensively metabolized by CYP3A4 and CYP2D6. However, a dose adjustment is necessary in patients who are taking aripiprazole IM depot concomitantly with CYP2D6 and/or CYP3A4 inhibitors, CYP3A4 induces and who are CYP2D6 poor metabolizers. **The OCP review team has made several specific recommendations which are summarized in section 5.1.3 Dose identification/selection and limitations in this review**.

(*Id.* at 3 (emphasis added)).

131. In Section 5.1.3 of the Cross Discipline Team Leader Review, FDA further wrote:

Aripiprazole is extensively metabolized by CYP3A4 and CYP2D6. **A dose adjustment in patients taking aripiprazole IM depot concomitantly with CYP2D6 and/or CYP3A4 inhibitors, CYP3A4 inducers or patients who are a CYP2D6 poor metabolizer should be considered. Our clinical pharmacological reviewers had several specific comments regarding these issues**.

(Ex. 16 (Cross Discipline Team Leader Review) at 8 (emphasis added)).

132. In Section 5.1.3 of the Cross Discipline Team Leader Review, FDA further wrote:

For patients who take aripiprazole IM depot concomitantly with long term (≥14 days) CYP2D6 and/or CYP3A4 inhibitors, a dose adjustment is required. . . . **[T]he sponsor did not provide specific instruction for patients who take 300 mg dose. Both OCP reviewers . . . provided further dose recommendations for patients who take 300 mg every 4 weeks based on PK simulation: 200 mg IM every 4 weeks with concomitant strong CYP3A4 or CYP2D6 inhibitor, and 160 mg IM every 4 weeks with concomitant CYP2D6 and CYP3A4 inhibitor**.

(Ex. 16 (Cross Discipline Team Leader Review) at 8 (emphasis added)).

133. In Section 5.1.3 of the Cross Discipline Team Leader Review, FDA further wrote:

For patients who take a CYP3A4 inducer, the sponsor proposed no dose adjustment for short-term co-administration with a CYP3A4 inducer and use clinical judgment for long-term co-administration. Both OCP reviewers agreed that a dose adjustment is not necessary for short-term co-administration with a CYP3A4 inducer and suggest "avoid use" instead of [redacted] for long term co-administration because [redacted] is too vague to provide any useful advice to the health providers.

71

(Ex. 16 (Cross Discipline Team Leader Review) at 8).

134.    In Section 5.1.3 of the Cross Discipline Team Leader Review, FDA further wrote:

> For patients who are CYP2D6 poor metabolizers (PM), . . . **OCP reviewers disagree with the sponsor and suggest 300 mg IM every [redacted] for CYP2D6 PM** because the exposures of CYP2D6 PM are consistent with that observed in long-term concomitant CYP2D6 inhibitors and 300 mg is the recommended dose for concomitant use of CYP2D6 inhibitors. Additionally, study 31-07-246 is relapse prevention study with a randomized withdrawal design. Only patients who had been tolerated the drug and were stable with the drug were selected to continue the study. **Therefore, the safety profile of CYP2D6 PM in this study can not be used as the basis for dose selection**.

(Ex. 16 (Cross Discipline Team Leader Review) at 9 (emphasis added)).

135.    In the "Labeling Recommendations" section of the Cross Discipline Team Leader Review, FDA further wrote:

> **There are extensive physician labeling revisions recommended** by the Division, the Study Endpoints and Labeling Development (SEALD), the Pediatric Maternal Health Staff (PMHS), the Division of Professional Promotion/Office of Prescription Drug Promotion (OPDP), and the Patient Labeling Team (PLT)/the Office of Medical Policy Initiatives. **We are in the process negotiating the labeling with the sponsor. The final agreed upon labeling will be attached to the action letter when this NDA is approved**.

(Ex. 16 (Cross Discipline Team Leader Review) at 11 (emphasis added)).

136.    In the Other Review(s), there is a document from FDA dated July 16, 2012, where Appendix A (redacted in its entirety) contained "Recommended revisions for Abilify Maintena Labeling." (Ex. 17 (Other Review(s)) at 14).

137.    In the Administrative and Correspondence Documents there are multiple documents, one of which is a June 29, 2012 Email from Sonny Saini (FDA) to David Goldberger (Otsuka), attaching "the labeling for ABILIFY MAINTENA that includes our revisions." (Ex. 18 (Administrative and Correspondence Documents) at 25).

138.    The Administrative and Correspondence Documents further contain a Memorandum of Meeting Minutes for a Type B Pre-NDA meeting between FDA and Otsuka that occurred on June 7, 2011.  (Ex. 18 (Administrative and Correspondence Documents) at 71).  The Meeting Minutes contain a set of questions from Otsuka, including Question 8, which asked:

> Based upon the recent labeling change for ABILIFY® to modify dosing resulting from concomitant administration of CYP2D6 and/or CYP3A4 inhibitors, Otsuka is planning to use simulation modeling to assess transient and chronic concomitant administration of CYP2D6 and/or CYP3A4 inhibitors for aripiprazole IM depot. This evaluation will be used to provide guidance for dose adjustments.  Does the Division agree?

(*Id.* at 83).  FDA responded:

> *Yes, your proposed approach is acceptable.  We also recommend that you simulate the worst case scenario where there is a complete dumping at the injection site, i.e., all the doses are dissolved and released to the systemic circulation.*

(*Id.*).

## B.    Label for Abilify Maintena

139.    When Otsuka's NDA for Abilify Maintena was approved by FDA on February 28, 2013, the label for Abilify Maintena ("Abilify Maintena Label 2013") was published.

140.    Abilify Maintena was approved in 300 mg and 400 mg doses.  For example, the Abilify Maintena Label 2013 stated: "Recommended starting and maintenance dose is 400 mg administered monthly as a single injection."  (Ex. 19 (Abilify Maintena Label 2013) at 1).  The Abilify Maintena Label 2013 further stated: "Some patients may benefit from a reduction to a 300 mg dose."  (*Id.*).  The Abilify Maintena Label 2013 further listed "400 mg/vial and 300 mg/vial of lyophilized powder for reconstitution" as the dosage forms and strengths.  (*Id.*).

141.    To address the known impact on patients that have reduced, or increased, metabolism of aripiprazole, however, the Abilify Maintena Label 2013 also included dosage

adjustments for such patients.  There are dosage adjustments for patients that innately metabolize the drug poorly ("poor metabolizers" or "PM" or "CYP2D6 poor metabolizers"), leading to increased drug concentrations in the blood stream when compared to others.  There are also dosage adjustments for patients that are concomitantly being administered pharmaceuticals that lead to either reduced, or increased metabolism of aripiprazole.  Those altered metabolic states are due to drug-drug interactions with CYP3A4 and/or CYP2D6 inhibitors, or CYP3A4 inducers.

142.    The Abilify Maintena Label 2013 stated:

- Dosage adjustments for patients who are CYP2D6 poor metabolizers and for patients taking CYP2D6 inhibitors, CYP3A4 inhibitors, or CYP3A4 inducers for greater than 14 days (2.3):

|  | Adjusted Dose |
|---|---|
| **CYP2D6 Poor Metabolizers** |  |
| CYP2D6 Poor Metabolizers | 300 mg |
| CYP2D6 Poor Metabolizers taking concomitant CYP3A4 inhibitors | 200 mg |
| **Patients Taking 400 mg of ABILIFY MAINTENA** |  |
| Strong CYP2D6 __or__ CYP3A4 inhibitors | 300 mg |
| CYP2D6 __and__ CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid use |
| **Patients Taking 300 mg of ABILIFY MAINTENA** |  |
| Strong CYP2D6 __or__ CYP3A4 inhibitors | 200 mg |
| CYP2D6 __and__ CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid use |

(Ex. 19 (Abilify Maintena Label 2013) at 1).

143.    Section 2.3 of the Abilify Maintena Label 2013 further stated:

**Table 1: Dose Adjustments of ABILIFY MAINTENA in Patients who are CYP2D6 Poor Metabolizers and Patients Taking Concomitant CYP2D6 Inhibitors, 3A4 Inhibitors, and/or CYP3A4 Inducers for Greater than 14 days**

|  | Adjusted Dose |
|---|---|
| **CYP2D6 Poor Metabolizers** | |
| CYP2D6 Poor Metabolizers | 300 mg |
| CYP2D6 Poor Metabolizers taking concomitant CYP3A4 inhibitors | 200 mg |
| **Patients Taking 400 mg of ABILIFY MAINTENA** | |
| Strong CYP2D6 **or** CYP3A4 inhibitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid use |
| **Patients Taking 300 mg of ABILIFY MAINTENA** | |
| Strong CYP2D6 **or** CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid use |

(Ex. 19 (Abilify Maintena Label 2013) at 5).

144.    These tables contain the same dosage adjustments provided by FDA's OCP Review Team in Table 1 of the Clinical Pharmacology Review:

| Table 1: Dose Adjustments in Patients Taking Concomitant CYP2D6 inhibitors, 3A4 inhibitors, and/or CYP3A4 inducers for greater than 14 days (b) (4) | |
| --- | --- |
| | **Adjusted Dose** |
| **Patients Taking 400 mg of ABILIFY** (b) (4) | |
| Strong CYP2D6 inhibitors **or** strong CYP3A4 inhibitors | 300 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 200 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Taking 300 mg of ABILIFY** (b) (4) | |
| strong CYP2D6 OR strong CYP3A4 inhibitors | 200 mg |
| CYP2D6 **and** CYP3A4 inhibitors | 160 mg |
| CYP3A4 inducers | Avoid Use |
| **Patients Who are Poor Metabolizers of CYP2D6** | |
| Poor Metabolizers of CYP2D6 | 300 mg |
| Poor Metabolizers of CYP2D6 taking concomitant strong CYP3A4 inhibitors | 160 mg |

When the inhibitor or inducer is withdrawn, change the ABILIFY MAINTENA dose *[see Dosage and Administration (2.1)]*.

(Ex. 12 (Clinical Pharmacology Review) at 4; *see also id.* at 5-6).

145. Section 2.3 of the Abilify Maintena Label 2013 further stated:

Dosage adjustments are recommended in patients who are CYP2D6 poor metabolizers and in patients taking concomitant CYP3A4 inhibitors or CYP2D6 inhibitors for greater than 14 days (see Table 1). If the CYP3A4 inhibitor, or CYP2D6 inhibitor is withdrawn, the ABILIFY MAINTENA dosage may need to be increased *[see Dosage and Administration (2.1)]*.

(Ex. 19 (Abilify Maintena Label 2013) at 4).

146. Section 7.1 of the Abilify Maintena Label 2013 further stated:

Concomitant use of ABILIFY MAINTENA with carbamazepine or other CYP3A4 inducers decreases the concentrations of aripiprazole. Avoid use of ABILIFY MAINTENA in combination with carbamazepine and other inducers of CYP3A4 for greater than 14 days *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 19 (Abilify Maintena Label 2013) at 26; *see also id.* at 33).

147. Section 7.2 of the Abilify Maintena Label 2013 further stated:

> Concomitant use of ABILIFY MAINTENA with ketoconazole or other CYP3A4 inhibitors for more than 14 days increases the concentrations of aripiprazole and reduction of the ABILIFY MAINTENA dose is recommended *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 19 (Abilify Maintena Label 2013) at 27; *see also id.* at 33).

148.    Section 7.3 of the Abilify Maintena Label 2013 further stated:

> Concomitant use of ABILIFY MAINTENA with quinidine or other CYP2D6 inhibitors increases the concentrations of aripiprazole after longer-term use (i.e., over 14 days) and reduction of the ABILIFY MAINTENA is recommended *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 19 (Abilify Maintena Label 2013) at 27; *see also id.* at 33).

149.    Section 8.6 of the Abilify Maintena Label 2013 further stated:

> Approximately 8% of Caucasians and 3–8% of Black/African Americans cannot metabolize CYP2D6 substrates and are classified as poor metabolizers (PM).  Dosage adjustment is recommended in CYP2D6 poor metabolizers due to high aripiprazole concentrations *[see Dosage and Administration (2.3) and Clinical Pharmacology (12.3)]*.

(Ex. 19 (Abilify Maintena Label 2013) at 30; *see also id.* at 35-36).

## II.    **THE RAOUFINIA PATENTS**

150.    The Raoufinia Patents all claim an earliest filing date of September 24, 2013.  This is more than one year after FDA's OCP Review Team's labeling suggestions were provided in the Clinical Pharmacology Review, seven months after the Abilify Maintena label was approved with the NDA, and more than five months after the Clinical Pharmacology Review was placed online.

151.    The Raoufinia Patents are generally directed to dose adjustments of aripiprazole depending on patients' CYP2D6 or CYP3A4 enzyme function and/or whether or not the patients are on CYP2D6 and/or CYP3A4 inhibitors or inducers.

A.    **The 057 Patent**

152.    The 057 patent is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION." (Ex. 1 (057 patent) at Title).

153.    The inventor listed on the face of the 057 patent is "Arash Raoufinia." (Ex. 1 (057 patent) at Inventor).

154.    The 057 patent issued on January 7, 2020. (Ex. 1 (057 patent) at Date of Patent).

155.    The 057 patent is listed in the Orange Book under NDA No. 202971.

1.    **Claims**

156.    The 057 patent has 20 claims (3 independent claims and 17 dependent claims).

157.    The claims of the 057 patent are as follows:

1. A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 66% to 75% of a 300 or 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer and is concomitantly administered a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor.

2. The method of claim 1, wherein 66% to 75% of a 300 mg weight equivalent dose of aripiprazole is administered.

3. The method of claim 1, wherein 66% of a 300 mg weight equivalent dose of aripiprazole is administered.

4. The method of claim 1, wherein 66% to 75% of a 400 mg weight equivalent dose of aripiprazole is administered.

5. The method of claim 1, wherein 75% of a 400 mg weight equivalent dose of aripiprazole is administered.

6. The method of claim 1, wherein the long-acting drug-containing suspension comprises a prodrug of aripiprazole.

7. The method of claim 1, wherein the long-acting drug-containing suspension comprises aripiprazole.

8. The method of claim 6, wherein the long-acting drug-containing suspension comprises (7-(4-(4-(2,3-dichlorophenyl)piperazin-1-yl)butoxy)-2-oxo-3,4-dihydroquinolin-1(2H)-yl)methyl dodecanoate.

9. A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 75% of a 300 or 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 poor metabolizer not concomitantly administered a strong CYP3A4 inhibitor or a strong CYP2D6 inhibitor.

10. The method of claim 9, wherein 75% of a 300 mg weight equivalent dose of aripiprazole is administered.

11. The method of claim 9, wherein 75% of a 400 mg weight equivalent dose of aripiprazole is administered.

12. The method of claim 9, wherein the long-acting drug-containing suspension comprises a prodrug of aripiprazole.

13. The method of claim 9, wherein the long-acting drug-containing suspension comprises aripiprazole.

14. The method of claim 12, wherein the long-acting drug-containing suspension comprises (7-(4-(4-(2,3-dichlorophenyl)piperazin-1-yl)butoxy)-2-oxo-3,4-dihydroquinolin-1(2H)-yl)methyl dodecanoate.

15. A method of initiating systemic aripiprazole treatment in a patient, comprising initially intramuscularly administering to the patient 53% of a 300 mg or 50% of a 400 mg weight equivalent dose of aripiprazole in the form of a long-acting drug-containing suspension which systemically releases aripiprazole, wherein the dose is released over a period of about one month, and wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer and is concomitantly administered a strong CYP2D6 inhibitor and a strong CYP3A4 inhibitor.

16. The method of claim 15, wherein 53% of a 300 weight equivalent dose of aripiprazole is administered.

17. The method of claim 15, wherein 50% of a 400 mg weight equivalent dose of aripiprazole is administered.

18. The method of claim 15, wherein the long-acting drug-containing suspension comprises a prodrug of aripiprazole.

19. The method of claim 15, wherein the long-acting drug-containing suspension comprises aripiprazole.

20. The method of claim 18, wherein the long-acting drug-containing suspension comprises (7-(4-(4-(2,3-dichlorophenyl)piperazin-1-yl)butoxy)-2-oxo-3,4-dihydroquinolin-1(2H)-yl)methyl dodecanoate.

(Ex. 1 (057 patent) at Claims 1-20).

## 2.    Specification

158. The Abstract of the 057 patent states: "The disclosed embodiments relate to methods of initiating aripiprazole treatment in a patient who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, or both." (Ex. 1 (057 patent) at Abstract).

159. The specification of the 057 patent discloses:

> In various embodiments, the present invention is directed to methods of systemically delivering aripiprazole to a patient, particularly patients having impaired CYP2D6 or CYP3A4 enzyme function. In one embodiment, the present invention comprises administering intramuscularly to a patient, a starting dose of a long-acting drug-containing suspension which systemically releases therapeutic plasma levels of aripiprazole over a period of about one month to a patient, wherein said patient has impaired CYP2D6 or CYP3A4 enzyme function. Patients with impaired CYP2D6 or CYP3A4 enzyme function include, for example a patient who is a CYP2D6 or CYP3A4 poor metabolizer, a patient concomitantly administered a strong CYP3A4 and/or CYP2D6 inhibitor, or a patient who is a CYP2D6 or CYP3A4 poor metabolizer and is concomitantly administered a strong CYP3A4 and/or CYP2D6 inhibitor. In various embodiments, the dose of long-acting drug-containing suspension providing therapeutic plasma levels of aripiprazole administered to such patient with impaired CYP2D6 or CYP3A4 enzyme function is adjusted such that the starting dose provides no more than about 75%, about 75%, no more than about 50%, about 66% to about 75%, or about 50%, of the amount of aripiprazole compared to an initial dose recommended for a patient

with normal CYP2D6 and CYP3A4 enzyme function (i.e., who is neither a CYP2D6 poor metabolizer nor a CYP3A4 poor metabolizer and is not concomitantly administered a CYP2D6 or CYP3A4 inhibitor or inducer, or other agents which modify CYP2D6 or CYP3A4 function). In other embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is a CYP2D6 or CYP3A4 poor metabolizer. In still other embodiments the patient with impaired CYP2D6 or CYP3A4 enzyme function is a CYP2D6 poor metabolizer. In still other embodiments the patient with impaired CYP2D6 or CYP3A4 function is a CYP3A4 poor metabolizer. In some embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is an extensive metabolizer who has been concomitantly administered a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor. In some embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function is an extensive metabolizer who has been concomitantly administered both a strong CYP2D6 inhibitor and a strong CYP3A4 inhibitor.

(Ex. 1 (057 patent) at 1:23-65).

160.    The specification of the 057 patent further discloses:

Doses which are too low can provide ineffective treatment of, e.g. schizophrenic symptoms, which can be disastrous to a patient's quality of life, while doses which are too high can cause serious and sometimes irreversible side effects. Because the plasma levels of aripiprazole can be significantly affected by the rate at which the drug is metabolized in the patient, it is important to account for the CYP2D6 and CYP3A4 isozyme function of a patient in order to achieve the desired, clinically effective plasma levels of aripiprazole, while minimizing side effects.

(Ex. 1 (057 patent) at 3:10-19).

161.    The specification of the 057 patent further discloses:

Many drugs are metabolized in the liver by one or more of the cytochrome P450 (CYP) family of enzymes. Aripiprazole is primarily metabolized by the CYP2D6 and CYP3A4 isozymes. These isozymes often exhibit significant phenotypic variability, which can significantly affect the functioning of the enzyme. Most patients can be characterized as having "normal" CYP2D6 or CYP3A4 enzyme function, and readily ("extensively") metabolize drugs such as aripiprazole. However, some patients have little or no CYP2D6 or CYP3A4 enzyme function, and can be considered "poor metabolizers" – i.e., have a substantially reduced ability to metabolize aripiprazole, and therefore do not eliminate it as

efficiently as extensive metabolizers. Such "poor metabolizers" may have about an about 63-112% increase in aripiprazole exposure (an average of about 80%) and about a 35% decrease in exposure to the active metabolite of aripiprazole, compared to the extensive metabolizers.

(Ex. 1 (057 patent) at 3:20-36).

162.    The specification of the 057 patent further discloses:

> Similar to the effects observed for poor metabolizers, above, extensive metabolizers concomitantly administered CYP2D6 inhibitors and/or CYP3A4 inhibitors also exhibit an approximately 63-112% increase in aripiprazole exposure (average of about 80%) and about a 35% decrease in exposure to the active metabolite of aripiprazole. Concomitant administration of such inhibitors with compositions which release aripiprazole (e.g., long-acting intramuscular depot compositions which systemically release aripiprazole) can be particularly important when the patient is also a CYP2D6 or CYP3A4 poor metabolizer, since the metabolism of aripiprazole will be suppressed by the poor metabolizer's innately low CYP2D6 or CYP3A4 enzyme activity, as well as the further inhibition provided by the CYP2D6 or CYP3A4 inhibitor. Poor metabolizers concomitantly administered CYP2D6 and/or CYP3A4 inhibitors exhibit a correspondingly greater increase in aripiprazole exposure up to 4 fold in aripiprazole concentrations.

(Ex. 1 (057 patent) at 3:43-60).

163.    The specification of the 057 patent further discloses:

> Alternatively, some drugs can significantly increase the activity of the enzyme (e.g., act as "inducers" of the CYP2D6 or CYP3A4 enzyme), and thereby substantially increase the rate of aripiprazole metabolism. Even for patients who are CYP2D6 or CYP3A4 poor metabolizers, the increased rate of metabolism of aripiprazole provided by concomitantly administered "inducers" may be such that intramuscular administration of an aripiprazole-releasing suspension never provides a patient with clinically effective levels of aripiprazole.

(Ex. 1 (057 patent) at 3:61-4:3).

164.    The specification of the 057 patent further discloses:

> For a patient with impaired CYP2D6 or CYP3A4 enzyme function who is a CYP2D6 poor metabolizer or CYP3A4 poor metabolizer,

the starting dose according to the present method would be about 75% of the recommended initial dose of 400 mg of aripiprazole for a patient with normal CYP2D6 or CYP3A4 enzyme function (i.e., about 300 mg, expressed as an equivalent weight of aripiprazole). For a patient with impaired CYP2D6 or CYP3A4 enzyme function who is a CYP2D6 poor metabolizer or a CYP3A4 poor metabolizer, and is concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor, (in particular, patients who are CYP2D6 or CYP3A4 poor metabolizers and concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor for about 14 days or more during treatment with a long-acting drug-containing suspension which delivers therapeutic plasma levels of aripiprazole) the starting dose according to the present method would be about 50% of the recommended initial dose of 400 mg of aripiprazole for a patient with normal CYP2D6 or CYP3A4 enzyme function (i.e. about 200 mg, expressed as an equivalent weight of aripiprazole).

(Ex. 1 (057 patent) at 5:14-35).

165.    The specification of the 057 patent further discloses:

In alternative embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function can be an extensive metabolizer (rather than a CYP2D6 or CYP3A4 poor metabolizer), who is concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor, in particular, patients who are extensive metabolizers and concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor for about 14 days or more during treatment with a long-acting drug-containing suspension which delivers therapeutic plasma levels of aripiprazole. For such patients, the starting dose can provide about 66% to about 75%, for example, about 66% of the amount of aripiprazole compared to the initial dose recommended for a patient with normal CYP2D6 and CYP3A4 enzyme function or about 75% of the amount of aripiprazole compared to the initial dose recommended for a patient with normal CYP2D6 and CYP3A4 enzyme function. If the recommended initial dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 400 mg of aripiprazole, the starting dose for a patient with impaired CYP2D6 or CYP3A4 enzyme function who is an extensive metabolizer concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor according to the present method would be about 75% of the recommended initial dose (i.e., about 300 mg, expressed as the equivalent weight of aripiprazole). If the recommended initial dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 300 mg of aripiprazole, the starting dose for a patient with impaired CYP2D6 or CYP3A4 enzyme function who is an extensive metabolizer concomitantly administered a strong CYP2D6 or

CYP3A4 inhibitor according to the present method would be about 66% of the recommended initial dose (i.e., about 200 mg, expressed as the equivalent weight of aripiprazole).

(Ex. 1 (057 patent) at 5:36-67).

166.    The specification of the 057 patent further discloses:

In yet other embodiments, the patient with impaired CYP2D6 or CYP3A4 enzyme function can be an extensive metabolizer (rather than a CYP2D6 or CYP3A4 poor metabolizer), who is concomitantly administered both a strong CYP2D6 and a strong CYP3A4 inhibitor. If the recommended initial dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 400 mg of aripiprazole, the starting dose for a patient with impaired CYP2D6 or CYP3A4 enzyme function who is an extensive metabolizer concomitantly administered both a strong CYP2D6 and a strong CYP3A4 inhibitor according to the present method would be about 50% of the recommended initial dose (i.e., about 200 mg, expressed as the equivalent weight of aripiprazole). If the recommended initial dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 300 mg of aripiprazole, the starting dose for a patient with impaired CYP2D6 or CYP3A4 enzyme function who is an extensive metabolizer concomitantly administered both a strong CYP2D6 and a strong CYP3A4 inhibitor according to the present method would be about 53% of the recommended initial dose (i.e., about 160 mg, expressed as the equivalent weight of aripiprazole).

(Ex. 1 (057 patent) at 6:1-23).

167.    The specification of the 057 patent further discloses:

In still other embodiments, a patient taking a CYP2D6 or CYP3A4 inducer, should entirely avoid intramuscularly administered dosage forms which release aripiprazole.

(Ex. 1 (057 patent) at 6:24-26).

### 3.    Prosecution History

168.    U.S. Patent Application No. 14/034,727 ("the 727 application") (Ex. 2 (File Wrapper for the 727 application, hereinafter "057 PH")) was filed on September 24, 2013.  The 727 application ultimately matured into the 057 patent.

169.    Cooley LLP, including specifically Thomas A. Blinka and/or Raymond S. Parker, III, originally handled prosecution of the 727 application.  (*See, e.g.*, Ex. 2 (057 PH), 09-24-13 Information Disclosure Statement at 2; Ex. 2 (057 PH), 02-17-16 Information Disclosure Statement at 3).

170.    On September 24, 2013, Applicants filed two "Declaration[s] (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)" from named inventor Arash Raoufinia and then-named inventor Robert McQuade.  (Ex. 2 (057 PH), 09-24-13 Raoufinia Declaration; Ex. 2 (057 PH), 09-24-13 McQuade Declaration).  The McQuade Declaration was dated August 29, 2013; the Raoufinia Declaration was undated.  (*Id.*).  Both declarations stated:

> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

(*Id.*).

171.    On September 24, 2013, Applicants filed an Information Disclosure Statement. (Ex. 2 (057 PH), 09-24-13 Information Disclosure Statement).  The Information Disclosure Statement stated: "In accordance with the duty of disclosure set forth in 37 C.F.R. § 1.56, Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98." (*Id.* at 1).

172.    The Information Disclosure Statement only cited U.S. Patent Nos. 7,115,587, 7,807,680, 8,338,427, and 8,431,576; U.S. Publication No. 2009/0022823; a 2012 Abilify Label ("Abilify Label 2012"); and a 2007 article by Hendset et al.  (Ex. 2 (057 PH), 09-24-13 Information Disclosure Statement).

173.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review, the Abilify Maintena Label 2013, or any of the documents published in the "Drug Approval Package" for Abilify Maintena.  (Ex. 2 (057 PH), 09-24-13 Information Disclosure Statement).

174.    On February 3, 2014, the Examiner issued a Non-Final Rejection.  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection).

175.    In the February 3, 2014 Non-Final Rejection, the Examiner rejected claims 1-12 and 14-19 as anticipated by a July 2013 article by Gopalakrishna et al. titled "Long-Acting Injectable Aripiprazole: How Might It Fit Into Our Tool Box?" ("Gopalakrishna") (Ex. 20).  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 7-12).

176.    In the February 3, 2014 Non-Final Rejection, the Examiner also rejected claims 1-19 as obvious over Gopalakrishna in view of the Abilify Label 2012.  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 13-20).

177.    In the February 3, 2014 Non-Final Rejection, The Examiner also rejected claims 1-20 as obvious over the Abilify Label 2012 in view of various other prior art references.  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 20-44).

178.    Gopalakrishna disclosed:

## Abilify Maintena™

Long-acting injectable aripiprazole was approved by the U.S. FDA on 28th February 2013 and will be marketed under the name Abilify Maintena. Like its oral predecessor it carries the same warnings including the black box warning of increased mortality in elderly patients with dementia-related psychosis (13). The medication is available as a lyophilized powder which needs to be reconstituted with the specific amount of sterile water included in the kit to form an opaque milky-white suspension. After reconstitution, the suspension can be stored in the vial but cannot be stored in the syringe. While not as convenient as LAIs distributed in pre-constituted vials, the ability to use a single vial to constitute a number of dose options is an advantage. To reconstitute, a specific volume of the sterile water must be injected into the vial to achieve either the 400-mg or 300-mg suspension dose. A 300-mg vial can be used to inject 300-mg, 200-mg or 160-mg doses, whereas a 400-mg vial can be used to inject all of the above and the 400-mg dose (see Table 2). This implies that, assuming the cost of 400-mg vial being higher than 300-mg vial, the 400-mg vial should be used only for doses of 400 mg to be cost effective. The reconstitution and administration, though complicated, provides flexibility for prescribers to modify the dose in smaller increments compared to preset fixed dosages in other available second-generation LAIs.

(Ex. 20 (Gopalakrishna) at 90).

179.    Gopalakrishna further disclosed:

> Dose modifications have been emphasized in the package insert among patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors for more than 14 days. It also advises to avoid using ALAI in the presence of a CYP3A4 inducer for more than 14 days, as the aripiprazole serum concentration drops to sub-therapeutic levels due to faster metabolism. This may pose constraints for prescribers using this long-acting antipsychotic over others. At the time of writing this review, pricing information is not available so any advantages or disadvantages from a cost perspective cannot be evaluated.

(Ex. 20 (Gopalakrishna) at 91).

180.    Gopalakrishna further disclosed (citing to the Abilify Maintena Label 2013):

| Table 2 Recommended Volume to Inject after Reconstitution of Abilify Maintena (13) | | | |
|---|---|---|---|
| 400-mg vial | | 300-mg vial | |
| Dose intended | Volume to inject | Dose | Volume to inject |
| 400 mg | 2 mL | — | — |
| 300 mg | 1.5 mL | 300 mg | 1.5 mL |
| 200 mg | 1 mL | 200 mg | 1 mL |
| 160 mg | 0.8 mL | 160 mg | 0.8 mL |

(Ex. 20 (Gopalakrishna) at 91).

181.    Gopalakrishna further disclosed:

| Table 3 | Comparison Among Available LAIs in the United States | | | | | |
|---|---|---|---|---|---|---|
| | **Fluphenazine decanoate** | **Haloperidol decanoate** | **Risperidone microspheres** | **Paliperidone palmitate** | **Olanzapine pamoate** | **Aripiprazole monohydrate** |
| Available dosage strengths | 25 mg/mL (variable dose) | 50 mg/mL, 100 mg/mL (variable dose) | 12.5 mg, 25 mg, 37.5 mg, 50 mg | 39 mg, 78 mg, 117 mg, 156 mg, 234 mg | 210 mg, 300 mg, 405 mg | 300 mg, 400 mg |
| Dose range | 12.5 to 100 mg | 20 to 450 mg | 12.5 to 50 mg | 39 to 234 mg | 150 to 405 mg | 160 to 400 mg |
| Maximum recommended dose | 100 mg every 2 weeks | 450 mg every 4 weeks | 50 mg every 2 weeks | 234 mg every 4 weeks | 300 mg every 2 weeks or 405 mg every 4 weeks | 400 mg |
| Injection site | Deltoid or gluteal | Deltoid or gluteal | Deltoid or gluteal | Deltoid or gluteal | Gluteal only | Gluteal only |
| Injection technique | Z-Track | Z-Track | Standard | Standard | Standard | Standard |
| Solubilization and vehicle | Ester in sesame seed oil | Ester in sesame seed oil | Microsphere matrix in aqueous suspension | Nanoparticles in aqueous suspension | Nanoparticles in aqueous suspension | Lyophilized powder reconstituted with sterile water to form an injectable suspension |
| Initiation or loading | Loading possible | Loading possible | None | Initiation required | Initiation required | None |
| Time to peak | 8–24 hours | 3–9 days | 4–5 weeks | 13 days | <1 week | 5–7 days |
| Overlap with oral | 1 week | 4 weeks (none if loading) | 3 weeks | None | None | 2 weeks |
| Time to steady state | 2–3 months | 2–3 months | 6–8 weeks | 36 days | 3 months | 3–4 months |

(Ex. 20 (Gopalakrishna) at 91).

182.    In the February 3, 2014 Non-Final Rejection, the Examiner also wrote:

> Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

(Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 13).

183.    However, Applicants never advised the PTO of any other inventors or invention dates of any claims that were not commonly owned.

184.    On April 3, 2014, Applicants filed an additional Information Disclosure Statement. (Ex. 2 (057 PH), 04-03-14 Information Disclosure Statement).   The Information Disclosure Statement stated: "In accordance with the duty of disclosure set forth in 37 C.F.R. § 1.56, Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98." (*Id.* at 1).

185.    The Information Disclosure Statement only cited the Abilify Maintena Label 2013. (Ex. 2 (057 PH), 04-03-14 Information Disclosure Statement).

186.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena. (Ex. 2 (057 PH), 04-03-14 Information Disclosure Statement).

187.    On April 3, 2014, Applicants submitted an Amendment/Request for Reconsideration After Non-Final Rejection.  (Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration).  Therein, Applicants wrote:

> Applicants submit that *Gopalakrishna* is not properly prior art . . . .
>
> On its face, *Gopalakrishna* was published in "Summer 2013" and thus was necessarily disclosed "1 year or less before the effective filing date" of the present application (September 24, 2013).  The aripiprazole doses cited in *Gopalakrishna* are embodied in Table 2, which cites to footnote 13 therein.  Footnote 13 references the ABILIFY MAINTENA package insert published by Otsuka Pharmaceutical Company Ltd. (OPC) in February of 2013, prior to the disclosure of *Gopalakrishna*. A copy of the ABILIFY MAINTENA package insert is submitted herewith in an IDS.
>
> The inventors, Robert McQuade and Arash Raoufinia, are employees of Otsuka Pharmaceutical Development and Commercialization, Inc. (OPDC), a subsidiary of OPC.  The subject matter relied upon by the Examiner in the rejection (*i.e.,* long-acting, injectable aripiprazole doses), and disclosed by *Gopalakrishna* was obtained from the ABILIFY MAINTENA package insert published by OPC, which at least indirectly obtained such subject matter from the inventors.  *See 132 Declaration*, paragraph 7.  Accordingly, the

disclosure of *Gopalakrishna* relied upon by the Examiner is not prior art under the exception of 35 USC 102(b)(1)(A).

Alternatively, since the ABILIFY MAINTENA package insert was published by OPC less than 1 year [*sic* – before] the effective filing date of the present invention prior to the disclosure of *Gopalakrishna*, and OPC at least indirectly obtained such subject matter from the inventors (*132 Declaration,* paragraph 7), the disclosure of *Gopalakrishna* relied upon by the Examiner is not prior art under the exception of 35 USC 102(b)(1)(B).

(*Id.* at 13-14 (emphasis added)).

188.    Applicants further wrote:

As noted above, *Gopalakrishna* is not properly prior art under the exception of 35 USC 102(b)(1)(A), as the disclosure relied upon by the Examiner therein was obtained from the ABILIFY MAINTENA package insert published by OPC, which at least indirectly obtained such subject matter from the inventors.  Alternatively, the disclosure of *Gopalakrishna* relied upon by the Examiner is not prior art under the exception of 35 USC 102(b)(1)(B) since the ABILIFY MAINTENA package insert was published by OPC before the disclosure of *Gopalakrishna*, and OPC at least indirectly obtained such subject matter from the inventors.  The remaining reference, the *Abilify Label*, cannot support *prima facie* obviousness as it fails to disclose (1) long-acting drug-containing suspensions which provide therapeutic plasma levels of aripiprazole over a period of about one month, (2) the specific dose adjustments for specific patient populations, relative to patients with "normal" CYP2D6 or CYP3A4 enzyme function as claimed.  Accordingly, *prima facie* obviousness has not been established, and for this reason alone, the rejection cannot be sustained.

(Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 19 (emphasis added)).

189.    Applicants further wrote:

Furthermore, as discussed in the accompanying *132 Declaration*, there is no simple relationship between the pharmacokinetics/ pharmacodynamics of a daily-dosed formulation and a long-acting (*i.e.* "over a period of about one month" as recited in the claimed invention) formulation. Consequently, without empirical knowledge of the release and clearance characteristics of the long-acting composition over the period of time between doses, there is no predictable way to *a priori* establish the appropriate dose for patients with reduced drug clearance as a result of reduced enzyme function

> (*e.g.*, due to CYP2D6 poor metabolizer status and/or administration
> of a CYP2D6 and/or CYP3A4 inhibitor), let alone based on the dose
> adjustments of the [Abilify Label 2012], suitable for a substantially
> different short-acting dosage form.  *See 132 Declaration*, paragraph
> 18.

(Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 21-22 (emphasis added)).

190.    Applicants further wrote:

> However, psychiatric patients taking long-acting medications are
> invariably outpatients (by virtue of the fact that they are not
> receiving daily doses), and therefore are not under close supervision
> by a physician.  Furthermore, because of the long duration of the
> medication, the dose cannot be adjusted frequently, and any under-
> dosing would persist for a substantial period of time. This
> combination of infrequent physician supervision and infrequent
> dose adjustment, as a practical matter, does not allow for titration of
> the dose because the risk of prolonged, unnoticed psychiatric
> symptoms is too dangerous for the patient (and those around the
> patient). Thus, ethically and medically, such experimentation to
> determine an appropriate dose of long-acting, aripiprazole-
> producing for patients with significantly reduced enzyme function
> is not possible.  Accordingly, any experimentation to adjust the
> dose, based on the recommendations of the [Abilify Label 2012],
> would not only be impracticable, but undue. *See 132 Declaration*,
> paragraphs 19 and 20.

(Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 23 (emphasis added)).

191.    On April 3, 2014, Applicants also submitted an Affidavit Traversing Rejections or

Objections Under Rule 132, which contained the Declaration of Arash Raoufinia, Pharm.D., Under

37 C.F.R. § 1.132, dated April 2, 2014.  (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration).

192.    On information and belief, Thomas A. Blinka and/or Raymond S. Parker, III (both

of Cooley LLP) were involved in preparing the April 2, 2014 Raoufinia Declaration.

193.    In his Declaration, Raoufinia wrote:

> I am a co-inventor of the subject matter described and claimed in the
> above-captioned application, which is assigned to Otsuka
> Pharmaceutical Co., Ltd. (hereinafter "Otsuka").  I presently serve
> as the Director of Clinical Pharmacology, Global Clinical
> Development at Otsuka Pharmaceutical Development &

> Commercialization, Inc., a subsidiary of Otsuka. Otsuka has developed an injectable, long-acting suspension of aripiprazole currently marketed as ABILIFY MAINTENA.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 1).

194.    In his Declaration, Raoufinia further wrote:

> I have a Pharm. D. from the Medical College of Virginia, and have 12 years of experience in clinical pharmacology, pharmacokinetics, and the development of drugs for the treatment of mental illness. During this period, I have carried out research in the area of Alzheimer's disease, schizophrenia, and depression. I also had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA, a long-acting aripiprazole suspension intended for monthly administration.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 2).

195.    In his Declaration, Raoufinia further wrote:

> I have reviewed the specification, claims, and pending Office Action in the above-captioned application, as well as the references cited therein.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 3).

196.    In his Declaration, Raoufinia further wrote:

> **The dose adjustments in the ABILIFY MAINTENA package insert** (published by Otsuka Pharmaceutical Company Ltd.) (OPC), as referenced in Table 2 of *Gopalakrishna* (Gopalakrishna et al., Clinical Schizophrenia and Related Psychoses, Summer 2013, pp. 87-82) **were provided to OPC by myself and my coinventor, Robert McQuade**.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 7 (emphasis added)).

197.    In his Declaration, Raoufinia further wrote:

> Furthermore, the dose adjustments provided in the [Abilify Label 2012] do not provide guidance to one of skill in the art regarding dose adjustments suitable for injectable suspensions which provide long-acting release of aripiprazole. There is no simple pharmacokinetic or pharmacodynamic relationship between short-acting daily dosage forms such as oral Abilify tablets or injectable short-acting aripiprazole *solutions*, and long-acting suspensions

intended to release aripiprazole over a period of at least about a month.  <u>Without detailed knowledge of how quickly the long-acting dosage form is released into the bloodstream and metabolized, there is no predictable way to determine, from dose adjustments suitable for quite different short-acting dosage forms, what dose adjustments would be appropriate for long-acting dosage forms</u>.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 18 (emphasis added)).

198.    In his Declaration, Raoufinia further wrote:

While it is not uncommon to adjust ("titrate") short-acting dosage forms to optimize efficacy and minimize side effects, physicians would not normally considered doing so for psychiatric medications in the form of long-acting dosage forms which release aripiprazole over a period of at least about a month. As a practical matter, psychiatric patients in need of treatment with aripiprazole and administered as a long-acting dosage form are invariably outpatients who are not under close (i.e. daily) supervision of a physician. Furthermore, because of the long duration of drug release inherent in long-acting dosage forms, the dose cannot be adjusted frequently. Accordingly, ethically and medically, titration of long-acting dosage forms (e.g. based on the much lower dose adjustments provided by the [Abilify Label 2012]) is not considered safe, and is not done as a practical matter because of the risk of prolonged, unsupervised under-dosing of the patient.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 19).

199.    In his Declaration, Raoufinia further wrote:

Moreover, as discussed in paragraph 18, above, there are no simple pharmacokinetic or pharmacodynamic relationships between short-acting and long-acting dosage forms which release aripiprazole, upon which one skilled in the art could estimate titration doses for a long-acting suspension type of dosage form. Attempts to titrate doses of long-acting aripiprazole-releasing suspensions also risks under- or over-dosing the patient, and as discussed above in paragraph 12, under-dosed psychiatric patients are at significant risk of self harm, or harming others, and prolonged under-dosing can exacerbate psychiatric symptoms, making ongoing treatment more difficult.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 20).

200.    In his Declaration, Raoufinia further wrote:

> I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true and further that these statements are made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under § 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the above-referenced application or any patent issuing thereon.

(Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 21).

201.    On information and belief, many of the statements in the April 2, 2014 Declaration were those that FDA's OCP Review Team provided to Otsuka.  (*See* Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶¶ 4, 8-13, 16-20).

202.    On May 8, 2014, the Examiner issued a Final Rejection.  (Ex. 2 (057 PH), 05-08-14 Final Rejection).

203.    In the May 8, 2014 Non-Final Rejection, the Examiner rejected claims 1, 4, 12, 15-16, 19, 22-23, and 27 as anticipated by Gopalakrishna, doing so "for the reasons set forth at pages 7-12 of previous office action dated February 3, 2014, of which reasons are herein incorporated by reference."  (Ex. 2 (057 PH), 05-08-14 Final Rejection at 8; *see also id.* at 8-17).

204.    In the May 8, 2014 Non-Final Rejection, the Examiner also rejected claims 1, 4, 12-13, 15-16, 19, 22-23, and 26-30 as obvious over Gopalakrishna in view of the Abilify Label 2012, "for the reasons set forth at pages 13-20 of previous office action dated February 3, 2014, of which reasons are herein incorporated by reference."  (Ex. 2 (057 PH), 05-08-14 Final Rejection at 18; *see also id.* at 18-36).

205.    In the May 8, 2014 Non-Final Rejection, the Examiner wrote:

> <u>Applicant has argued that Gopalakrishna is not properly prior art</u> and has argued that the 35 USC 102(b)(1)(B) exception applies. Applicant indicates that Gopalakrishna was published in the "summer 2013" and is thus within the 1 year grace period that

extends back to September 27, 2012. They indicate that the doses cited in Gopalakrishna are embodied in table 2 which cites to footnote 13 and that footnote 13 references the Abilify Maintena package insert which was published by Otsuka Pharmaceutical Company Ltd in February 2013 (also within the grace period). They state that the inventors are employees of Ostuka (OPDC) and that the subject matter relied upon by the examiner "i.e., long-acting, injectable aripiprazole doses" (see arguments page 14, 2nd paragraph) disclosed by Gopalakrishna was obtained from the Abilify Maintena label which is at least indirectly obtained from the inventors. <u>Applicants arguments have been considered and the material in table 2 is no longer prior art, however only the material in which applicant identifies as being obtained by them is part of the exception, the rest of the reference still applies. Applicant has only identified table 2 and the 'long-acting injectable aripiprazole doses' as being material obtained from the inventors. Gopalakrishna still anticipates the rejection without that material.</u>

(Ex. 2 (057 PH), 05-08-14 Final Rejection at 8-9 (emphasis added)).

206.    The Examiner further wrote:

> <u>Applicant has argued that Gopalakrishna is not properly prior art</u> and has argued that the 35 USC 102(b)(1)(B) exception applies. Applicant indicates that Gopalakrishna was published in the "summer 2013" and is thus within the 1 year grace period that extends back to September 27, 2012. <u>As indicated above with respect to the anticipation rejection, the reasons of which are herein incorporated by reference, applicant only identifies table 2, so that material is excluded however the rest of Gopalakrishna is still applicable.</u>

(Ex. 2 (057 PH), 05-08-14 Final Rejection at 18 (emphasis added)).

207.    The Examiner further wrote:

> Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

(Ex. 2 (057 PH), 05-08-14 Final Rejection at 17-18).

208.    On May 30, 2014, Applicants filed a Power of Attorney, which was signed by Seiji Ejima, Director, IP Department of Otsuka Pharmaceutical Co., Ltd.  (Ex. 2 (057 PH), 05-30-14 Power of Attorney).

209.    On November 7, 2014, Applicants filed a "Request to Correct Inventorship."  (Ex. 2 (057 PH), 11-07-14 Request to Correct Inventorship).   Therein, Applicants "request[ed] correction of inventorship . . . by removing Robert McQuade as an inventor" because, according to Applicants, "Robert McQuade was erroneously named as an inventor without deceptive intention on his part."  (*Id.* at 1).

210.    However, Raoufinia's statement in his April 2, 2014 Declaration that "[t]he dose adjustments . . . were provided to [Otsuka] by myself and my coinventor, Robert McQuade" (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 7) has never been corrected.

211.    On June 1, 2015, Applicants (including Thomas A. Blinka and Raymond S. Parker, III) had an interview with the Examiner.  (Ex. 2 (057 PH), 06-11-15 Applicant Initiated Interview Summary).  The Examiner summarized the substance of interview as follows:

> The Gopalakrishna reference and 102 rejection based on that reference was discussed; applicant indicated that they would also exclude the section with regard to dosage adjustments on page 91 of Gopalakrishna in addition to table 2.  Proposed claim language was discussed including clarification of the amount administered to be something such as 66-75% of a 300-400mg weight equivalent dose of arpiprazole to allow for the use of pro-drugs of aripiprazole.  The examiners indicated that definitive numbers would be an improvement with respect to the indefiniteness rejection but that the actual claim language would require further consideration. The teachings of the Abilify label and the Fleischhacker references were also discussed but no agreement was reached. The examiners encouraged applicant to include language to more specifically identify that this method is for an initial dosage while transitioning from an immediate release oral/intramuscular aripiprazole medication or a similar type of anti-psychotic medication and that it was not drawn to an ongoing treatment regimen.

(*Id.* (emphasis added)).

212.    On June 8, 2015, Applicants submitted a Request for Continued Examination.  (Ex. 2 (057 PH), 06-08-15 Request for Continued Examination).  Therein, Applicants wrote:

> The claims have been rejected as anticipated by *Gopalakrishna* . . . . Applicant thanks the Examiner for her indication that the "material in table 2 is no longer prior art" as it was derived from the ABILIFY MAINTENA package insert which is at least indirectly obtained from the inventor.  However, the Examiner has still maintained her rejection based on a citation to *Gopalakrishna's* disclosure at page 91, column 2, lines 1-11, and Table 3.
>
> Applicant respectfully submits that *Gopalakrishna's* disclosure at page 91, column 2, lines 1-11 is also excluded as prior art, for the same reasons as the material in table 2.  This citation states, in part "[d]ose modifications have been emphasized ***in the package insert*** among patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors . . . ." (emphasis added).

(*Id.* at 11 (non-bold emphasis added, bold emphasis in original)).

213.    Applicants further wrote:

> On its face, *Gopalakrishna* was published in "Summer 2013" and thus was necessarily disclosed "1 year or less before the effective filing date" of the present application (September 24, 2013). In the context of *Gopalakrishna*, which is directed to administration of aripiprazole depot (*i.e.*, ABILIFY MAINTENA), the disclosure at page 91, column 2, lines 1-11 of *Gopalakrishna* can reasonably only be interpreted as derived from the ABILIFY MAINTENA package insert.
>
> The inventor, Arash Raoufinia, is an employee of Otsuka Pharmaceutical Development and Commercialization, Inc. (OPDC), a subsidiary of Otsuka Pharmaceutical Company Ltd. (OPC).  The subject matter relied upon by the Examiner in the rejection (*i.e.*, at page 91, column 2, lines 1-11 of *Gopalakrishna*) was obtained from the ABILIFY MAINTENA package insert published by OPC, which at least indirectly obtained such subject matter from **the inventor** (who **provided the dose adjustment information used in the label for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors**).  Accordingly, the disclosure at page 91, column 2, lines 1-11 of *Gopalakrishna* relied upon by the Examiner cannot be prior art under the exception of 35 USC 102(b)(1)(A).

> Alternatively, since the ABILIFY MAINTENA package insert was published by OPC less than 1 year the effective filing date of the present invention prior to the disclosure at page 91, column 2, lines 1-11 of *Gopalakrishna*, and OPC at least indirectly obtained such subject matter from the inventor (*132 Declaration* filed April 3, 2014, paragraph 7), <u>this and other disclosures of *Gopalakrishna* related to dose adjustments for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 or CYP3A4 inhibitors, relied upon by the Examiner, cannot be prior art under the exception of 35 USC 102(b)(1)(B)</u>.
>
> As <u>the disclosures in *Gopalakrishna* related to dose adjustments for patients who are poor CYP2D6 metabolizers or on concomitant CYP2D6 and/or CYP3A4 inhibitors are not prior art</u>, the rejection under 35 USC § 102(a)(l) necessarily fails . . . .

(Ex. 2 (057 PH), 06-08-15 Request for Continued Examination at 12-13 (emphasis added)).

214.    Applicants further wrote:

> As discussed above, <u>none of the disclosures in *Gopalakrishna* related to poor metabolizers, or concomitant administration of strong inhibitors are properly prior art</u>.  Accordingly, as a matter of law *Gopalakrishna* cannot be relied upon by the Examiner as disclosing any method of administering to the claimed patient populations, let alone as disclosing adjusting the recommended dose administered to such patients.

(Ex. 2 (057 PH), 06-08-15 Request for Continued Examination at 15 (emphasis added)).

215.    On July 30, 2015, the Examiner sent notice to Applicants that the June 8, 2015 Request for Continued Examination "could not be entered because it fails to comply with the requirements of the accelerated examination program."  (Ex. 2 (057 PH), 07-30-15 Notice of Informal or Non-Responsive Continued Prosecution Application (CPA) Amendment).  Applicants were given one month to "supply the omission or correction in order to avoid abandonment."  (*Id.*).

216.    On August 27, 2015, Applicants filed an additional Information Disclosure Statement.  (Ex. 2 (057 PH), 08-27-15 Information Disclosure Statement).  The Information Disclosure Statement stated: "In accordance with the duty of disclosure set forth in 37 C.F.R. §

1.56, Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98." (*Id.* at 1).

217.    The Information Disclosure Statement only cited a 2012 article by Kane et al. ("Kane").  (Ex. 2 (057 PH), 08-27-15 Information Disclosure Statement).

218.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena. (Ex. 2 (057 PH), 08-27-15 Information Disclosure Statement).

219.    On August 27, 2015, Applicants filed a Preliminary Amendment and Supplemental Accelerated Examination Support Document.    (Ex. 2 (057 PH), 08-27-15 Preliminary Amendment; Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document).

220.    In the Supplemental Accelerated Examination Support Document, Applicants wrote:

> In determining which references are most closely deemed related to the claimed invention, a variety of sources were considered.  Those sources included: a) references listed in Information Disclosure Statements in compliance with 37 C.F.R. §1.98 which were filed on September 24, 2013 and on April 3, 2014, during the prosecution of the instant application; b) references cited in PTO-892 form, mailed on February 3, 2014, by the Examiner during the prosecution of the instant application; and c) a new Information Disclosure Statement in compliance with 37 C.F.R. $1.98. Each of the following references are deemed to be the most closely related to the subject matter of the claims.

(Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 4).  The references "deemed to be the most closely related to the subject matter of the claims," as identified by Applicants, included Gopalakrishna, but did not include the Clinical Pharmacology Review or the Abilify Maintena Label 2013.  (*Id.* at 5).

221.    In the Supplemental Accelerated Examination Support Document, Applicants further wrote:

> Table 2 of Gopalakrishna et al. and any material referencing a "package insert" for Abilify Maintena (13) are excluded as prior art under 35 USC 102(b)(1).  Applicants note that *Gopalakrishna* was published in the "[s]ummer [of] 2013", less than one year prior to the filing of the instant application on September 24, 2013.  The disclosure in the section of *Gopalakrishna* entitled "Abilify Maintena<sup>TM</sup>" at pp. 90-91, as well as the column in Table 3 entitled "Aripiprazole monohydrate" disclose information from, or are derived from the Abilify Maintena package insert as indicated by endnote 13, and explicit attribution to the "[Abilify Maintena] package insert."  Further, as stated at p. 14, paragraph 3, of the Reply to non-final Office Action filed by Applicant on April 3, 2014 "[t]he subject matter relied upon by the Examiner in the rejection (*i.e.*, long-acting, injectable aripiprazole doses), and disclosed by *Gopalakrishna* was obtained from the ABILIFY MAINTENA package insert published by OPC, which at least indirectly obtained such subject matter from the inventors.  *See 132 Declaration*, paragraph 7."

(Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 5 n.1 (emphasis added)).

222.    In the Supplemental Accelerated Examination Support Document, Applicants also compared the currently pending claims to the disclosure of Gopalakrishna, identifying which claim limitations purportedly were or were not disclosed in Gopalakrishna, including because certain disclosures of Gopalakrishna were allegedly not prior art.  (Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 13-24).

223.    On November 3, 2015, the Examiner issued a Non-Final Rejection.  (Ex. 2 (057 PH), 11-03-15 Non-Final Rejection).  The Examiner issued multiple rejections, but Gopalakrishna was not included as a prior art reference in any such rejections.  (Ex. 2 (057 PH), 11-03-15 Non-Final Rejection at 7-38).

224.    On January 4, 2016, Applicants submitted an Amendment/Request for Reconsideration After Non-Final Rejection.  (Ex. 2 (057 PH), 01-04-16 Amendment/Request for Reconsideration).

225.    On January 29, 2016, Applicants (including Thomas A. Blinka and Raymond S. Parker, III) had an interview with the Examiner.  (Ex. 2 (057 PH), 02-11-16 Applicant Initiated Interview Summary).  Applicants and the Examiner discussed various "prior art of record."  (*Id.*). The Examiner summarized the substance of interview, in part, as follows:

> The possibility of a declaration by the inventors was discussed.  <u>The examiners indicated it would be helpful to have more information on how they came to the dosages that they arrived at</u>, particularly if they tried amounts suggested by prior art and found them to be insufficient, found a small dosage adjustment made a big difference in the pharmacodynamic effects of the aripiprazole.  Applicant's attorneys indicated that they would discuss the possibility of a declaration with applicant and filing a supplemental response to cite the In Re Cyclobenzaprine decision on the record.

(*Id.* (emphasis added)).

226.    On February 17, 2016, Applicants filed an additional Information Disclosure Statement.  (Ex. 2 (057 PH), 02-17-16 Information Disclosure Statement).  The Information Disclosure Statement stated: "In accordance with the duty of disclosure set forth in 37 C.F.R. § 1.56, Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98."  (*Id.* at 1).

227.    The Information Disclosure Statement only cited *In re Cyclobenzaprine Hydrochloride Extended-Release Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012).  (Ex. 2 (057 PH), 02-17-16 Information Disclosure Statement).

228.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena. (Ex. 2 (057 PH), 02-17-16 Information Disclosure Statement).

229.    On February 17, 2016, Applicants submitted a Supplemental Response.  (Ex. 2 (057 PH), 02-17-16 Supplemental Response).  Therein, Applicants wrote:

> [N]o correlation could be drawn between references regarding short acting aripiprazole formulations and the long acting aripiprazole formulation.

(*Id.* at 4).

230.    Applicants further wrote:

> [A]s the Examiner has not pointed to anything in the art that evidences that the art appreciated a PK/PD relationship was known for using a long acting aripiprazole formulations in the particular enzyme impaired (clearance impaired) patient populations, and that no correlation of a PK/PD relationship was known between the short acting and long acting aripiprazole formulations, then the rejections over the art cited is improper and should be withdrawn.  Applicant also submits that the Supplemental 132 Declaration of Dr. Raoufinia makes it clear that the presently claimed dose adjustments could not have been predicted from the prior art of record, more particularly the art related to short acting aripiprazole dosage forms, but would only have been discernible from the analysis of clinical trial results for the long acting injectable aripiprazole dosage form.

(Ex. 2 (057 PH), 02-17-16 Supplemental Response at 6 (emphasis added); *see also id.* at 5-6).

231.    On February 17, 2016, Applicants also submitted an Affidavit Traversing Rejections or Objections Under Rule 132, which contained the Supplemental Declaration Under 37 C.F.R. § 1.132 of Arash Raoufinia, Pharm.D., dated February 17, 2016.  (Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration).

232.    On information and belief, Thomas A. Blinka and/or Raymond S. Parker, III (both of Cooley LLP) were involved in preparing the February 17, 2016 Raoufinia Declaration.

233.    In his Supplemental Declaration, Raoufinia wrote:

> I am the inventor of the subject matter described and claimed in the above-captioned application, which is assigned to Otsuka Pharmaceutical Co., Ltd. (hereinafter "Otsuka").  I presently serve as the Director of Clinical Pharmacology, Global Clinical Development at Otsuka Pharmaceutical Development &

Commercialization, Inc., a subsidiary of Otsuka. Otsuka has developed an injectable, long-acting suspension of aripiprazole currently marketed as ABILIFY MAINTENA.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 1).

234. In his Supplemental Declaration, Raoufinia further wrote:

I have a Pharm. D. from the Medical College of Virginia, and have 12 years of experience in clinical pharmacology, pharmacokinetics, and the development of drugs for the treatment of mental illness. During this period, I have carried out research in the area of Alzheimer's disease, schizophrenia, and depression. I also had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA, a long-acting aripiprazole suspension intended for monthly administration.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 2).

235. In his Supplemental Declaration, Raoufinia further wrote:

I have reviewed the specification, pending claims, and Office Action dated November 3, 2015, in the above-captioned application, as well as the references cited therein.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 3).

236. In his Supplemental Declaration, Raoufinia further wrote:

This Declaration is intended to supplement the matters raised in my Declaration submitted on April 3, 2014.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 4).

237. In his Supplemental Declaration, Raoufinia further wrote:

As one of skill in the art, I submit the following:

- none of the art cited discloses a pharmacokinetic/pharmacodynamic (PK/PD) relationship for a dose regimen using a long acting aripiprazole suspension formulation in an enzyme impaired patient population;

- the release profile for short acting oral aripiprazole tablets or injectable short-acting aripiprazole solutions is substantially

different from that of the long acting suspension formulation used in the claimed invention;

- none of the art discloses that there is a way to correlate PK/PD information about short acting oral aripiprazole tablets or injectable short-acting aripiprazole solutions to PK/PD information for a dose regimen using a long acting suspension formulation in an enzyme impaired patient population;

- **without the conducting of an appropriately designed clinical trial** using the long acting aripiprazole suspension formulation in an enzyme impaired patient population **one would not have known what, or if any, dose adjustment needed to be made**; and

- **the particular claimed adjustment to the normal dose regimen** could not have been predicted based on the cited art, particularly art related to short-acting, daily dosed aripiprazole dosage forms, but **was only determined from the analysis of the clinical trial results**.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 5 (emphasis added)).

238.    In his Supplemental Declaration, Raoufinia further wrote:

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true and further that these statements are made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under § 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the above-referenced application or any patent issuing thereon.

(Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 6).

239.    On March 10, 2016, the Examiner issued a Final Rejection.  (Ex. 2 (057 PH), 03-10-16 Final Rejection).

240.    On June 10, 2016, Applicants filed an additional Information Disclosure Statement. (Ex. 2 (057 PH), 06-10-16 Information Disclosure Statement).   The Information Disclosure Statement stated: "In accordance with the duty of disclosure set forth in 37 C.F.R. § 1.56,

Applicant(s) hereby submit the following information in conformance with 37 C.F.R. §§ 1.97 and 1.98." (*Id.* at 1).

241.    The Information Disclosure Statement only cited ARISTADA Prescribing Information. (Ex. 2 (057 PH), 06-10-16 Information Disclosure Statement).

242.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena. (Ex. 2 (057 PH), 06-10-16 Information Disclosure Statement).

243.    On June 10, 2016, Applicants filed a Notice of Appeal of the Examiner's March 10, 2016 Final Rejection to the Patent Trial and Appear Board ("PTAB"). (Ex. 2 (057 PH), 06-10-16 Notice of Appeal Filed).

244.    On March 12, 2019, the PTAB reversed the Examiner, relying in part on the April 2, 2014 Raoufinia Declaration. (Ex. 2 (057 PH), 03-12-19 PTAB Decision at 8-10). The PTAB wrote that "[d]eclaratory evidence as to issues of fact is entitled to substantial weight." (*Id.* at 9).

245.    On August 30, 2019, Applicants filed a Power of Attorney, which switched prosecution counsel from Thomas A. Blinka (of Cooley LLP) to Adriana L. Burgy (of Finnegan, Henderson, Farabow, Garrett & Dunner LLP). (Ex. 2 (057 PH), 08-30-19 Power of Attorney). Finnegan LLP, including specifically Adriana L. Burgy, subsequently handled prosecution of the 727 application (and handled prosecution for the remaining Raoufinia Patents).

246.    On September 17, 2019, the PTO issued a Notice of Allowance. (Ex. 2 (057 PH), 09-17-19 Notice of Allowance).

**B.    The 803 Patent**

247.    The 803 patent is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION." (Ex. 3 (803 patent) at Title).

248. The inventor listed on the face of the 803 patent is "Arash Raoufinia." (Ex. 3 (803 patent) at Inventor).

249. The 803 patent is a continuation of the 057 patent and claims priority to the 057 patent. (Ex. 3 (803 patent) at Related U.S. Application Data).

250. The 803 patent issued on April 20, 2021. (Ex. 3 (803 patent) at Date of Patent).

251. The 803 patent is listed in the Orange Book under NDA No. 202971.

### 1. **Claims**

252. The 803 patent has 26 claims (6 independent claims and 20 dependent claims).

253. The claims of the 803 patent are as follows:

1. A method of treating schizophrenia in a patient comprising:

   intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg or of aripiprazole prodrug of about 441 mg,

   wherein the dose is systemically released over a period of about one month, and the patient is a CYP2D6 poor metabolizer.

2. The method of claim 1, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

3. The method of claim 2, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

4. The method of claim 1, wherein the aripiprazole prodrug is 7-(4-(4-(2,3-dichlorophenyl)piperazin-l-yl)butoxy)-2-oxo-3,4-dihydroquinolin-l(2H)-yl)methyl dodecanoate.

5. The method of claim 1, wherein the patient is not concomitantly administered a strong CYP3A4 inhibitor or a strong CYP2D6 inhibitor.

6. A method of treating schizophrenia in a patient comprising:

   intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg,

wherein the dose is systemically released over a period of about one month and the patient is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor.

7. The method of claim 6, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

8. The method of claim 7, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

9. A method of treating schizophrenia in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 300 mg or of aripiprazole prodrug of 441 mg,

wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor and where an initial recommended dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 400 mg of aripiprazole or 662 mg of aripiprazole prodrug.

10. The method of claim 9, wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer.

11. The method of claim 9, wherein the patient's concomitant use of a strong CYP2D6 inhibitor or a strong CYP3A4 inhibitor is for at least 14 days.

12. The method of claim 9, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

13. The method of claim 11, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

14. A method of treating schizophrenia in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg,

wherein the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors, where an initial recommended dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 400 mg, and the dose is systemically released over a period of about one month.

15. The method of claim 14, wherein the patient's concomitant use of CYP2D6 and a CYP3A4 inhibitors is for at least 14 days.

16. The method of claim 14, wherein the patient is a CYP2D6 and CYP3A4 extensive metabolizer.

17. The method of claim 14, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

18. The method of claim 17, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

19. A method of treating schizophrenia in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 198 mg,

wherein the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor, where an initial recommended dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 300 mg, and the dose is systemically released over a period of about one month.

20. The method of claim 19, wherein the patient's concomitant use of a strong CYP2D6 or CYP3A4 inhibitor is for at least 14 days.

21. The method of claim 19, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

22. The method of claim 21, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

23. A method of treating schizophrenia in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 159 mg,

wherein the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors, where an initial recommended dose for a patient with normal CYP2D6 or CYP3A4 enzyme function is 300 mg of aripiprazole, and the dose is systemically released over a period of about one month.

24. The method of claim 23, wherein the patient's concomitant use of CYP2D6 and CYP3A4 inhibitors is for at least 14 days.

25. The method of claim 23, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

> 26. The method of claim 25, wherein the gluteal muscle is chosen from ventrogluteal muscle and dorsogluteal muscle.

(Ex. 3 (803 patent) at Claims 1-26).

### 2.    Specification

254.    The specification of the 803 patent is substantially the same as the specification of the 057 patent.

### 3.    Prosecution History

255.    U.S. Patent Application No. 16/710,495 ("the 495 application") (Ex. 4 (File Wrapper for the 495 application, hereinafter "803 PH")) was filed on December 11, 2019.  The 495 application ultimately matured into the 803 patent.

256.    Finnegan LLP, including specifically Adriana L. Burgy, handled prosecution of the 495 application.  (*See, e.g.*, Ex. 4 (803 PH), 12-11-19 Fee Transmittal Letter at 1).

257.    On December 11, 2019, Applicants filed a "Declaration (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)" from named inventor Arash Raoufinia.  (Ex. 4 (803 PH), 12-11-19 Raoufinia Declaration).  The declaration was undated. (*Id.*).  The declaration stated:

> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

(*Id.*).

258.    On August 6, 2020, Applicants filed a Preliminary Amendment.  (Ex. 4 (803 PH), 08-06-20 Preliminary Amendment).

259.    On August 24, 2020, Applicants filed a Power of Attorney, which was signed by Masaki Sobe, Director, IP Department of Otsuka Pharmaceutical Co., Ltd.  (Ex. 4 (803 PH), 08-24-20 Power of Attorney).

260.    On December 24, 2020, the PTO issued a Notice of Allowance.  (Ex. 4 (803 PH), 12-24-20 Notice of Allowance).  In the "Reasons for Allowance," the Examiner wrote:

> The Examiner has considered the decision of the PTAB in parent application No. 14/034,727 dated March 12, 2019, particularly at pages 8-10 thereof relating the criticalness of IM administration of aripiprazole in the claimed patient population, and conducted a thorough search of the appropriate data bases for the claimed subject matter and did not discover any reference which anticipates that claimed subject matter or would form a basis for concluding that the claimed subject matter would have been obvious. . . . Accordingly, the Examiner believes the claimed subject matter to be currently in condition for allowance.

(*Id.* at 2).

261.    In the List of References Cited by Examiner, the "Search Notes" state that "Parent application/board decision reviewed."  (Ex. 4 (803 PH), at 12-24-20 Search Notes).

### C.    The 553 Patent

262.    The 553 patent is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION."  (Ex. 5 (553 patent) at Title).

263.    The inventor listed on the face of the 553 patent is "Arash Raoufinia."  (Ex. 5 (553 patent) at Inventor).

264.    The 553 patent is a continuation of the 803 patent and claims priority to the 057 patent.  (Ex. 5 (553 patent) at Related U.S. Application Data).

265.    The 553 patent issued on October 26, 2021.  (Ex. 5 (553 patent) at Date of Patent).

266.    The 553 patent is listed in the Orange Book under NDA No. 202971.

1.    **Claims**

267.    The 553 patent has 30 claims (4 independent claims and 26 dependent claims).

268.    The claims of the 553 patent are as follows:

1. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 160 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension,

wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors.

2. The method according to claim 1, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension.

3. The method according to claim 1, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

4. The method according to claim 1, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

5. The method according to claim 1, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

6. The method according to claim 1, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

7. The method according to claim 6, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

8. The method according to claim 7, wherein the suspending agent is carboxymethyl cellulose sodium, the bulking agent is mannitol.

9. The method according to claim 1, wherein the aripiprazole have a mean particle size of about 1 to about 30 microns.

10. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 160 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension,

wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of CYP2D6 and CYP3A4 inhibitors,

wherein the dose is systemically released over a period of about one month,

the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension,

the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and

the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

11. The method according to claim 10, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

12. The method according to claim 11, the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

13. The method according to claim 12, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

14. The method according to claim 13, wherein the suspending agent is carboxymethyl cellulose sodium, the bulking agent is mannitol.

15. The method according to claim 14, wherein the aripiprazole have a mean particle size of about 1 to about 30 microns.

16. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension,

wherein the dose is systemically released over a period of about one month and the patient is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor.

17. The method according to claim 16, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension.

18. The method according to claim 16, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

19. The method according to claim 16, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

20. The method according to claim 16, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

21. The method according to claim 16, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

22. The method according to claim 21, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

23. The method according to claim 22, wherein the suspending agent is carboxymethyl cellulose sodium, the bulking agent is mannitol.

24. The method according to claim 16, wherein the aripiprazole have a mean particle size of about 1 to about 30 microns.

25. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg and co-administering to the patient an oral antipsychotic after a first

administration of said adjusted dose of the long-acting suspension,

wherein the dose is systemically released over a period of about one month,

the patient is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor,

the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension,

the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and

the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

26. The method according to claim 25, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

27. The method according to claim 26, the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

28. The method according to claim 27, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

29. The method according to claim 28, wherein the suspending agent is carboxymethyl cellulose sodium, the bulking agent is mannitol.

30. The method according to claim 29, wherein the aripiprazole have a mean particle size of about 1 to about 30 microns.

(Ex. 5 (553 patent) at Claims 1-30).

## 2.      Specification

269.    The specification of the 553 patent is substantially the same as the specification of

the 057 patent.

### 3.    **Prosecution History**

270.    U.S. Patent Application No. 17/304,610 ("the 610 application") (Ex. 6 (File Wrapper for the 610 application, hereinafter "553 PH")) was filed on June 23, 2021.  The 610 application ultimately matured into the 553 patent.

271.    Finnegan LLP, including specifically Adriana L. Burgy, handled prosecution of the 610 application.  (*See, e.g.*, Ex. 6 (553 PH), 06-23-21 Fee Transmittal Letter at 1).

272.    On June 23, 2021, Applicants filed a "Declaration (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)" from named inventor Arash Raoufinia.  (Ex. 6 (553 PH), 06-23-21 Raoufinia Declaration).  The declaration was undated.  (*Id.*).  The declaration stated:

> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

(*Id.*).

273.    On June 23, 2021, Applicants filed Information Disclosure Statement.  (Ex. 6 (553 PH), 06-23-21 Information Disclosure Statement).

274.    The Information Disclosure Statement cited several references, including the Abilify Maintena Label 2013 and Gopalakrishna.  (Ex. 6 (553 PH), 06-23-21 Information Disclosure Statement).

275.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena.  (Ex. 6 (553 PH), 06-23-21 Information Disclosure Statement).

276.    On June 23, 2021, Applicants filed a Power of Attorney, which was signed by Masaki Sobe, Director, IP Department of Otsuka Pharmaceutical Co., Ltd. (Ex. 6 (553 PH), 06-23-21 Power of Attorney).

277.    On June 23, 2021, Applicants filed a Preliminary Amendment. (Ex. 6 (553 PH), 06-23-21 Preliminary Amendment).

278.    On July 21, 2021, the PTO issued a Notice of Allowance. (Ex. 6 (553 PH), 07-21-21 Notice of Allowance). In the "Reasons for Allowance," the Examiner wrote:

> The Examiner has considered the decision of the PTAB in parent application No. 14/034,727 dated March 12, 2019, particularly at pages 8-10 thereof relating the criticalness of IM administration of aripiprazole in the claimed patient population, and conducted a thorough search of the appropriate data bases for the claimed subject matter and did not discover any reference which anticipates that claimed subject matter or would form a basis for concluding that the claimed subject matter would have been obvious. . . . Accordingly, the Examiner believes the claimed subject matter to be currently condition for allowance.

(*Id.* at 2-3).

279.    In the List of References Cited by Examiner, the "Search Notes" state that "Parent application/board decision reviewed." (Ex. 6 (553 PH), at 07-21-21 Search Notes).

**D.    The 547 Patent**

280.    The 547 patent is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION." (Ex. 7 (547 patent) at Title).

281.    The inventor listed on the face of the 547 patent is "Arash Raoufinia." (Ex. 7 (547 patent) at Inventor).

282.    The 547 patent is a continuation of the 553 patent and claims priority to the 057 patent. (Ex. 7 (547 patent) at Related U.S. Application Data).

283. The 547 patent issued on May 31, 2022. (Ex. 7 (547 patent) at Date of Patent).

284. The 547 patent is listed in the Orange Book under NDA No. 202971.

### 1. Claims

285. The 547 patent has 24 claims (3 independent claims and 21 dependent claims).

286. The claims of the 547 patent are as follows:

1. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

> intramuscularly administering to a patient a long-acting suspension of an adjusted dose of aripiprazole of 200 mg or 300 mg,

> wherein the dose is released over a period of about one month, the patient is concomitantly administered a strong CYP2D6 or CYP3A4 inhibitor, and

> administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer.

2. The method according to claim 1, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

3. The method according to claim 1, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

4. The method according to claim 3, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

5. The method according to claim 4, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

6. The method according to claim 1, wherein aripiprazole has a mean particle size ranging from about 1 to about 30 microns.

7. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to a patient a long-acting suspension of an adjusted dose of aripiprazole and co-administering to a patient an oral antipsychotic after a first administration of the adjusted dose of the long-acting suspension,

wherein the adjusted dose is 300 mg or 200 mg when the patient is taking a strong CYP2D6 or CYP3A4 inhibitor,

the adjusted dose is 200 mg or 160 mg when the patient is taking a CYP2D6 and CYP3A4 inhibitor, and

administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer.

8. The method according to claim 7, wherein the adjusted dose is 300 mg or 200 mg when the patient is taking a strong CYP2D6 or CYP3A4 inhibitor for 14 days or more.

9. The method according to claim 7, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension.

10. The method according to claim 9, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

11. The method according to claim 7, wherein the co-administration of the oral antipsychotic helps achieve a steady state level of aripiprazole after the first administration of the adjusted dose.

12. The method according to claim 7, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

13. The method according to claim 12, the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

14. The method according to claim 13, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

15. The method according to claim 7, wherein aripiprazole has a mean particle size ranging from about 1 to about 30 microns.

16. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering a long-acting suspension of a dose of aripiprazole of about 300 mg or 400 mg and co-administering an oral antipsychotic after a first administration of the dose of the long-acting suspension to a patient taking a CYP3A4 inducer,

wherein use of the CYP3A4 inducer is avoided after an administration of the long-acting suspension.

17. The method according to claim 16, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the dose of the long-acting suspension.

18. The method according to claim 17, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

19. The method according to claim 16, wherein the co-administration of the oral antipsychotic helps achieve a steady state level of aripiprazole after the first administration of the dose.

20. The method according to claim 16, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

21. The method according to claim 16, wherein a long-acting suspension comprises the dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

22. The method according to claim 21, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

23. The method according to claim 21, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

24. The method according to claim 16, wherein aripiprazole has a mean particle size ranging from about 1 to about 30 microns.

(Ex. 7 (547 patent) at Claims 1-24).

## 2.    <u>Specification</u>

287.    The specification of the 547 patent is substantially the same as the specification of the 057 patent.

### 3.    **Prosecution History**

288.    U.S. Patent Application No. 17/459,221 ("the 221 application") (Ex. 8 (File Wrapper for the 221 application, hereinafter "547 PH")) was filed on August 27, 2021.  The 221 application ultimately matured into the 547 patent.

289.    Finnegan LLP, including specifically Adriana L. Burgy, handled prosecution of the 221 application.  (*See, e.g.*, Ex. 8 (547 PH), 08-27-21 Fee Transmittal Letter at 1).

290.    On August 27, 2021, Applicants filed a "Declaration (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)" from named inventor Arash Raoufinia.  (Ex. 8 (547 PH), 08-27-21 Raoufinia Declaration).  The declaration was undated.  (*Id.*).  The declaration stated:

> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

(*Id.*).

291.    On August 27, 2021, Applicants filed an Information Disclosure Statement.  (Ex. 8 (547 PH), 08-27-21 Information Disclosure Statement).

292.    The Information Disclosure Statement cited several references, including the Abilify Maintena Label 2013 and Gopalakrishna.  (Ex. 8 (547 PH), 08-27-21 Information Disclosure Statement).

293.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena.  (Ex. 8 (547 PH), 08-27-21 Information Disclosure Statement).

294.    On August 27, 2021, Applicants filed a Power of Attorney, which was signed by Masaki Sobe, Director, IP Department of Otsuka Pharmaceutical Co., Ltd. (Ex. 8 (547 PH), 08-27-21 Power of Attorney).

295.    On August 27, 2021, Applicants filed a Preliminary Amendment. (Ex. 8 (547 PH), 08-27-21 Preliminary Amendment).

296.    On December 17, 2021, the Examiner issued a Non-Final Rejection. (Ex. 8 (547 PH), 12-17-21 Non-Final Rejection). The Examiner's corresponding "Search Notes" state that "Parent application/board decision reviewed." (Ex. 8 (547 PH), 12-17-21 Search Notes).

297.    On March 17, 2022, Applicants submitted an Amendment/Request for Reconsideration After Non-Final Rejection. (Ex. 8 (547 PH), 03-17-22 Amendment/Request for Reconsideration).

298.    On April 4, 2022, the PTO issued a Notice of Allowance. (Ex. 8 (547 PH), 04-04-22 Notice of Allowance).

### E.    The 087 Patent

299.    The 087 patent is titled "METHOD OF PROVIDING ARIPIPRAZOLE TO PATIENTS HAVING IMPAIRED CYP2D6 OR CYP3A4 ENZYME FUNCTION." (Ex. 9 (087 patent) at Title).

300.    The inventor listed on the face of the 087 patent is "Arash Raoufinia." (Ex. 9 (087 patent) at Inventor).

301.    The 087 patent is a continuation of abandoned U.S. Patent Application No. 17/206,241, which is a continuation of the 803 patent, and claims priority to the 057 patent. (Ex. 9 (087 patent) at Related U.S. Application Data).

302.    The 087 patent issued on August 2, 2022. (Ex. 9 (087 patent) at Date of Patent).

303.    The 087 patent is listed in the Orange Book under NDA No. 202971.

1.    **Claims**

304.    The 087 patent has 30 claims (4 independent claims and 26 dependent claims).

305.    The claims of the 087 patent are as follows:

1. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension,

wherein the dose is systemically released over a period of about one month and the patient is a CYP2D6 poor metabolizer.

2. The method according to claim 1, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension.

3. The method according to claim 1, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

4. The method according to claim 1, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

5. The method according to claim 1, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

6. The method according to claim 1, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

7. The method according to claim 6, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

8. The method according to claim 7, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

9. The method according to claim 1, wherein the aripiprazole has a mean particle size of about 1 to about 30 microns.

10. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

> intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of about 300 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long-acting suspension,

> wherein the dose is systemically released over a period of about one month,

> the patient is a CYP2D6 poor metabolizer,

> the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension,

> the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and

> the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

11. The method according to claim 10, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

12. The method according to claim 11, the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

13. The method according to claim 12, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

14. The method according to claim 13, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

15. The method according to claim 14, wherein the aripiprazole has a mean particle size of about 1 to about 30 microns.

16. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 300 mg or 200 mg and co-administering to the patient an oral antipsychotic after a first administration of said adjusted dose of the long acting suspension,

wherein the dose is systemically released over a period of about one month, and the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor.

17. The method according to claim 16, wherein the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension.

18. The method according to claim 16, wherein the oral antipsychotic is 10 mg or 20 mg per day of aripiprazole.

19. The method according to claim 16, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

20. The method according to claim 16, wherein the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

21. The method according to claim 16, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

22. The method according to claim 21, wherein the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

23. The method according to claim 22, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

24. The method according to claim 16, wherein the aripiprazole has a mean particle size of about 1 to about 30 microns.

25. A method of treating schizophrenia or bipolar I disorder in a patient comprising:

intramuscularly administering to the patient a long-acting suspension of an adjusted dose of aripiprazole of 300 mg or 200 mg and co-administering to the patient an oral antipsychotic

after a first administration of said adjusted dose of the long acting suspension,

wherein the dose is systemically released over a period of about one month,

the patient has concomitant use of a strong CYP2D6 or CYP3A4 inhibitor,

the oral antipsychotic is administered at least for 14 days after the first administration of the adjusted dose of the long-acting suspension,

the oral antipsychotic is 10 mg or 20 mg of aripiprazole, and

the step of intramuscularly administering is in the patient's deltoid or gluteal muscle.

26. The method according to claim 25, wherein a long-acting suspension comprises the adjusted dose of aripiprazole, a solvent for injection, and a vehicle for aripiprazole.

27. The method according to claim 26, the vehicle for aripiprazole comprises one or more of at least one suspending agent, at least one bulking agent, at least one buffer, and at least one pH adjusting agent.

28. The method according to claim 27, wherein the co-administration of the oral antipsychotic helps achieving a steady state level of aripiprazole after the first administration of the adjusted dose.

29. The method according to claim 28, wherein the suspending agent is carboxymethyl cellulose sodium and the bulking agent is mannitol.

30. The method according to claim 29, wherein the aripiprazole has a mean particle size of about 1 to about 30 microns.

(Ex. 9 (087 patent) at Claims 1-30).

## 2.    Specification

306.    The specification of the 087 patent is substantially the same as the specification of the 057 patent.

### 3.     **Prosecution History**

307.    U.S. Patent Application No. 17/304,606 ("the 606 application") (Ex. 10 (File Wrapper for the 606 application, hereinafter "087 PH")) was filed on June 23, 2021. The 606 application ultimately matured into the 087 patent.

308.    Finnegan LLP, including specifically Adriana L. Burgy, handled prosecution of the 606 application. (*See, e.g.*, Ex. 10 (087 PH), 06-23-21 Fee Transmittal Letter at 1).

309.    On June 23, 2021, Applicants filed a "Declaration (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet (37 CFR 1.76)" from named inventor Arash Raoufinia. (Ex. 10 (087 PH), 06-23-21 Raoufinia Declaration). The declaration was undated. (*Id.*). The declaration stated:

> I believe that I am the original inventor or an original joint inventor of a claimed invention in the application. I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

(*Id.*).

310.    On June 23, 2021, Applicants filed an Information Disclosure Statement. (Ex. 10 (087 PH), 06-23-21 Information Disclosure Statement).

311.    The Information Disclosure Statement cited several references, including the Abilify Maintena Label 2013 and Gopalakrishna. (Ex. 10 (087 PH), 06-23-21 Information Disclosure Statement).

312.    The Information Disclosure Statement did not identify the Clinical Pharmacology Review or any of the documents published in the "Drug Approval Package" for Abilify Maintena. (Ex. 10 (087 PH), 06-23-21 Information Disclosure Statement).

313.    On June 23, 2021, Applicants filed a Power of Attorney, which was signed by Masaki Sobe, Director, IP Department of Otsuka Pharmaceutical Co., Ltd.  (Ex. 10 (087 PH), 06-23-21 Power of Attorney).

314.    On June 23, 2021, Applicants filed a Preliminary Amendment.  (Ex. 10 (087 PH), 06-23-21 Preliminary Amendment).

315.    On July 19, 2021, the Examiner issued a Non-Final Rejection.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection).

316.    In the July 19, 2021 Non-Final Rejection, the Examiner rejected claims 21-25 and 30 as obvious over the combination of Kane and the Clinical Pharmacology Review.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4-5).

317.    In the July 19, 2021 Non-Final Rejection, the Examiner also rejected claims 26-29 and 31-35 as obvious over the combination of Kane and the Clinical Pharmacology Review in view of U.S. Patent Application Publication No. 2005/0148597 ("Kostanski").  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 5-7).

318.    In the July 19, 2021 Non-Final Rejection, the Examiner also rejected claims 36-40 and 45 as obvious over the combination of Kane and the Clinical Pharmacology Review.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 7-9).

319.    In the July 19, 2021 Non-Final Rejection, the Examiner also rejected claims 41-44 and 46-50 as obvious over the combination of Kane and the Clinical Pharmacology Review in view of Kostanski.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 9-11).

320.    In the July 19, 2021 Non-Final Rejection, the Examiner wrote that the Clinical Pharmacology Review was "disclosed to the public on 05/14/2012."  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4).

321.    During prosecution of the 087 patent, in the July 19, 2021 Non-Final Rejection, the Examiner relied on the Clinical Pharmacology Review to reject the pending claims. (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4-11).

322.    The July 19, 2021 Non-Final Rejection predated the issuance of the 553 patent.

323.    The July 19, 2021 Non-Final Rejection predated the filing of the 221 application.

324.    The July 19, 2021 Non-Final Rejection predated the issuance of the 547 patent.

325.    On October 18, 2021, Applicants submitted an Amendment/Request for Reconsideration After Non-Final Rejection. (Ex. 10 (087 PH), 10-18-21 Amendment/Request for Reconsideration). Therein, Applicants wrote:

> Regarding the secondary references of the Abilify [Maintena Pharmacology] Review and Kostanski, here, the Office merely finds those missing pieces in Kane in these cited references. As an initial matter, it is unclear what supports the Office's assertion that the line on page 1 of the Abilify [Maintena Pharmacology] Review, i.e., "OCP Required Inter-Division Briefing was held on May 14, 2012," constitutes its public disclosure date of the reference. . . . The Office fails to make . . . a showing that the date "OCP Required Inter-Division Briefing was held on May 14, 2012" is the date of public disclosure. As such, the Abilify [Maintena Pharmacology] Review cannot be relied upon as prior art.

(*Id.* at 13-14 (emphasis added)).

326.    On November 5, 2021, the PTO issued a Notice of Allowance. (Ex. 10 (087 PH), 11-05-21 Notice of Allowance). In the "Reasons for Allowance," the Examiner wrote:

> At the time of the invention, the claimed methodology was not anticipated in the prior art. The instant application is continuation of Application 14034727, now U.S. Patent 10,525,057. In the appeal decision of 03/12/2019, the Appellate judges overturned a prima facie case to reduce the long acting aripiprazole intramuscular suspension from 400 mg or 300 mg to 66%-75% of the equivalent dose to a patient who is a CYP2D6 poor metabolizer, as it is not obvious to adjust the dose of a long-acting, once a month injection as there is no way to reduce the amount of the drug that the patient is subject to over the period for which the IM depot is to last, and too high a dose could present serious disadvantages (page 8-9 of

PTAB decision of 03/12/2019). In the instant case, said 75% of the 400 mg dose of US Patent 10,525,057 is a 300 mg dose of the long acting aripiprazole intramuscular suspension, which is found within the instant claims.

(*Id.* at 3).

## III.   <u>INEQUITABLE CONDUCT</u>

327.   The Raoufinia Patents are generally directed to dose adjustments of aripiprazole depending on patients' CYP2D6 or CYP3A4 enzyme function and/or whether or not the patients are on CYP2D6 and/or CYP3A4 inhibitors or inducers.

328.   The Raoufinia Patents only issued, however, after Applicants misrepresented that Raoufinia had invented such dose adjustments, while concealing the fact that each was actually conceived of and developed by the FDA and then provided to Otsuka—as part of FDA review of Otsuka's product, Abilify Maintena—as the recommended doses.

329.   FDA conceived of, developed, and proposed to Otsuka at least the following dosing adjustments:

(1) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor <u>OR</u> a strong CYP3A4 inhibitor: Dose adjustment to 200 mg.

(2) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor <u>AND</u> a strong CYP3A4 inhibitor: Dose adjustment to 160 mg.

(3) For patients taking a CYP3A4 inducer: Avoid use.

(4) For patients known to be poor metabolizers of CYP2D6: Dose adjustment to 300 mg.

(Ex. 12 (Clinical Pharmacology Review) at 4 (Table 1); *id.* at 5-6 (Table 1)).

330.   Further, during prosecution of the Raoufinia Patents, in response to rejections from the PTO, Applicants made misrepresentations and omissions to the PTO regarding the eligibility of certain references and/or disclosures therein as prior art to the Raoufinia Patents, including at

least the following: Gopalakrishna; Abilify Maintena Label 2013; and Clinical Pharmacology Review.

331.    Applicants' misrepresentations and withholding of information during prosecution of the Raoufinia Patents were highly material and convinced the Examiner to withdraw rejections that Applicants could not otherwise have overcome.

332.    Applicants' misrepresentations and withholding of information during prosecution, to the extent such occurred during prosecution of the 057 patent, also carried over into and infected prosecution of each of the subsequent Raoufinia Patents.

333.    Had the PTO been presented with full and accurate information regarding inventorship of the Raoufinia Patents, including specifically that the dosing adjustments originated with FDA and not Raoufinia, the PTO would not have allowed at least some (if not all) of the issued claims of the Raoufinia Patents.

334.    Had the PTO evaluated the full scope of prior art, the PTO would not have allowed at least some (if not all) of the issued claims of the Raoufinia Patents.

335.    The single most reasonable inference able to be drawn from the evidence collected to date is that Applicants specifically intended to deceive the PTO with their misconduct.

### A.    Duty of Good Faith and Candor

336.    Arash Raoufinia, as the purported inventor of the Raoufinia Patents, owed a duty of good faith and candor to the PTO.

337.    The duty of good faith and candor required Raoufinia to disclose all information known to be material to him, and to not make false or misleading statements or misrepresentations during prosecution of the Raoufinia Patents.

338.    Otsuka retained outside counsel at the law firm of Cooley LLP to assist in the prosecution of at least the 057 patent.  On information and belief, the individuals directly responsible for such prosecution include at least Thomas A. Blinka and Raymond S. Parker, III.

339.    Messrs. Blinka and Parker and their colleagues at Cooley LLP, given such involvement in prosecution, owed a duty of good faith and candor to the PTO.

340.    The duty of good faith and candor required Messrs. Blinka and Parker and their colleagues at Cooley LLP to disclose all information known to be material, and to not make false or misleading statements or misrepresentations during prosecution of at least the 057 patent.

341.    Otsuka retained outside counsel at the law firm of Finnegan LLP to assist in the prosecution of at least the 803, 553, 547, and 087 patents.  On information and belief, the individuals directly responsible for such prosecution include at least Adriana L. Burgy.

342.    Ms. Burgy and her colleagues at Finnegan LLP, given such involvement in prosecution, owed a duty of good faith and candor to the PTO.

343.    That duty of good faith and candor required Ms. Burgy and her colleagues at Finnegan LLP to disclose all information known to be material, and to not make false or misleading statements or misrepresentations during prosecution of at least the 803, 553, 547, and 087 patents.

**B.    Materiality**

**1.    Applicants' Failure to Identify Inventors**

344.    During prosecution of the Raoufinia Patents, Arash Raoufinia repeatedly wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both." (Ex. 2 (057 PH), 09-24-13 Raoufinia Declaration; Ex. 4 (803 PH), 12-11-19 Raoufinia Declaration;

Ex. 6 (553 PH), 06-23-21 Raoufinia Declaration; Ex. 8 (547 PH), 08-27-21 Raoufinia Declaration; Ex. 10 (087 PH), 06-23-21 Raoufinia Declaration).

345.   Raoufinia further wrote that "[t]he dose adjustments in the ABILIFY MAINTENA package insert . . . were provided to [Otsuka] by myself and my coinventor, Robert McQuade." (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 7).

346.   However, as discussed above (*see* Section I.A), FDA's OCP Review Team contained inventors of the Raoufinia Patents.  It was the members of the OCP Review Team—not Raoufinia—who invented the claimed dose adjustments of the Raoufinia Patents.

347.   The contribution of FDA's OCP Review Team—i.e., conception of the claimed dose adjustments—was critical to the Raoufinia Patents, particularly when measured against the full scope of the invention.

348.   On information and belief, the claimed dose adjustments that were conceived of by FDA's OCP Review Team were clearly defined such that only ordinary skill was necessary to reduce the invention to practice without extensive research or experimentation.

349.   On information and belief, Otsuka adopted the claimed dose adjustments that were conceived of by FDA's OCP Review Team, incorporating them into the Abilify Maintena Label 2013 with no further modification and with no further testing.

350.   At the time he signed his September 24, 2013 Declaration during prosecution of the 057 patent, Raoufinia was not an "original" inventor of the invention claimed therein.   On information and belief, Raoufinia knew that his certification that he was the "original" inventor was false, and that the statement was a highly material misrepresentation to the PTO.

351.    Raoufinia failed to disclose to the PTO that the OCP Review Team (i.e., at least Huixia Zhang, Satjit Brar, Mike Pacanowski, Atul Bhattaram, and/or Hao Zhu) were either the true inventors of the Raoufinia Patents, or at the very least were co-inventors.

352.    On information and belief, Raoufinia deliberately misrepresented that he invented the Raoufinia Patents, when FDA's OCP Review Team contained the proper inventors or co-inventors.

353.    On information and belief, Raoufinia acted in bad faith or with deceptive intent regarding his improper inventorship, and as discussed below, these misrepresentations were also made to improperly overcome material prior art.

354.    As discussed above (*see* Section I.A), around June 4, 2012, the OCP Review Team found Otsuka's proposed labeling for Abilify Maintena to be unacceptable and recommended several changes to the proposed labeling.   These included (for patients known to be poor metabolizers of CYP2D6 and/or for patients taking concomitant CYP2D6 inhibitors, CYP3A4 inhibitors, and/or CYP3A4 inducers long-term (i.e., greater than 14 days)):

(1) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor OR a strong CYP3A4 inhibitor:  Dose adjustment to 200 mg.

(2) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor AND a strong CYP3A4 inhibitor:  Dose adjustment to 160 mg.

(3) For patients taking a CYP3A4 inducer:  Avoid use.

(4) For patients known to be poor metabolizers of CYP2D6:  Dose adjustment to 300 mg.

(Ex. 12 (Clinical Pharmacology Review) at 4 (Table 1); *id.* at 5-6 (Table 1)).

355.    Otsuka adopted at least one of the OCP Review Team's dosing recommendations, unchanged, as reflected in the Abilify Maintena Label 2013.  (Ex. 19 (Abilify Maintena Label 2013) at 1, 5).

356.    At least one of the OCP Review Team's dose adjustment recommendations is also reflected, again unchanged, in the claims of the Raoufinia Patents.

357.    For example, claim 1 of the 057 patent, claim 19 of the 803 patent, claims 1 and 7 of the 547 patent, and claims 16 and 25 of the 087 patent all recite doses of "66% . . . of a 300" mg dose (i.e., 198 mg), "198 mg," or "200 mg" when a patient is also using a strong CYP2D6 or CYP3A4 inhibitor.  Claim 6 of the 803 patent and claims 16 and 25 of the 553 patent are similar and recite doses of "200 mg" when a patient "is a CYP2D6 poor metabolizer concomitantly taking a CYP3A4 inhibitor."  This is encompassed by one of the labeling recommendations from FDA's OCP Review Team—listed above as (1)—and thus at least some members of the OCP Review Team are either the true inventors of these claims (and claims dependent therefrom), or at the very least co-inventors.

358.    Further, claim 15 of the 057 patent, claim 23 of the 803 patent, claims 1 and 10 of the 553 patent, and claim 7 of the 547 patent all recite doses of "53% of a 300 mg" dose (i.e., 159 mg), "159 mg," or "160 mg" when a patient is also using both a CYP2D6 inhibitor and a CYP3A4 inhibitor.  This is also encompassed by one of the labeling recommendations from FDA's OCP Review Team—listed above as (2)—and thus at least some members of the OCP Review Team are either the true inventors of these claims (and claims dependent therefrom), or at the very least co-inventors.

359.    Further, claims 1, 7, and 16 of the 547 patent all recite "administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer" or "use of the CYP3A4

135

inducer is avoided after an administration of the long-acting suspension."   This is also encompassed by one of the labeling recommendations from FDA's OCP Review Team—listed above as (3)—and thus at least some members of the OCP Review Team are either the true inventors of these claims (and claims dependent therefrom), or at the very least co-inventors.

360.   Further, claim 9 of the 057 patent, claim 1 of the 803 patent, and claims 1 and 10 of the 087 patent all recite doses of "75% of a . . . 400 mg" dose (i.e., 300 mg) or "300 mg" when a patient is a "CYP2D6 poor metabolizer."   This is also encompassed by one of the labeling recommendations from FDA's OCP Review Team—listed above as (4)—and thus at least some members of the OCP Review Team are either the true inventors of these claims (and claims dependent therefrom), or at the very least co-inventors.

361.   Applicants failed to disclose to the PTO that these claimed dosing adjustments were provided to Otsuka by the FDA's OCP Review Team.

362.   Raoufinia did not invent all "dose adjustments in the ABILIFY MAINTENA package insert," as his April 2, 2014 Declaration falsely represents.   (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 7).

363.   Raoufinia was mis-joined as an inventor to the Raoufinia Patents because he did not invent the claimed dose adjustments that he claimed to have invented.

364.   The FDA's OCP Review Team, or members thereof, were non-joined as inventor(s) to the Raoufinia Patents because the members of FDA's OCP Review Team were not properly credited as inventors for their contributions.

365.   Applicants also misrepresented the type of information that would allegedly be necessary to arrive at the claimed dosing adjustments.

366.    For example, in his 2014 Declaration, Raoufinia wrote that "[w]ithout detailed knowledge of how quickly the long-acting dosage form is released into the bloodstream and metabolized, there is no predictable way to determine, from dose adjustments suitable for quite different short-acting dosage forms, what dose adjustments would be appropriate for long-acting dosage forms."  (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 18).

367.    Applicants relied on this assertion from Raoufinia in writing that "without empirical knowledge of the release and clearance characteristics of the long-acting composition over the period of time between doses, there is no predictable way to *a priori* establish the appropriate dose for patients with reduced drug clearance as a result of reduced enzyme function (*e.g.*, due to CYP2D6 poor metabolizer status and/or administration of a CYP2D6 and/or CYP3A4 inhibitor) . . . ."  (Ex. 2 (057 PH), 04-03-14 Amendment/ Request for Reconsideration at 22).

368.    Applicants also relied on this assertion from Raoufinia in writing that "any experimentation to adjust the dose, based on the recommendations of the [Abilify Label 2012], would not only be impracticable, but undue."  (Ex. 2 (057 PH), 04-03-14 Amendment/ Request for Reconsideration at 23).

369.    As another example, in his 2016 Supplemental Declaration, Raoufinia wrote that "without the conducting of an appropriately designed clinical trial using the long acting aripiprazole suspension formulation in an enzyme impaired patient population one would not have known what, or if any, dose adjustment needed to be made."  (Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 5).  He also wrote that "the particular claimed adjustment to the normal dose regimen could not have been predicted based on the cited art, . . . but was only determined from the analysis of the clinical trial results."  (*Id.*).

370.    Applicants relied on these assertions from Raoufinia in writing that "the presently claimed dose adjustments could not have been predicted from the prior art of record, more particularly the art related to short acting aripiprazole dosage forms, but would only have been discernible from the analysis of clinical trial results for the long acting injectable aripiprazole dosage form." (Ex. 2 (057 PH), 02-17-16 Supplemental Response at 6).

371.    Applicants falsely suggested to the PTO that the only way to arrive at the claimed dosing adjustments was with detailed, empirical knowledge of the performance of the long-acting dosage form, such as with clinical trial results.

372.    On information and belief, however, prior to FDA approval of Abilify Maintena and the filing of the 057 patent, Otsuka had not conducted clinical trials to develop the dosing adjustment information on the specific patient populations recited by the claims of the Raoufinia Patents.

373.    Rather, as discussed above (*see* Section I.A), FDA approval of Abilify Maintena was based on predictive modeling and simulation of existing data.  And much of this work was conducted by FDA, including the OCP Review Team, and/or other third parties and is not even attributable to Raoufinia.  Applicants did not disclose these third parties' contributions to the PTO.

374.    The inequitable conduct regarding improper inventorship infected at least one independent claim of all the Raoufinia Patents.  Had the PTO known about the proper inventors or co-inventors, the PTO would not have issued any of the Raoufinia Patents.  Therefore, the Raoufinia Patents should be held unenforceable for inequitable conduct.

## 2.    Applicants' Misrepresentations and Omissions Regarding Prior Art

375.    On information and belief, Raoufinia was aware of Gopalakrishna prior to the filing of the 727 application on September 24, 2013.

376.    On information and belief, Applicants were aware of Gopalakrishna prior to the filing of the 727 application on September 24, 2013.

377.    On information and belief, Otsuka was aware of Gopalakrishna prior to the filing of the 727 application on September 24, 2013.

378.    On information and belief, Raoufinia was aware of the Abilify Maintena Label 2013 prior to the filing of the 727 application on September 24, 2013.

379.    On information and belief, Applicants were aware of the Abilify Maintena Label 2013 prior to the filing of the 727 application on September 24, 2013.

380.    On information and belief, Otsuka was aware of the Abilify Maintena Label 2013 prior to the filing of the 727 application on September 24, 2013.

381.    On information and belief, Raoufinia was aware of the Drug Approval Package for Abilify Maintena, including specifically the Clinical Pharmacology Review, prior to the filing of the 727 application on September 24, 2013.

382.    On information and belief, Applicants were aware of the Drug Approval Package for Abilify Maintena, including specifically the Clinical Pharmacology Review, prior to the filing of the 727 application on September 24, 2013.

383.    On information and belief, Otsuka was aware of the Drug Approval Package for Abilify Maintena, including specifically the Clinical Pharmacology Review, prior to the filing of the 727 application on September 24, 2013.

384.    Gopalakrishna, Abilify Maintena Label 2013, and the Drug Approval Package for Abilify Maintena, including specifically the Clinical Pharmacology Review, were publicly available prior to September 24, 2013, yet not disclosed to the PTO by Applicants at the time of the filing of the 727 application.

385.    Gopalakrishna, Abilify Maintena Label 2013, and the Drug Approval Package for Abilify Maintena, including specifically the Clinical Pharmacology Review, were not identified by Applicants in the initial Information Disclosure Statement submitted during prosecution of the Raoufinia Patents.  (Ex. 2 (057 PH), 09-24-13 Information Disclosure Statement).

386.    During prosecution of the Raoufinia Patents, Gopalakrishna was initially identified by the Examiner on February 3, 2014, during prosecution of the 057 patent, in rejecting the then-pending claims.  (*E.g.*, Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 7).  The Abilify Maintena Label 2013 was then identified by Applicants in response, on April 3, 2014, in conjunction with arguments for the exclusion of Gopalakrishna as prior art.  (*E.g.*, Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 13-14).

387.    During prosecution of the Raoufinia Patents, the Clinical Pharmacology Review was initially identified by the Examiner on December 17, 2021, during prosecution of the 087 patent, in rejecting the then-pending claims.  (*E.g.*, Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4).

388.    The Clinical Pharmacology Review was the only document published in the "Drug Approval Package" for Abilify Maintena that was before the PTO during prosecution of the Raoufinia Patents.

389.    During prosecution of the Raoufinia Patents, in response to rejections from the PTO, Applicants made multiple misrepresentations and/or omissions to the PTO regarding the eligibility of Gopalakrishna, Abilify Maintena Label 2013, and the Clinical Pharmacology Review as prior art to the Raoufinia Patents.

**i.      Gopalakrishna**

390.    Applicants' false statements and/or omissions regarding Otsuka's alleged work on Abilify Maintena prevented Gopalakrishna from being considered as prior art, despite the Examiner finding (during prosecution of the 057 patent) that Gopalakrishna would have anticipated and/or rendered claims obvious.

391.    The Examiner initially rejected then-pending claims during prosecution of the 057 patent as anticipated by Gopalakrishna and as obvious over Gopalakrishna in view of the Abilify Label 2012.  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 7-20).

392.    In response, Applicants wrote that the disclosures from Gopalakrishna relied upon by the Examiner were not properly prior art because they were obtained from the Abilify Maintena Label 2013, the subject matter of which had at least been indirectly obtained from the inventors. (*E.g.*, Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 13-14, 19). Applicants did not mention the FDA's OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically their contribution to the dose adjustments in the Abilify Maintena Label 2013 and Gopalakrishna.

393.    Applicants also submitted the 2014 Declaration from Raoufinia, in which he stated that he "had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA," and that "[t]he dose adjustments in the [Abilify Maintena Label 2013] . . . as referenced in Table 2 of Gopalakrishna . . . were provided to [Otsuka] by myself and my coinventor, Robert McQuade."  (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶¶ 2, 7). Raoufinia did not mention the FDA's OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically their contribution to the dose adjustments in the Abilify Maintena Label 2013 and Gopalakrishna.

394.    Thereafter, the Examiner accepted Applicants' argument that certain disclosures of Gopalakrishna were not prior art, but still rejected then-pending claims as anticipated by or obvious over other disclosures of Gopalakrishna.  (Ex. 2 (057 PH), 05-08-14 Final Rejection at 8-9, 18).

395.    In response, Applicants again wrote (in multiple submissions) that the additional disclosures from Gopalakrishna were not properly prior art because they were obtained from the Abilify Maintena Label 2013, the subject matter of which had at least been indirectly obtained from the inventors.  (*E.g.*, Ex. 2 (057) PH, 06-11-15 Applicant Initiated Interview Summary; Ex. 2 (057 PH), 06-08-15 Request for Continued Examination at 11-13; Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 5 n.1).  Applicants did not mention the FDA's OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically their contribution to the dose adjustments in the Abilify Maintena Label 2013 and Gopalakrishna.

396.    Thereafter, the Examiner never again included Gopalakrishna in any rejections based on the prior art.  Due to Applicants' misrepresentations and/or omissions during prosecution, the Examiner did not consider Gopalakrishna as prior art.

397.    Applicants also submitted the 2014 Supplemental Declaration from Raoufinia, in which he stated that the claimed dose adjustments "could not have been predicted," but required an "analysis of the clinical trial results."  (Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 5).  Raoufinia did not mention the FDA's OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically that FDA predicted the dose adjustments based on predictive modeling and simulation of existing data.

398.    Gopalakrishna is prior art to the Raoufinia Patents.

399.    The Raoufinia Patents would not have issued but for Raoufinia's material misrepresentations regarding his and Otsuka's work and material omissions regarding the FDA OCP Review Team's contribution to the claimed dose adjustments.  These misrepresentations and omissions were the only means by which Applicants could overcome anticipation and obviousness rejections that rendered all pending claims invalid.

400.    Others were involved in perpetuating this fraud, including at least prosecution counsel and their law firms.  They also provided material misrepresentations and omissions to the PTO regarding Raoufinia and Otsuka's work and the FDA OCP Review Team's contribution to the claimed dose adjustments.  They also never corrected Raoufinia's material misrepresentations and omissions to the PTO.

### ii.    Abilify Maintena Label 2013

401.    Applicants' false statements and/or omissions regarding Otsuka's alleged work on Abilify Maintena prevented the Abilify Maintena Label 2013 from being considered as prior art, despite the Examiner finding (during prosecution of the 057 patent) that Gopalakrishna—which Applicants argued was derived from the Abilify Maintena Label 2013—would have anticipated and/or rendered claims obvious.

402.    As discussed above (*see* Section III.B.2.i), Applicants, including Raoufinia, wrote that the disclosures from Gopalakrishna were not properly prior art because they were obtained from the Abilify Maintena Label 2013, the subject matter of which had at least been indirectly obtained from the inventors.  Applicants, including Raoufinia, did not mention the FDA OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically their contribution to the dose adjustments in the Abilify Maintena Label 2013.

403.    The Examiner never included the Abilify Maintena Label 2013 in any rejections based on the prior art.  Due to Applicants' misrepresentations and/or omissions during prosecution, the Examiner did not consider the Abilify Maintena Label 2013 as prior art.

404.    The Abilify Maintena Label 2013 is prior art to the Raoufinia Patents.

405.    The Raoufinia Patents would not have issued but for Raoufinia's material misrepresentations regarding his and Otsuka's work and material omissions regarding the FDA OCP Review Team's contribution to the claimed dose adjustments.  These misrepresentations and omissions were the only means by which Applicants could overcome anticipation and obviousness rejections that rendered all pending claims invalid.

406.    Others were involved in perpetuating this fraud, including at least prosecution counsel and their law firms.  They also provided material misrepresentations and omissions to the PTO regarding Raoufinia and Otsuka's work and the FDA OCP Review Team's contribution to the claimed dose adjustments.  They also never corrected Raoufinia's material misrepresentations and omissions to the PTO.

### iii.    Clinical Pharmacology Review

407.    Applicants' false statements and/or omissions regarding the public availability of the Clinical Pharmacology Review prevented the reference from being considered as prior art, despite the Examiner finding (during prosecution of the 087 patent) that claims were obvious over the Clinical Pharmacology Review in combination with other references.

408.    The Examiner rejected then-pending claims during prosecution of the 087 patent as obvious over the Clinical Pharmacology Review in combination with other references.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4-11).  In doing so, the Examiner wrote that the Clinical Pharmacology Review was "disclosed to the public on 05/14/2012."  (*Id.* at 4).

409.   In response, Applicants argued that May 14, 2012 was not the date of public disclosure, and therefore the Clinical Pharmacology Review could not be relied upon as prior art. (Ex. 10 (087 PH), 10-18-21 Amendment/Request for Reconsideration at 13-14).

410.   But the Clinical Pharmacology Review was publicly available by April 11, 2013, which predates the earliest filing date of the Raoufinia Patents.  Applicants, including Raoufinia, did not mention that the Clinical Pharmacology Review was publicly available by April 11, 2013.

411.   Also, the Clinical Pharmacology Review was drafted by FDA's OCP Review Team (not Raoufinia and/or Otsuka).  Applicants, including Raoufinia, did not mention the FDA OCP Review Team's work on the clinical pharmacology sections of Abilify Maintena, including specifically their contribution to the dose adjustments in the Abilify Maintena Label 2013.

412.   Thereafter, the PTO issued a Notice of Allowance.  (Ex. 10 (087 PH), 11-05-21 Notice of Allowance).   Due to Applicants' misrepresentations and/or omissions during prosecution, the Examiner dropped its consideration of the Clinical Pharmacology Review as prior art.

413.   The Clinical Pharmacology Review is prior art to the Raoufinia Patents.

414.   The Raoufinia Patents would not have issued but for Raoufinia's material misrepresentations and/or omissions regarding the availability of the Clinical Pharmacology Review as prior art.  These misrepresentations and omissions were the only means by which Applicants could overcome obviousness rejections that rendered all pending claims invalid.

415.   Others were involved in perpetuating this fraud, including at least prosecution counsel and their law firms.  They also provided material misrepresentations and omissions to the PTO regarding the availability of the Clinical Pharmacology Review as prior art.  They also never corrected Raoufinia's material misrepresentations and omissions to the PTO.

416.    Had the PTO been provided with the proper date of the Clinical Pharmacology Review, Applicants would have been confronted with statements from FDA in the Clinical Pharmacology Review that the claimed dose limitations were invented by FDA's OCP Review Team.  Had this occurred, the PTO would not have granted the 087 patent, because the Clinical Pharmacology Review showed that FDA's OCP Review Team was either a true inventor or a co-inventor of the Raoufinia Patents.  This would have also caused the PTO to reconsider the previously-issued Raoufinia Patents and decide they were also improperly granted to Otsuka.

* * *

417.    Applicants' misrepresentations and omissions were highly material to prosecution of the Raoufinia Patents.

418.    For example, false affidavits or declarations submitted to secure patentability are *per se* material.  As such, at least the following misrepresentations from Raoufinia's Declarations are material:

- "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application."  (Ex. 2 (057 PH), 09-24-13 Raoufinia Declaration; Ex. 4 (803 PH), 12-11-19 Raoufinia Declaration; Ex. 6 (553 PH), 06-23-21 Raoufinia Declaration; Ex. 8 (547 PH), 08-27-21 Raoufinia Declaration; Ex. 10 (087 PH), 06-23-21 Raoufinia Declaration).

- "I also had the responsibility to draft the clinical pharmacology sections related to ABILIFY MAINTENA, a long-acting aripiprazole suspension intended for monthly administration."  (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 2).

- "The dose adjustments in the [Abilify Maintena Label 2013] . . . as referenced in Table 2 of Gopalakrishna . . . were provided to [Otsuka] by myself and my coinventor, Robert McQuade."  (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 7).

146

- "Without detailed knowledge of how quickly the long-acting dosage form is released into the bloodstream and metabolized, there is no predictable way to determine, from dose adjustments suitable for quite different short-acting dosage forms, what dose adjustments would be appropriate for long-acting dosage forms." (Ex. 2 (057 PH), 04-02-14 Raoufinia Declaration at ¶ 18).

- "[W]ithout the conducting of an appropriately designed clinical trial using the long acting aripiprazole suspension formulation in an enzyme impaired patient population one would not have known what, or if any, dose adjustment needed to be made." (Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 5).

- "[T]he particular claimed adjustment to the normal dose regimen could not have been predicted based on the cited art, particularly art related to short-acting, daily dosed aripiprazole dosage forms, but was only determined from the analysis of the clinical trial results." (Ex. 2 (057 PH), 02-17-16 Raoufinia Declaration at ¶ 5).

419.    Further, if Applicants had not misrepresented the nature of their work—and omitted discussion of the FDA's OCP Review Team's work—on the clinical pharmacology sections of Abilify Maintena, including specifically the FDA's OCP Review Team's contribution to the dose adjustments in the Abilify Maintena Label 2013 and Gopalakrishna, the PTO would have considered Gopalakrishna and the Abilify Maintena Label 2013 as prior art and would not have allowed the claims of the Raoufinia Patents.

420.    The claims of the Raoufinia Patents are anticipated by and/or rendered obvious over Gopalakrishna and Abilify Maintena Label 2013.  Gopalakrishna and Abilify Maintena Label 2013 are therefore material prior art.

421.    Gopalakrishna is material prior art, as also shown by the Examiner rejecting then-pending claims based on Gopalakrishna before Applicants misled the Examiner into determining that Gopalakrishna was not prior art.  (Ex. 2 (057 PH), 02-03-14 Non-Final Rejection at 7-20; Ex. 2 (057 PH), 05-08-14 Final Rejection at 8-36).   In view of Applicants' arguments that the disclosures of Gopalakrishna were obtained from the Abilify Maintena Label 2013 (*e.g.*, Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 13-14, 19; Ex. 2 (057 PH), 06-11-15 Applicant Initiated Interview Summary; Ex. 2 (057 PH), 06-08-15 Request for Continued Examination at 11-13; Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 5 n.1)), Abilify Maintena Label 2013 is material prior art for the same reasons.

422.    Gopalakrishna is material prior art, as also shown by Applicants admitting that certain claim limitations of then-pending claims were disclosed by Gopalakrishna.  (Ex. 2 (057 PH) 08-27-15 Supplemental Accelerated Examination Support Document at 13-24).   In view of Applicants' arguments that the disclosures of Gopalakrishna were obtained from the Abilify Maintena Label 2013 (*e.g.*, Ex. 2 (057 PH), 04-03-14 Amendment/Request for Reconsideration at 13-14, 19; Ex. 2 (057 PH), 06-11-15 Applicant Initiated Interview Summary; Ex. 2 (057 PH), 06-08-15 Request for Continued Examination at 11-13; Ex. 2 (057 PH), 08-27-15 Supplemental Accelerated Examination Support Document at 5 n.1)), Abilify Maintena Label 2013 is material prior art for the same reasons.

423.    Further, if Applicants had informed the PTO that the Clinical Pharmacology Review was publicly available by April 11, 2013 and was drafted by FDA's OCP Review Team, the PTO would have considered the Clinical Pharmacology Review as prior art and would not have allowed the claims of the 087 patent.  The PTO would also have reconsidered previously-issued Raoufinia Patents and decided they were improperly granted to Applicants.

424.    The claims of the Raoufinia Patents are anticipated by and/or rendered obvious over the Clinical Pharmacology Review.  The Clinical Pharmacology Review is therefore material prior art.

425.    The Clinical Pharmacology Review is material prior art, as also shown by the Examiner rejecting then-pending claims based on Clinical Pharmacology Review before Applicants misled the Examiner into determining that Clinical Pharmacology Review was not prior art.  (Ex. 10 (087 PH), 07-19-21 Non-Final Rejection at 4-11).

426.    Further, if Applicants had not misrepresented the nature of their work—and omitted discussion of the FDA's OCP Review Team's work—on the clinical pharmacology sections of Abilify Maintena, including specifically that the claimed dosing adjustments were, in fact, provided to Otsuka by the FDA's OCP Review Team, the PTO would not have allowed the claims of Raoufinia Patents due to improper inventorship and/or derivation.

427.    Further, even without Gopalakrishna, the Abilify Maintena Label 2013, and the Clinical Pharmacology Review, the Examiner still rejected then-pending claims as obvious during prosecution, requiring Applicants to seek relief from the PTAB.  (*E.g.*, Ex. 2 (057 PH), 03-10-16 Final Rejection; Ex. 2 (057 PH), 06-10-16 Notice of Appeal Filed).  The PTAB reversed the Examiner's obviousness rejections—again, without the benefit of Gopalakrishna, the Abilify Maintena Label 2013, and the Clinical Pharmacology Review—but emphasized the claimed dose adjustments (which the PTAB did not know the FDA's OCP Review Team had conceived) in doing so.  (Ex. 2 (057 PH), 03-12-19 PTAB Decision at 4-10).

428.    The PTAB also specifically relied on the false and/or misleading statements from Raoufinia's April 2, 2014 Declaration regarding the lack of predictability or ability to optimize dosing for a long-acting form of aripiprazole, as opposed to the shorter-acting versions relied on

149

from the prior art.  (Ex. 2 (057 PH), 03-12-19 PTAB Decision at 8-9).  The PTAB found the declaration "persuasive" and wrote that "[d]eclaratory evidence as to issues of fact is entitled to substantial weight."  (*Id.* at 9).  In contrast, the PTAB remarked that Applicants' remaining arguments, "[f]or the most part, . . . amount to mere attorney argument, which is generally unconvincing in the face of the logically-arranged factual foundation supporting the Examiner's prior art rejection."  (*Id.* at 8).

429.    Had the PTAB known of the inventorship information concealed by Applicants, it would have had access to Gopalakrishna, the Abilify Maintena Label 2013, and the Clinical Pharmacology Review.  The PTAB also would have had access to truthful information regarding the modeling upon which FDA approval was sought and obtained (in place of actual clinical studies).  With this information, the PTAB would not have allowed some (if not all) of the issued claims.

430.    Had the PTAB known of the misleading nature of the assertions in Raoufinia's Declaration (and of the history of false representations and concealment already infecting the record), this would have undermined the weight placed on Raoufinia's Declaration and further caused the PTAB to not allow some (if not all) of the issued claims.

### C.    <u>Intent to Deceive</u>

431.    The single most reasonable inference able to be drawn from the evidence collected to date is that Applicants, including Raoufinia, made a deliberate decision to withhold the proper inventorship and misrepresent the scope of inventorship to defeat various material invalidity arguments.  These deliberate decisions were so material that, if any of them had been provided to the PTO, the Raoufinia Patents would not have been allowed.

432.    For example, Raoufinia submitted several declarations during prosecution of the Raoufinia Patents claiming, *inter alia*, to be the sole inventor of the claims; to have drafted and/or

provided the clinical pharmacology sections related to Abilify Maintena, including specifically the claimed dose adjustments reflected therein; and that there was no way to predict the claimed dose adjustments without detailed knowledge of the long-acting dosage form of aripiprazole and/or clinical trials related thereto.  On information and belief, these statements were knowingly false. On information and belief, Raoufinia deliberately misrepresented that he invented the Raoufinia Patents, when in fact (as he knew) the FDA's OCP Review Team provided the claimed dosing adjustments to Otsuka.

433.    Further, during prosecution of the 057 patent, the Examiner rejected pending claims based on Gopalakrishna multiple times.  On information and belief, Applicants therefore knew that Gopalakrishna and the Abilify Maintena Label 2013 were material to patentability.  Applicants argued, however, that the disclosures in Gopalakrishna and Abilify Maintena Label 2013 were not properly prior art because they had been obtained from the inventors.  Applicants were only able to make this argument because they withheld the fact that it was the FDA's OCP Review Team— not Raoufinia—who provided the claimed dosing adjustments (likewise reflected in the disclosures of the Abilify Maintena Label 2013 and Gopalakrishna) to Otsuka.

434.    Further, during prosecution of the 087 patent, the Examiner rejected pending claims as obvious based on the Clinical Pharmacology Review.  On information and belief, Applicants therefore knew that the Clinical Pharmacology Review was material to patentability.  Applicants argued, however, that the Clinical Pharmacology Review was not properly prior art, as it was not publicly available as of the date identified by the Examiner—i.e., May 14, 2012.  But Applicants withheld the fact that the Clinical Pharmacology Review was publicly available before the priority date (and thus was prior art), at least as early as April 11, 2013.

435.    Further, as part of the FDA review process for Abilify Maintena, Otsuka provided its proposed label for Ability Maintena to FDA.  The FDA did not approve of the proposed label, and instead the OCP Review Team proposed multiple changes to the proposed labeling for Abilify Maintena, including various dosing adjustments.  But Applicants repeatedly represented to the PTO during prosecution of the Raoufinia Patents that the claimed dosing adjustments were a result of Raoufinia and/or Otsuka's work, when in fact it was the FDA's OCP Review Team who contributed the claimed dosing adjustments.

436.    Further, Applicants' misrepresentations and omissions were a pattern of conduct spanning several years—at least from the September 24, 2013 filing date of the 727 application until issuance of the 087 patent on August 2, 2022—multiple patent applications, and multiple prosecution counsel.

437.    Further, Applicants' misconduct—rather than being an isolated incident—included several false or misleading declarations submitted by Raoufinia, arguments and statements misrepresenting the nature of Raoufinia and/or Otsuka's involvement in development of the claimed dosing adjustments, withholding the fact that it was the FDA's OCP Review Team who contributed the claimed dosing adjustments, and misleading statements regarding the public availability of the Clinical Pharmacology Review.

438.    The single most reasonable inference to draw from Applicants' conduct during prosecution of the 057 patent is that Applicants knew that Gopalakrishna (and thus the Abilify Maintena Label 2013) disclosed the claimed dose adjustments; knew the claims would not be allowed if Gopalakrishna remained prior art; and thus intentionally misrepresented the scope and nature of Raoufinia's purported contribution while simultaneously failing to disclose it was the FDA's OCP Review Team who contributed the claimed dosing adjustments—this in order to

deceive the PTO, overcome and/or prevent prior art rejections, and ensure that inventorship was maintained solely by personnel with obligations of assignment to Otsuka.

439.    The single most reasonable inference to draw from Applicants' conduct during prosecution of the 087 patent is that Applicants knew that the Clinical Pharmacology Review disclosed the claimed dose adjustments; knew the claims would not be allowed if the Clinical Pharmacology Review remained prior art; and thus intentionally misled the Examiner into believing the Clinical Pharmacology Review was not prior art—this in order to deceive the PTO, overcome and/or prevent prior art rejections, and ensure that inventorship was maintained solely by personnel with obligations of assignment to Otsuka.

### D.    Infectious Unenforceability

440.    The inequitable conduct regarding the Raoufinia Patents would have prevented any of the Raoufinia Patents from being issued for the reasons stated above.  The inequitable conduct has infected all the Raoufinia Patents, and thus all Raoufinia Patents are unenforceable.

441.    The Raoufinia Patents all share the same title, inventor, abstract, and specification.

442.    The Information Disclosure Statements for the 803, 553, 547, and 087 patents cite to the list of documents of record during prosecution of the 057 patent.

443.    The Notices of Allowance for the 803, 553, 547, and 087 patents cite back to prosecution of the 057 patent.

444.    The Raoufinia Patents are all family members, and are all continuations that ultimately descend from the 057 patent.

445.    The Raoufinia Patents are all in the Orange Book for Abilify Maintena.

446.    Abilify Maintena is discussed in Gopalakrishna, the Abilify Maintena Label 2013, and the Clinical Pharmacology Review.

447.     In view of the foregoing facts, the Raoufinia Patents are highly inter-related and bear an immediate and necessary relation to the inequitable conduct plaguing any of the Raoufinia Patents (but notably the 057 patent) due to the misrepresentations and omissions regarding inventorship and material prior art, such that any inequitable conduct committed during prosecution has infected subsequent patents.  All of the Raoufinia Patents are unenforceable pursuant to the doctrine of infectious unenforceability.

## COUNT XIV

## (Declaratory Judgment of Unenforceability of the 057, 803, 553, 547, and 087 Patents Due to Improper Inventorship)

448.     Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

449.     Because fact discovery is ongoing and Apotex Inc. has not finished its investigation into Plaintiffs' documents or deposed Plaintiffs' witnesses, Apotex Inc. provides the following statement of its counterclaims, in part, on information and belief.

450.     The Raoufinia Patents are unenforceable for improper inventorship.

451.     Chapter 2157 of the Manual of Patent Examining Procedure states: "[W]here it is clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship under 37 CFR 1.48, [PTO] personnel should reject the claims under 35 U.S.C. 101 and 35 U.S.C. 115.

452.     35 U.S.C. § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

453. 35 U.S.C. 115(a) states: "An application for patent that is filed under section 111(a) . . . shall include, or be amended to include, the name of the inventor for any invention claimed in the application."

454. 35 U.S.C. 116(a) states: "When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath . . . ."

455. The Raoufinia Patents fail to meet these statutory requirements because, to the extent the Raoufinia Patents claim any inventive subject matter, such invention was not made by the sole named inventor, Arash Raoufinia, or at least not solely.

456. On information and belief, documents produced by Plaintiffs in related litigations, including specifically the Mylan Litigation, will provide further evidence that the Raoufinia Patents are unenforceable due to improper inventorship.

457. A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the unenforceability of the Raoufinia Patents that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

458. The Raoufinia Patents are unenforceable due to improper inventorship.

459. Apotex Inc. is entitled to a judicial declaration that the Raoufinia Patents are unenforceable due to improper inventorship.

## I.   IMPROPER INVENTORSHIP

460. As discussed above (*see* Count XIII, Section I.A), the FDA's OCP Review Team contained original inventors or original joint inventors of the Raoufinia Patents.

461. Applicants, including Raoufinia, failed to identify to the PTO that the FDA's OCP Review Team were either the true inventors of the Raoufinia Patents, or were true co-inventors of the Raoufinia Patents.

462.    On information and belief, Applicants, including Raoufinia, deliberately misrepresented that Raoufinia invented the Raoufinia Patents, when the FDA's OCP Review Team contained the true inventors or co-inventors of the Raoufinia Patents.

463.    On information and belief, the claimed dose adjustments that were conceived of by FDA's OCP Review Team were clearly defined such that only ordinary skill was necessary to reduce the invention to practice without extensive research or experimentation.

464.    On information and belief, Otsuka adopted the claimed dose adjustments that were conceived of by FDA's OCP Review Team, incorporating them into the Abilify Maintena Label 2013 with no further modification and with no further testing.

465.    The FDA's OCP Review Team provided a specific, settled idea that solved the problem at hand, which was ensuring proper dosing in specific patient populations.

466.    The FDA's OCP Review Team provided specific dose adjustments tailored to certain patient populations, and faulted Otsuka for missing critical data regarding certain patient populations.

467.    The FDA's OCP Review Team did not merely suggest a result to be accomplished, but provided the means of accomplishing it: specific dose adjustments for specific patient groups.

468.    The contribution of FDA's OCP Review Team—i.e., conception of the claimed dose adjustments—was critical to the Raoufinia Patents, particularly when measured against the full scope of the invention.

469.    The dose adjustments conceived of by the FDA's OCP Review Team were expressly incorporated into at least one independent claim of each of the Raoufinia Patents, with no further modification by Applicants.

470.    Approximately 15 months after the FDA's OCP Review Team provided its labeling changes, Applicants began prosecution of the Raoufinia Patents, and claimed that Raoufinia had invented the dose adjustments that were, in fact, conceived of the FDA's OCP Review Team.

471.    The dose adjustments conceived of by the FDA's OCP Review Team were incorporated, unchanged, into the claims of the Raoufinia Patents, just as they had been incorporated, unchanged into the Abilify Maintena Label 2013.

### A.    Material Misrepresentations with Intent to Deceive

472.    On information and belief, Applicants, including Raoufinia, made material misrepresentations to the PTO with the intent to deceive the PTO regarding inventorship of the Raoufinia Patents.

473.    During prosecution of the 057 patent, on or about September 24, 2013, Raoufinia wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both."  (Ex. 2 (057 PH), 09-24-13 Raoufinia Declaration).

474.    But it was the FDA's OCP Review Team that provided the claimed dose adjustments.  Specifically, on or about June 4, 2012, the OCP Review Team found Otsuka's proposed labeling for Abilify Maintena to be unacceptable and recommended several changes to the proposed labeling.  These included (for patients known to be poor metabolizers of CYP2D6 and/or for patients taking concomitant CYP2D6 inhibitors, CYP3A4 inhibitors, and/or CYP3A4 inducers long-term (i.e., greater than 14 days)):

(1) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor OR a strong CYP3A4 inhibitor:  Dose adjustment to 200 mg.

(2) For patients taking the 300 mg dose of Abilify Maintena concomitantly with a strong CYP2D6 inhibitor <u>AND</u> a strong CYP3A4 inhibitor:  Dose adjustment to 160 mg.

(3) For patients taking a CYP3A4 inducer:  Avoid use.

(4) For patients known to be poor metabolizers of CYP2D6:  Dose adjustment to 300 mg.

(Ex. 12 (Clinical Pharmacology Review) at 4 (Table 1); *id.* at 5-6 (Table 1)).

475.    Otsuka incorporated the dose adjustments that were provided by the FDA's OCP Review Team, unchanged, into the Abilify Maintena Label 2013, which published on February 28, 2013.

476.    Both the FDA's labeling recommendations (provided on June 4, 2012) and the Abilify Maintena Label 2013 (published on February 28, 2013) predated prosecution of the Raoufinia Patents.

477.    Applicants also incorporated the dose adjustments provided by the FDA's OCP Review Team, unchanged, into at least one independent claim of each of the Raoufinia Patents.

478.    The FDA's OCP Review Team thus contributed to the conception of the subject matter of at least one claim of each of the Raoufinia Patents.

479.    Raoufinia was mis-joined as an inventor to the Raoufinia Patents because he did not invent the claimed dose adjustments that he claimed to have invented.

480.    The FDA's OCP Review Team, or members thereof, were non-joined as inventor(s) to the Raoufinia Patents because the members of FDA's OCP Review Team were not properly credited as inventors for their contributions.

481.    If the PTO had been presented with full and accurate information regarding inventorship of the claimed subject matter during prosecution of the Raoufinia Patents, the Raoufinia Patents would not have been granted.

482.    On information and belief, Applicants, including Raoufinia, deliberately concealed from the PTO that the FDA's OCP Review Team—and not Raoufinia—provided the dose adjustments in the Abilify Maintena Label 2013 and the claims of the Raoufinia Patents.

483.    During prosecution of the 057 patent, on or about September 24, 2013; during prosecution of the 803 patent, on or about December 11, 2019; during prosecution of the 553 patent, on or about June 23, 2021; during prosecution of the 547 patent, on or about August 27, 2021; and during prosecution of the 087 patent, on or about June 23, 2021, Raoufinia wrote: "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.  I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both." (Ex. 2 (057 PH), 09-24-13 Raoufinia Declaration; Ex. 4 (803 PH), 12-11-19 Raoufinia Declaration; Ex. 6 (553 PH), 06-23-21 Raoufinia Declaration; Ex. 8 (547 PH), 08-27-21 Raoufinia Declaration; Ex. 10 (087 PH), 06-23-21 Raoufinia Declaration).

484.    At the time he signed these declarations during prosecution of the Raoufinia Patents, Raoufinia was not an "original" inventor of the invention(s) claimed therein.  On information and belief, Raoufinia knew that his certifications that he was the "original" inventor were false, and that the statements were highly material misrepresentations to the PTO.

485.    These declarations were unmistakably false and constitute egregious misconduct before the PTO.  The declarations are therefore *per se* material to the patentability Raoufinia Patents.

486.    On information and belief, Raoufinia knowingly and with specific intent to deceive the PTO, falsely represented to the PTO in these declarations that he was the "original" inventor of the subject matter claimed therein.

487.    At no time during prosecution of the Raoufinia Patents did Applicants, including Raoufinia, inform the PTO that Raoufinia did not invent the claimed dose adjustments.

488.    Likewise, at no time during prosecution of the Raoufinia Patents did Applicants, including Raoufinia, inform the PTO that the FDA's OCP Review Team had invented certain claim elements of the Raoufinia Patents, including certain dose adjustments.

489.    On information and belief, Applicants, including Raoufinia, withheld this information from the PTO because its disclosure would have proven that Raoufinia was not the original inventor of the Raoufinia Patents.

490.    The single most reasonable inference to be drawn from these facts is that Applicants, including Raoufinia, made deliberate misrepresentations about inventorship with the specific intent to deceive the PTO regarding the inventorship of the Raoufinia Patents.

491.    On information and belief, Applicants, including Raoufinia, deliberately concealed from the PTO that the FDA's OCP Review Team conceived of the claims of the Raoufinia Patents.

492.    Had the PTO known of the FDA's OCP Review Team's conception of the claims of the Raoufinia Patents, the PTO would not have granted the Raoufinia Patents to Applicants.

**B.    <u>Infectious Unenforceability</u>**

493.    The inequitable conduct due to improper inventorship regarding the Raoufinia Patents would have prevented any of the Raoufinia Patents from being issued for the reasons stated above.  The inequitable conduct due to improper inventorship has infected all the Raoufinia Patents, and thus all Raoufinia Patents are unenforceable.

494.    The Raoufinia Patents all share the same title, inventor, abstract, and specification.

495.    The Information Disclosure Statements for the 803, 553, 547, and 087 patents cite to the list of documents of record during prosecution of the 057 patent.

496.    The Notices of Allowance for the 803, 553, 547, and 087 patents cite back to prosecution of the 057 patent.

497.    The Raoufinia Patents are all family members, and are all continuations that ultimately descend from the 057 patent.

498.    The Raoufinia Patents are all in the Orange Book for Abilify Maintena.

499.    In view of the foregoing facts, the Raoufinia Patents are highly inter-related and bear an immediate and necessary relation to the inequitable conduct plaguing any of the Raoufinia Patents (but notably the 057 patent) due to improper inventorship, such that any inequitable conduct committed during prosecution has infected subsequent patents.  All of the Raoufinia Patents are unenforceable pursuant to the doctrine of infectious unenforceability.

## COUNT XV

### (Declaratory Judgment of Invalidity of the 057, 803, 553, 547, and 087 Patents Due to Improper Inventorship)

500.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

501.    Because fact discovery is ongoing and Apotex Inc. has not finished its investigation into Plaintiffs' documents or deposed Plaintiffs' witnesses, Apotex Inc. provides the following statement of its counterclaims, in part, on information and belief.

502.    As discussed above (*see* Count XIII, Section I.A), it was the members of the FDA's OCP Review Team—and not Raoufinia—who conceived of the claimed dose adjustments.

503.    Because Raoufinia is the only inventor listed on the Raoufinia Patents, the Raoufinia Patents are invalid for improper inventorship.

504.    On information and belief, documents produced by Plaintiffs in related litigations, including specifically the Mylan Litigation, will provide further evidence that the Raoufinia Patents are invalid due to improper inventorship.

505.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the Raoufinia Patents that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

506.    The Raoufinia Patents are invalid due to improper inventorship for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 115, and/or 116.

507.    Apotex Inc. is entitled to a judicial declaration that the Raoufinia Patents are invalid due to improper inventorship.

## COUNT XVI

### (Declaratory Judgment of Invalidity of the 057, 803, 553, 547, and 087 Patents Due to Derivation)

508.    Apotex Inc. realleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

509.    Because fact discovery is ongoing and Apotex Inc. has not finished its investigation into Plaintiffs' documents or deposed Plaintiffs' witnesses, Apotex Inc. provides the following statement of its counterclaims, in part, on information and belief.

510.    As discussed above (*see* Count XIII, Section I.A), it was the members of the FDA's OCP Review Team—and not Raoufinia—who conceived of the claimed dose adjustments, then communicated those dose adjustments to Otsuka.

511.    On information and belief, Raoufinia did not independently conceive of the claimed dosing adjustments.

512.    Because Raoufinia is the only inventor listed on the Raoufinia Patents, the Raoufinia Patents are invalid for derivation.

513.    On information and belief, documents produced by Plaintiffs in related litigations, including specifically the Mylan Litigation, will provide further evidence that the Raoufinia Patents are invalid due to derivation.

514.    A present, genuine, and justiciable controversy exists between Apotex Inc. and Plaintiffs regarding, *inter alia*, the invalidity of the Raoufinia Patents that is of sufficient immediacy and reality to warrant the issuance of a Declaratory Judgment.

515.    The Raoufinia Patents are invalid due to derivation for failure to comply with one or more of the requirements in 35 U.S.C. §§ 101, 115, and/or 116.

516.    Apotex Inc. is entitled to a judicial declaration that the Raoufinia Patents are invalid due to derivation.

## **PRAYER FOR RELIEF**

WHEREFORE, Apotex Inc. respectfully requests judgment in its favor and against Plaintiffs:

(a)    declaring that the manufacture, use, sale, offer for sale, importation, and/or marketing of the ANDA Products has not infringed, does not infringe, and would not—if made, used, sold, offered for sale, imported, or marketed—infringe, either directly or indirectly, any valid and/or enforceable claim of the patents-in-suit, either literally or under the doctrine of equivalents;

(b)    declaring that the claims of the Patents-in-Suit are invalid;

(c)    declaring that the claims of the 057, 803, 553, 547, and 087 patents are unenforceable;

(d)    ordering that the Complaint be dismissed with prejudice, and judgment entered in favor of Apotex Inc.;

(e)    declaring this case exceptional, and awarding Apotex Inc. its reasonable attorneys' fees and costs of these Counterclaims under 35 U.S.C. § 285; and

(f)    awarding Apotex Inc. such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Apotex Inc. hereby demands a jury trial on all issues so triable.

Dated:  December 15, 2025

Respectfully submitted,

*s/John C. Philips, Jr.*
John C. Philips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington DE, 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

Of Counsel:

William A. Rakoczy (admitted *pro hac vice*)
Joseph T. Jaros (admitted *pro hac vice*)
Greg L. Goldblatt (admitted *pro hac vice*)
Dylan G. Sacenti (admitted *pro hac vice*)
Sarah ML Wilkening (admitted *pro hac vice*)
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

*Attorneys for Defendants Apotex Inc., Apotex Corp.,*
*Apotex Pharmachem Inc. and*
*Aposherm Delaware Holdings Corporation*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on December 15, 2025, a true and correct copy of **DEFENDANTS' AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT** was electronically filed, and copies were served by ECF on all counsel of record in this matter.

Dated: December 15, 2025                    _s/John C. Phillips, Jr._
                                            John C. Philips, Jr. (#110)